# EXHIBIT 4

**In Re:**

*Platinum Partners Value Arbitrage Fund, L.P. v. Michael Goldberg*

*16-12925-scc & 18-01650-scc*

*December 8, 2021*

*eScribers, LLC*

*(973) 406-2250*

*operations@escribers.net*

*www.escribers.net*

*To purchase copies of this transcript, please contact us by phone*



Min-U-Script® with Word Index

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  - - - - - - - - - - - - - - - - - - - -x

5  In the Matter of:

6  PLATINUM PARTNERS VALUE ARBITRAGE        Lead Case No.

7  FUND L.P. AND PLATINUM PARTNERS          16-12925-scc

8  VALUE ABRITRAGE INTERMEDIATE FUND,

9          Debtor.

10  - - - - - - - - - - - - - - - - - - - -x

11  PLATNIMUM PARTNERS VALUE ARBITRAGE FUND L.P.,

12          Plaintiff,                     Adv. Proc. No.

13  v.                                     18-01650-scc

14  MICHAEL GOLDBERG,

15          Defendant.

16  - - - - - - - - - - - - - - - - - - - -x

17                United States Bankruptcy Court

18                One Bowling Green

19                New York, New York

20

21                December 8, 2021

22                11:00 AM

23  B E F O R E:

24  HON. SHELLEY C. CHAPMAN

25  U.S. BANKRUPTCY JUDGE

1

2   Adversary Proceeding: 18-01650-scc Platinum Partners Value

3   Arbitrage Fund L.P. v. Goldberg

4   Doc. #38 Oral Argument on the Summary Judgement Motions

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20   Transcribed by:  Ellen S. Kolman

21   eScribers, LLC

22   352 Seventh Avenue, Suite #604

23   New York, NY 10001

24   (973)406-2250

25   operations@escribers.net

1

2  A P P E A R A N C E S (All present by video or telephone):

3  HOLLAND & KNIGHT LLP

4        Attorneys for Debtor

5        31 West 52nd Street

6        12th Floor

7        New York, NY 10019

8

9  BY:   ROBERT BURNS, ESQ.

10

11

12  LAW OFFICE OF MARK R. KOOK

13        Attorneys for Dr. Michael Goldberg

14        1180 Avenue of the Americas

15        New York, NY 10036

16

17  BY:   MARK R. KOOK, ESQ.

18

19

20

21

22

23

24

25

1                       P R O C E E D I N G S

2           THE COURT:  Good morning, everyone.  This is Judge

3    Chapman.  We're here this morning for a hearing on cross-

4    motions for summary judgment in the Platinum Partners Value

5    Arbitrage Fund v. Michael Goldberg adversary proceeding.

6    Adversary proceeding number 18-01650.

7           This hearing is being conducted entirely

8    telephonically via the CourtSolutions platform and a recording

9    of the hearing will be made.  No private recordings are

10   permitted.

11          I do have a list of those of you who have registered

12   to participate this morning.  Please identify yourself for the

13   record when you speak, and identify the party on whose behalf

14   you are appearing.

15          I see on my dashboard that I have Mr. Burns from

16   Holland & Knight.  Are you there, sir?

17          MR. BURNS:  Good morning, Your Honor.

18          THE COURT:  Good morning.

19          And I have Mr. Kook on behalf of Dr. Goldberg.

20          MR. KOOK:  Good morning, Your Honor.

21          THE COURT:  Good morning.  Okay, so first of all, I

22   want to start by a bit of an apology.  Your papers, at least

23   the latter filings, had the misfortune of coming in right when

24   the pandemic was rather disrupting life.  And we had ceased

25   physically going to the courtroom as of March 9th, 2020.  And

1   then the remainder of the papers came in, I believe, in April

2   and May.  And frankly, no one was there to the extent that you

3   had sent copies to chambers.  And as you can imagine, we have a

4   very large docket, and unless things are specifically brought

5   to our attention we find it impossible to keep track of

6   everything.  So I'm glad that you ultimately reached out

7   because this had simply gotten lost in the fog of COVID, and

8   we're sorry about that.  But obviously, once we were aware that

9   it was still out there, we turned our attention to it and here

10  we are today.  So apologies for the delay.

11          Life has been anything but normal for the past twenty

12  months, and looks like it's going to not be normal for a while

13  yet.  And thank you all to whoever it was that put together the

14  binders that I've worked with.

15          So on that point, I have spent a lot of time with your

16  submissions and I don't need to hear -- I'm sure you've

17  prepared extensively for today.  I really don't need to hear

18  summaries or reiterations of what's in the pleadings, but I'm

19  happy to give you each fifteen minutes to make whatever points

20  you'd like to make to me, highlights, things you'd like to

21  underscore, et cetera, and I will give you that time, frankly,

22  uninterrupted so that you can make whatever presentation you'd

23  like.  So Mr. Burns, would you like to go first?

24          MR. BURNS:  Absolutely, Your Honor, and thank you.

25          Robert Burns, on behalf of the foreign representatives

1   of Platinum Partners Value Arbitrage Fund LP in liquidation in

2   the Cayman Islands.  And I'll refer to that as PPVA throughout

3   this presentation.

4           Your Honor, there's lots of noise in the summary

5   judgment papers, as one would expect from a defendant on a

6   summary judgment motion.  But I'd like to spend the fifteen

7   minutes that Your Honor has graciously allowed trying to cut

8   through a little bit of that noise and focus on a few key

9   undisputed facts.

10          The timeline is extremely instructive here.  And

11  frankly, we think it's all you need to know to decide this

12  case.

13          I'll note at the outset that August 23rd, 2016 is the

14  operative line in the sand here.  That was the date on which

15  the winding up petition for PPVA was filed in the Cayman court,

16  and that was the date, according to our unrebutted submission

17  on Cayman law, when PPVA's existing management lost the reins

18  over PPVA's property, and all property of PPVA became subject

19  to the jurisdiction of the Cayman court and the Cayman court's

20  liquidators.  So that's the date on which we're asking this

21  Court to extend comity to the Cayman law and to the Cayman

22  court.

23          After Goldberg left Platinum in November 2013, or

24  December 2013, the -- we have two term sheets between Platinum

25  Management and Goldberg.  The first from 2014, the second from

1    2015.  There's a lot that's been said about what's in and
2    what's not in these terms sheets, but I think it's important to
3    focus on some of the key language in those term sheets.

4         They say that Platinum -- in this case, Platinum
5    Management, wishes, subject to the terms and conditions
6    described herein, to cause certain of the investment funds that
7    were under its management -- and that includes PPVA -- to
8    transfer to Dr. Goldberg certain positions that were held by
9    them as of December 31st, 2013.  And there's no dispute here,
10   Your Honor, that among those positions were certain Series B
11   convertible preferred shares of Navidea that subsequently were
12   converted into the warrants that are now at issue.

13        So what are the "terms and conditions" to which these
14   transfers would be "subject"?  For our purposes, there are two
15   in particular.  First, the notes.

16        This was never intended to be, nor is it on the face
17   of these agreements, an outright transfer of the listed
18   securities to Goldberg.  The term sheets say that Goldberg,
19   quote, shall issue seven-year notes -- and they're referred to
20   as securities loan notes -- to the Platinum funds that would be
21   transferring the securities to him.  And those notes would be
22   for the fair market value of those securities as of December
23   2013, which for the securities we're fighting about here was
24   eleven million dollars.

25        So Goldberg would give a note transferring to

1    Platinum -- to the transferring Platinum fund in this case,

2    PPVA, an eleven-million-dollar note.  He'd get the securities,

3    in this case the warrants.  And once he paid off the note, he'd

4    get the securities free and clear.  But until that happened,

5    until he paid off the note, whatever Goldberg did with respect

6    to those securities -- if he sold them, if he got dividends, et

7    cetera, the benefits would flow to the noteholders to prepay

8    the notes.

9           Which raises the second key condition here, the

10   protections accorded to the Platinum entities until such time

11   as Goldberg prepaid -- repaid the notes, and those protections

12   were stated in the term sheets.  They needed to be deposited

13   into a segregated brokerage account which was to be subject to

14   a securities account control agreement in favor of Platinum

15   Management or its affiliates.  And those terms of that

16   securities control agreement needed to be reasonably acceptable

17   to Platinum.

18          Why was that important?  Well, it's because the

19   Platinum entities that were transferring these securities were

20   intended to have a first priority protected security interest

21   in them.  Many of these securities, including the securities --

22   the warrants we're talking about here, were certificated

23   securities.  They were paper documents with wet ink signatures.

24   And so for the Platinum entities to preserve and protect their

25   security interest in these securities, they needed to be in

1    protections -- in accounts with suitable protections on them.

2            So to be very clear at the outset, Your Honor, the

3    transfers under this term sheet were never intended, nor are

4    they on the face of the agreement to be outright transfers to

5    Goldberg.  Goldberg would issue the note at the full value of

6    these securities.  He would hold them in a segregated account.

7    And once he paid them off -- effectively, once he bought them

8    at whatever price they were trading at the end of 2013, he

9    would own them free and clear and he would get the upside.

10            August 2015, PPVA and Navidea enter into a Securities

11   Exchange agreement that preferred stock becomes the warrants

12   that are now at issue.  Mr. Goldberg was a member of Navidea's

13   board at the time.  There are clear statements in the

14   underlying documents that PPVA was the legal and beneficial

15   owner of these preferred shares that were to become warrants.

16   Goldberg never raised an objection to that.  He argues

17   variously that he thought it was a mistake or that he didn't

18   think it was a big deal because he thought he was the rightful

19   owner of the preferred shares.  But the fact of the matter is,

20   he was a director of Navidea at the time.  He never raised an

21   objection.  He never said the warrants to be issued to him and

22   not to PPVA.

23            So in August 2015, the warrants get issued.  They're

24   held in PPVA's name.  They're issued in PPVA's name.  They're

25   deposited in PPVA's custodial vault.  And they're they sit to

1    this day.

2            2016, the house of cards that is Platinum began to

3    collapse and Goldberg starts seeing the writing on the wall and

4    becomes newly concerned about his term sheets.  But then

5    nothing happens until the line in the sand that I referred to

6    earlier on August 23rd, 2016 when the winding up petition is

7    filed in the Caymans.

8            So what do we know about where things stood as of that

9    moment in time?  Well, the warrants remained in PPVA's

10   custodial account and in PPVA's name.  Goldberg had not yet

11   created the segregated account with a securities account

12   control agreement to Platinum's satisfaction.  We know that

13   because he and his bankers were continuing to negotiate the

14   terms of such an agreement as late as late September 2016.  And

15   we know that we've never -- not on PPVA's side, not on

16   Goldberg's side, not on anyone's side -- seen a single actual

17   note issued by Goldberg to any Platinum entities.

18           So the undisputed factual record is that as of the

19   moment in which the Cayman liquidation proceedings commenced,

20   PPVA had not yet transferred possession of the warrants to

21   Goldberg, and Goldberg hadn't yet satisfied at least some of

22   the terms and conditions of the term sheet.

23           The months that followed, or the two months that

24   followed, there were a flurry of activities by Goldberg post-

25   liquidation to try to get any -- a deal -- any deal done.

1      We know that on October 11th, 2016, Goldberg had a

2  conversation with David Steinberg of Platinum.  Steinberg told

3  Goldberg that in light of the Cayman liquidation, PPVA --

4      THE COURT:  Having said I wasn't -- having said I

5  wasn't going to interrupt you, I am now going -- I am now going

6  to --

7      MR. BURNS:  Okay.  Yes, Your Honor.

8      THE COURT:  -- interrupt you to ask a question.

9      MR. BURNS:  Okay.

10     THE COURT:  Because one of the -- one of the things

11 that -- I'm trying to find the exact place.  Give me a moment.

12     One of the things that Dr. Goldberg says about what

13 you've been discussing is that -- and this is in his brief at

14 page 14 -- that Platinum never came to him with actual stock to

15 deliver until October 2016, at which time the account was in

16 place.

17     He argues that he opened the brokerage account

18 immediately upon Platinum finally coming to him with the

19 Navidea securities in hand to physically deliver to him.

20     So that statement is completely at odds with basically

21 everything that you've said, that nothing had occurred that

22 established -- that satisfied the conditions, proceeded to put

23 it in technical terms such that he was entitled to the

24 securities.

25     So could you respond directly to the allegation or to

1    the statement that Dr. Goldberg makes that PPVA delivered stock

2    to him in October, which is after the commencement of the

3    winding up?

4          MR. BURNS:  Well, Your Honor, I think the answer is

5    PPVA at all times had possession of these warrants.  They were

6    issued in 2015 by Navidea following Navidea's conversion of the

7    Series E preferred stock into warrants.  They were issued in

8    PPVA's name.  They were sent in paper form to PPVA.  We have a

9    paper trail establishing that PPVA put those warrants into its

10   custodial account, and there they sat -- and there they sit.

11         The fact of the matter is that --

12         THE COURT:  But you haven't answered my question.  Did

13   Platinum, whoever that was, go to Dr. Goldberg in October and

14   physically deliver Navidea's securities to him?

15         MR. BURNS:  Oh, certainly not, Your Honor, and that's

16   because as of that -- as of that time, prior to September of

17   2016, there was no -- there was no control account.  There was

18   no segregated brokerage account with security protections

19   acceptable to Platinum, and we know that because that didn't

20   happen until the end of September.

21         THE COURT:  But --

22         MR. BURNS:  Go ahead, Your Honor.

23         THE COURT:  So is it PPVA's position that said Dr.

24   Goldberg -- that that's a -- charitably call it a misstatement?

25   Is Goldberg -- is that not a truthful statement that Dr.

1  Goldberg is making, or is it?

2         MR. BURNS:  Well, I don't want to accuse my adversary

3  of being untrue.

4         THE COURT:  I know.  I understand.

5         MR. BURNS:  But I --

6         THE COURT:  It's a rather important point, because if

7  that -- and this is where summary judgment is so tricky because

8  obviously, as you know I can't resolve disputed issues of fact.

9  And to the extent that that is a true statement that Dr.

10  Goldberg is making in his papers, then that creates a counter-

11  narrative to what you're saying.

12         MR. BURNS:  What I can tell you, Your Honor, and I

13  hope this answers your question to -- I can tell you that the

14  unrebutted testimony of Platinum's former CFO, Mr. SanFilippo,

15  who his testimony is various places throughout the papers, but

16  he testified that -- he testified to a couple of salient points

17  on this question.

18         One, the PPVA warrants were in physical form.  They

19  sat in PPVA's custodial accounts.  They were always there for

20  the asking.

21         But two, the reason why they had not transferred to

22  Dr. Goldberg and the reason why they would not transfer to Dr.

23  Goldberg is because Dr. Goldberg hadn't done what he promised

24  to do as a condition precedent to receiving those warrants, and

25  that is to, at a minimum, set up the segregated account with

1    controlled protections to protect PPVA's security interest in

2    these securities.

3           So who knows what would have happened.  I presume what

4    would have happened had Goldberg actually done what he said he

5    would do in the term sheets and they actually issued the notes

6    and actually set up the controlled brokerage account, that

7    Platinum would have, or PPVA would have turned the warrants

8    over to him.  But the fact of the matter is, he did not do so

9    pre-liquidation.  And that was the reason that was testified by

10   Mr. SanFilippo, and I don't believe that's been rebutted here,

11   that was the reason why those securities did not transfer to

12   Goldberg prior to the commencement of the liquidation.

13          THE COURT:  So let me just pause, because this is a

14   very important point.

15          Mr. Kook?

16          MR. KOOK:  Yes, Your Honor.

17          THE COURT:  Can you tell me what's going on here?

18          MR. KOOK:  What document are you looking at, Your

19   Honor?

20          THE COURT:  On that point, in your papers, you say Dr.

21   Goldberg says they brought him -- they physically came to him

22   with the Navidea securities in hand.  Is that a truthful

23   statement?

24          MR. KOOK:  I believe it is, Your Honor.  I was just

25   trying to find where you --

1          THE COURT:  Hold on.  Believing it is doesn't really

2     cut it.  It either is or it isn't.  It's not whether it's a

3     little true.

4          MR. KOOK:  I agree with Your Honor.  I'm just trying

5     to see where Your Honor's quoting from.

6          THE COURT:  I'm sorry?

7          MR. KOOK:  Your Honor, I think Your Honor said she was

8     quoting from page 14 of a document?

9          THE COURT:  I believe that it's the brief at page 14

10    and then the brief at page 28.  It's your memorandum of law in

11    support of the motion for summary judgment and in opposition to

12    the plaintiff's motion for summary judgment.

13         MR. KOOK:  On page 14?

14         THE COURT:  It's the second full paragraph on page 14

15    that says, "Platinum never came to Dr. Goldberg with actual

16    stock to deliver until October 2016, at which time the account

17    was in place", and then it cites to the Goldberg affirmation at

18    paragraph 43.

19         MR. KOOK:  That is a true statement Your Honor.  To

20    the best of my knowledge, that is a true statement.

21         THE COURT:  Well, we seem to have a disputed issue of

22    fact.

23         You understand that this is very serious, and to the

24    extent that -- and maybe we should look at the affirmation,

25    because what he says is that Platinum never came to Dr.

1    Goldberg until October 2016.  So Platinum is not a person.

2    There would need to be a person.  So were this to go to trial,

3    Dr. Goldberg would have to -- would be called upon to testify

4    to this, and he would have to name the person.

5           MR. KOOK:  Yes, Your Honor.

6           THE COURT:  And if it turned out to not be true, would

7    be rather serious.

8           MR. BURNS:  Your Honor, I --

9           THE COURT:  Because I --

10          MR. BURNS:  Sorry.

11          THE COURT:  -- in October 2016, the winding up was

12   already taking place.  So it seems, on its face, curious that

13   as of that point, that at that time, the segregated account was

14   in place.

15          Let me go back to you, Mr. Burns.

16          MR. BURNS:  Yes, Your Honor, if I could just say a few

17   more -- a few more points on the discussion we've just been

18   having?

19          It is undisputed that the segregated account with

20   protections reasonably acceptable to Platinum was not in place

21   any earlier than the end of September 2016.  So that's a month

22   following the commencement of the Cayman litigation.  It

23   just -- it hadn't gotten done, and there's a conclusive paper

24   trail to that effect.  And there's also the conclusive

25   testimony and the unrebutted testimony of Platinum's former CFO

1   that -- so the warrants were issued by Navidea in 2015 pursuant

2   to the exchange agreement.  They were physical pieces of paper.

3   They at all relevant times sat in PPVA's custody and PPVA's

4   custodial vault.  But that the reason why those stocks were not

5   -- or why those securities were not transferred to Goldberg is

6   because he had not, until the end of September, done what he

7   was required to do under the term sheets as a condition

8   precedent, which is set up the segregated accounts with a

9   sufficient control protection agreement.

10          So the question of who came to whom is, I would

11  submit, a little beside the point to the question of had Mr.

12  Goldberg satisfied his conditions precedent to Platinum's

13  obligation to perform, i.e., deliver the stock.

14          Platinum was at all times ready, willing, and able to

15  deliver the stock.  How do we know that?  Well, because the

16  physical documents, the physical warrants were at all times,

17  since 2015, within Platinum's possession, custody, or control.

18  They were in their custodial vault.

19          THE COURT:  Can you talk about the purported

20  assignment of the warrant to Dr. Goldberg in October of 2016?

21          MR. BURNS:  Absolutely, Your Honor.

22          The circumstances were such that it all happened --

23  let me pull my notes here for a moment.

24          THE COURT:  Obviously, I'm interrupting you, so I'm

25  going to extend the fifteen minutes because we've got some

1    threads here that I need to run to ground.

2           MR. BURNS:  Oh, absolutely, Your Honor.  I'd much

3    rather -- I'd much rather answer your questions than say my

4    piece.

5           So October 11th, 2016, two things happened that are of

6    particular interest here.

7           We have an email from Goldberg himself reflecting the

8    conversation that he had had with David Steinberg, who was a

9    portfolio manager at Platinum.  And Mr. Steinberg told Mr.

10   Goldberg on that day, October 11th, 2016, that in light of the

11   Cayman liquidation proceedings, everything was frozen.

12   Platinum couldn't transfer the warrants or shares to Goldberg.

13          What happens then?  Well, literally an hour or two

14   later that same day, Goldberg cut Steinberg out of the

15   conversation, reaches out directly to Mark Nordlicht, who was

16   Platinum's former chief investment officer and now a convicted

17   felon due to his work in Platinum, he told -- Goldberg told

18   Nordlicht to just go ahead and execute the assignment form that

19   was on a copy of the warrant that Mr. Goldberg provided to Mr.

20   Nordlicht.

21          Goldberg prepared the form.  He put in the actual

22   date.  So October 11th, 2016.  Gave it to Nordlicht for his

23   signature.  Nordlicht said, whoa, hang on a second there, this

24   should actually be dated a year earlier.  Make of that what you

25   will, but the clear intimation is let's try to get this -- have

1  a date that's before the commencement of the Cayman liquidation

2  proceedings.

3           Goldberg sends the assignment form back to Nordlicht

4  undated.  Tells Nordlicht, put in whatever date you want.

5  Nordlicht signs it.  Puts in a date of October 2015 rather than

6  October 2016.  He sends it to Navidea and Goldberg takes it

7  from there.

8           Goldberg is at that point the CEO of Navidea, and

9  although the warrants themselves calls for the physical

10  surrender of the actual paper warrants to Navidea to facilitate

11  the transfer and reissue of the warrants, Goldberg, as Navidea

12  CEO, got the job done.  Got the warrants immediately reissued

13  in his name rather than PPVA's name, and a month or so later

14  executed them and got the five million and change shares of

15  common stock.

16           THE COURT:  And so no notes?

17           MR. BURNS:  No notes.  We've never seen a note, Your

18  Honor.  We've never -- we've scoured --

19           THE COURT:  So never seen a note, and I mean, and he

20  never paid for those shares, right?

21           MR. BURNS:  Yeah, we absolutely -- we've never seen --

22  there should be, according to the -- according to the term

23  sheet themselves, the warrants had a value as of the end of

24  December 2013 of about eleven million dollars, which means that

25  PPVA should be sitting on a note of about eleven million

1  dollars, a seven million -- a seven-year note for eleven

2  million dollars from Goldberg for these.  We've never seen it.

3  Goldberg's never produced it.  Goldberg, in fact, testified at

4  his deposition that he hadn't signed an actual note, and then

5  sort of proceeded to bob and weave for the coming months to

6  say, well, maybe I did sign a note.  Maybe I don't remember if

7  I signed a note.  Maybe I don't disagree that I signed a note.

8  Maybe the term sheets themselves are the notes and I never

9  needed to issue a note.  But we've never seen a note.

10         THE COURT:  Okay, thanks.  Could you pause for a

11  second?

12         Mr. Kook?

13         MR. KOOK:  Yes, Your Honor.

14         THE COURT:  So backdating the assignment is a bad

15  thing.

16         MR. KOOK:  The assignment was backdated, and I haven't

17  found any law that says the document can't be backdated to the

18  date that the event actually took place.  Nordlicht sent an

19  email --

20         THE COURT:  What event actually took -- what event

21  actually took place?

22         MR. KOOK:  That on --

23         THE COURT:  You have a -- you have a --

24         MR. KOOK:  -- 2015, when Navidea went to list the

25  securities on the Tel Aviv Stock Exchange, there was a rule

1  that they couldn't list more than one type of security.  So

2  they didn't list the security -- the convertible stock and they

3  changed it into warrants, and Goldberg --

4          THE COURT:  All of this is completely beside the

5  point.  There was no assignment that took place on the date --

6  on the assignment that was actually signed.

7          So two guys got together in October of 2016 knowing

8  that the train had left the station because the winding up had

9  already commenced, and one guy realized that, gee, it wouldn't

10 really work to put the accurate date on it because the curtain

11 had dropped on the winding up.  So between the two of them,

12 they just said, whatever, let's put an earlier date on it so it

13 looks okay.

14         MR. KOOK:  All the --

15         THE COURT:  Not only is that not okay, and not only is

16 it a question of that you can't find a case that says that bad,

17 that's a crime.

18         MR. KOOK:  Your Honor, there was no -- there was no

19 dispute between the parties to the transaction that the

20 ownership of these securities was transferred to Dr. Goldberg

21 in March of 2014.

22         We have the --

23         THE COURT:  What is -- wait, wait.  What is it -- I

24 don't know what you're talking about.  You are skipping --

25         MR. KOOK:  According to the --

1            THE COURT:  You are skipping -- you are skipping

2     everything.  You are skipping the fact that there were actual

3     documents that provided for the issuance of notes by Dr.

4     Goldberg.  Those notes -- if you -- those notes don't exist.

5     If you -- if --

6            MR. KOOOK:  Your Honor?

7            THE COURT:  The notes don't exist.  And apparently

8     your client admits that he never issued the notes and has said

9     that, well, the term sheet's a note.  I mean, a term sheet is

10    not a note and a security agreement.

11           MR. KOOK:  Your Honor, two points, if I may?

12           One, the term sheets can be a note.  The term sheets

13    say that no further documentation is necessary.  But more

14    importantly, Mr. SanFilippo testified --

15           THE COURT:  No, no, no, no, no.

16           MR. KOOK:  Mr. SanFilippo testified that he saw the

17    signed note and the PP -- Platinum Partners and PPVA both

18    issued statements that Dr. Goldberg owned the securities

19    well -- years before the --

20           THE COURT:  Your client --

21           MR. KOOK:  -- the dissolution.

22           THE COURT:  There's an email that says that your

23    client -- in which your client says, "Here it is.  Put in

24    whatever date you want."

25           MR. KOOK:  I believe that says --

1            THE COURT:  You can look at the Goldberg affirmation,

2    Exhibit 11, or the --

3            MR. KOOK:  I would need the --

4            THE COURT:  -- Burns declaration, Exhibit 13.  You

5    guys get together, realize they have a problem.  Your client

6    decides, all right, well, we'll draft up an assignment.

7    Nordlicht realizes it's a problem, and your guy tells him,

8    well, let's just solve the problem; here, put in whatever date

9    you want.  It's an email on October 14 from Goldberg to

10   Nordlicht.

11           I've been doing this for a long time, Mr. Kook.

12           MR. KOOK:  I understand, Your Honor.

13           THE COURT:  I'm sure that that's not advice that you

14   would give a client.  In my many Chapter 11 cases, where, for

15   example, the automatic stay comes into effect, the idea that

16   you could transfer property of a debtor away, after the

17   bankruptcy had commenced simply by backdating an assignment --

18           MR. KOOK:  Your Honor, the issue is that it was not

19   property of the PPVA at that point; ownership had already

20   passed.  In the amendment of the 13(d) (ph.) --

21           THE COURT:  It --

22           MR. KOOK:  -- which was certified --

23           THE COURT:  It --

24           MR. KOOK:  -- by PPVA and by Platinum Management,

25   states that ownership of these underlying securities were owned

1   by Dr. Michael Goldberg.  Platinum --

2              THE COURT:  All right.  So hold on --

3              MR. KOOK:  Platinum had not owned --

4              THE COURT:  Hold on, hold on.

5              So Mr. Burns --

6              MR. BURNS:  Yes, Your Honor?

7              THE COURT:  -- do you want to respond to that?  Go

8   ahead.

9              MR. BURNS:  Sure.  We're talking about the 13(d), Your

10   Honor?

11              THE COURT:  Yeah.

12              MR. KOOK:  Amendment number 3.

13              MR. BURNS:  Yeah.  Okay.  So my answer on the 13(d) is

14   it's essentially impossible to figure out.  There's one SEC

15   filing that has the language that Mr. Kook is noting.  And it

16   does say something about ownership, but it's hard to tell what

17   to make of this statement.  It has a statement that -- it says

18   5,411,850 shares of common stock is owned by Dr. Michael

19   Goldberg.  Well, that's never been the case with respect to the

20   securities we're talking about here, right?  I mean, we're

21   talking about --

22              MR. KOOK:  That goes to the --

23              MR. BURNS:  Excuse me, Mr. Kook.

24              THE COURT:  Let him finish his -- let him finish.

25              Go ahead.  Because you were --

1          MR. BURNS:  You were talking about warrants.  We're

2    talking about warrants that were issued in 2015 that were

3    exercisable for the issuance of 5.4 million-and-change shares

4    of common stock.  PPVA -- Platinum -- never exercised those

5    warrants.  It never held those common shares.  So what exactly

6    that 13(d) is referring to, I can't make heads or tails of.

7          I'll also note, Your Honor, that the warrants

8    themselves contained Blocher provisions.  So PPVA was prevented

9    from exercising those warrants to the extent the exercise would

10   take PPVA over 9.99 percent ownership in the Navidea common

11   stock.  So these warrants that we're talking about here were

12   properly excludable from PPVA's beneficial ownership,

13   regardless.  The fact that they were excluded from PPVA's

14   calculations in this document doesn't say that Goldberg owned

15   them.  It just means that they were properly excludable.  And

16   in fact, in the very same document, two paragraphs up from what

17   we're talking about, PPVA said exactly that with specific

18   reference to Navidea warrants:  We excluded these because there

19   are blockers that would prevent our exercise from these

20   calculations.

21         So just taking this one statement that is, frankly,

22   inscrutable and saying, based on this one statement made in

23   this one 13(d), Mr. Goldberg owned these warrants outright,

24   notwithstanding his undisputed lack of compliance with the

25   conditions preceding what he was supposed to do.  The notes,

1  the securities agreement -- that's currently all that defendant

2  has to show that he owned this.  But the fact of the matter is,

3  he did not own it.  He had not done what he was supposed to do

4  under the term sheets, and that's being disputed.

5          MR. KOOK:  Your Honor --

6          THE COURT:  All right.  Thank you.

7          Mr. Kook, hold on.  Hold on, hold on.

8          So given that -- so you say, well, he already owned

9  the shares.  If he already owned everything, he was all set,

10  right?  He was all set.  Your position is that he was all set

11  before the winding up started.

12          MR. KOOK:  Then it --

13          THE COURT:  Then why go through this?  Why go through

14  this charade of an assignment --

15          MR. KOOK:  Because he --

16          THE COURT:  -- if he already had everything that he

17  needed?  You don't need --

18          MR. KOOK:  He had --

19          THE COURT:  -- an assignment.  If he already owned it,

20  what's being assigned?

21          MR. KOOK:  In order to get --

22          THE COURT:  Okay.  He already owns it.

23          MR. KOOK:  I'm trying to answer your question, Your

24  Honor.

25          THE COURT:  All right.

1          MR. KOOK:  In order to get physical custody of the

2   shares that he owned, the warrant had to be exercised.  Navidea

3   insisted that the warrant be transferred and then converted

4   into the stock.  The underlying security was owned by Dr.

5   Goldberg.  The exchange agreement in 2015 was an error.  It

6   happened two months earlier.  The binding term sheet had been

7   amended with the ownership still -- nothing stated contrary to

8   the fact that ownership was in Dr. Goldberg's hands.  The fact

9   that the actual transfer PPVA was holding up did not take Dr.

10   Goldberg's ownership away from him.

11          The statement that Mr. Burns says is inscrutable says,

12   "Also excluded from the beneficial ownership calculation are

13   5,411,850 shares of common stock owned by Dr. Michael M.

14   Goldberg, a current director of Navidea, pursuant to an

15   agreement effective March 28th, 2014, and amended effective

16   June 11, 2015."  We have Mr. SanFilippo, the CFO of Platinum

17   Management stating that he actually saw the notes.  We have the

18   fact that the Platinum manager --

19          THE COURT:  And in this order --

20          MR. KOOK:  -- ordered the financial statement --

21          THE COURT:  So assuming for the moment that all of

22   this is true, which is very dubious, the deal was that these

23   shares -- these warrants and then the shares -- were not a gift

24   or compensation to Dr. Goldberg.  He was supposed to have paid

25   for them --

1          MR. KOOK:  And he did, Your Honor.

2          THE COURT:  -- right?

3          MR. KOOK:  He gave for the --

4          THE COURT:  How did he pay for them?

5          MR. KOOK:  He gave full consideration, including the

6    rights that for PPVA, and which PPVA had implemented, and

7    that --

8          THE COURT:  Wait, wait, wait.  Stop, stop, stop.

9          MR. KOOK:  -- with the (indiscernible) had done to --

10         THE COURT:  You say --

11         MR. KOOK:  -- to trade --

12         THE COURT:  -- you want me to believe -- excuse me.

13         You want me to believe that there were notes.  So

14   first of all, he says, well, the term sheet is a note.  Then he

15   says, well, someone saw the notes.  So if someone saw the

16   notes, then, he seems to be arguing -- you seem to be arguing

17   that there actually were notes, right?  So the overall

18   arrangement contemplated notes and the security interests.

19   Okay.  Were those notes paid?

20         MR. KOOK:  I believe the mechanisms to trigger the

21   payment had not occurred.

22         THE COURT:  What do you mean? I mean, if there were

23   notes --

24         MR. KOOK:  The --

25         THE COURT:  -- what were the terms of the note?

1          MR. KOOK:  There was cash due to Dr. Goldberg, which

2     he didn't receive.  There was -- I apologize, Your Honor,

3     for -- it's not on the tip of my tongue, as it were -- the

4     mechanism for the full notes to be paid.  I do not believe that

5     the time for the payment of the notes had occurred.

6          But in the first instance -- or one of the first

7     instances, what PPVA is doing here is saying there was a breach

8     of contract, and it has no standing to say there's a breach of

9     contract.  The parties to the contract treated the contract --

10    both parties have fully adhered to, fully implemented, and that

11    Dr. Goldberg owned the securities that was certified by PPVA

12    and private management.  We asked for the financial statements

13    to see how they were kept on the books of the company.  We were

14    told they weren't available during discovery.  Mr. SanFilippo

15    had had the ordered financial statements, which said that the

16    fund no longer owned the securities, but that Dr. Goldberg

17    owned them.

18          Mr. Burns is trying to insist --

19          THE COURT:  So which --

20          MR. KOOK:  -- that all the forms --

21          THE COURT:  Let me get this straight.  There's no

22    notes.  There's no segregated account until the time when this

23    backdated assignment occurs, which is the piece of paper that

24    Goldberg cooks up himself so that he, wearing his Navidea hat,

25    can give himself the shares.  That's what happens here.

1            Now, the winding up --

2            MR. KOOK:  I don't believe that --

3            THE COURT:  -- the winding up commences.  Goldberg

4    realizes he has a problem.  So he comes up with this assignment

5    thing because if he already actually had the warrant, life

6    would be good, right?  So then he comes up with this assignment

7    saying, Nordlicht says we have a problem; the answer to that is

8    put in whatever date you want.  So he backdates it by a year,

9    which is a completely made-up date.

10            MR. KOOK:  So Your Honor, it's not a --

11            THE COURT:  And then --

12            MR. KOOK:  -- it is not a completely made-up date.

13    It's the date --

14            THE COURT:  In what sense, when your client says to

15    Mr. Nordlicht, "Put in whatever date you want" --

16            MR. KOOK:  I don't believe --

17            THE COURT:  -- is that not --

18            MR. KOOK:  I don't have the email right in front of

19    me.  I don't believe that's the exact language.  But the point

20    is that that's the date --

21            THE COURT:  Mr. Burns?

22            Hold on.

23            Mr. Burns --

24            MR. BURNS:  Yes, Your Honor?

25            THE COURT:  -- can you help me out here?  Do you want

1  to read the exact language of the email?

2          MR. KOOK:  Is it in your --

3          MR. BURNS:  I would like to, Your Honor.  I'm flipping

4  through it.

5          MR. KOOK:  I have the email that's here, but I can't

6  find the one you're talking about.

7          MR. BURNS:  I believe it's Exhibit 13 to my

8  affirmation or --

9          THE COURT:  Yes, it's Exhibit 13 to your declaration.

10          MR. BURNS:  So email from Michael Goldberg to Mark

11  Nordlicht, 10/14/2016, 4:34 p.m., "Here it is.  Put in whatever

12  date you want."

13          THE COURT:  Yeah.  So if there were a real date, you

14  would say, yeah, date it as of this date because that's when

15  the assignment -- that's when the transfer actually happened.

16          MR. KOOK:  That's what Nordlicht --

17          THE COURT:  And I --

18          MR. KOOK:  That's what Nordlicht stated -- and that's

19  quoted in the email; it's quoted in our brief, that that's the

20  date you owned him.  That's the date that he -- that's the date

21  that after the daily exchange of the convertible D referred on

22  the Tel Aviv stock exchange occurred, and the warrants were

23  issued in its place, and Goldberg owned them.  He owned them as

24  of that date.  The parties to the transaction -- PPVA was not a

25  part of the transaction, although all its certifications and

1   statements contemporaneous with the transaction are that

2   Goldberg was the owner.  All the statements from the parties of

3   the transactions are that Goldberg was the owner.  Those were

4   the certified statements by PPVA and by Platinum Management,

5   that Goldberg was the owner.

6           There were difficulties, screw-ups, whatever it was,

7   from PPVA that they never transferred this physical possession

8   of the securities owned by Dr. Goldberg until a later date.

9   But that didn't change Dr. Goldberg's ownership from pre-

10  liquidation --

11          THE COURT:  Well --

12          MR. KOOK:  -- which is acknowledged by all the

13  parties.  He owned --

14          THE COURT:  What --

15          MR. KOOK:  -- them before the liquidation.

16          THE COURT:  I'm sorry, I'm just missing this.

17          There's a term sheet and an amended term sheet.  They

18  have provisions that say that there needs to be a segregated

19  account set up and that there need to be notes issued, right?

20  So here, a segregated account is not set up until after the

21  winding up is commenced.  No one presents the notes.  All we

22  have is someone thinks they saw the notes.  You're saying,

23  well, you think -- I mean, were there notes or were there not

24  notes?  It's a yes or no -- it's a yes-or-no question.  There's

25  a condition precedent that says that Dr. Goldberg has to

1  execute notes.

2           MR. KOOK:  Dr. Goldberg --

3           THE COURT:  Did he?

4           MR. KOOK:  -- understood that the notes were

5  effectively signed, the term sheet setting forth the terms of

6  the notes.

7           THE COURT:  No, no, no.

8           MR. KOOK:  I will not -- Your Honor --

9           THE COURT:  This is not --

10           MR. KOOK:  -- let me tell you --

11           THE COURT:  -- this is not Dr. --

12           MR. KOOK:  -- Dr. Goldberg --

13           THE COURT:  This is not about what Dr. Goldberg

14  understood.  I'm asking --

15           MR. KOOK:  Dr. Goldberg testified --

16           THE COURT:  I'm asking --

17           MR. KOOK:  Dr. Goldberg testified that he --

18           THE COURT:  If I put Mr. Goldberg --

19           MR. KOOK:  -- he --

20           THE COURT:  If I put Dr. Goldberg on the witness

21  stand, under oath, and I ask the question, Dr. Goldberg,

22  pursuant to the terms of the term sheet and the amended term

23  sheet, did you execute notes as contemplated by this agreement

24  and these transactions, would the answer be yes or no?

25           MR. KOOK:  I believe he will answer, as he testified,

PLATINUM PARTNERS L.P. v. MICHAEL GOLDBERG                    34

1  that he felt he was obligated upon signing the term sheets, and

2  those were the notes.  In fact, although he testified that he

3  did not recall signing the notes, another document -- a note,

4  per se -- Mr. SanFilippo said that he saw the notes.  So in

5  the --

6          THE COURT:  Let's just take a step back and reflect on

7  this for a moment.  Sophisticated fund manager, right, engaged

8  in a very valuable transaction that requires that he issue

9  notes in order to ultimately become the owner of millions of

10  dollars of securities, thinks that the word "note" doesn't mean

11  exactly what it means, a note, that maybe just the actual term

12  sheet is good enough.

13          MR. KOOK:  That's what the term sheet said.

14          THE COURT:  I mean, on its face, is that -- on its

15  face, that is incredible.  It is not credible.  That is not a

16  credible position to take.  And then relies on, oh, well,

17  someone saw the notes, so even though I didn't think I had to

18  actually execute notes, and I can't recall that I did, oh,

19  someone else saw them; so yeah, I satisfied the notes

20  provision.

21          That's what you're asking me to believe?

22          MR. KOOK:  Those are the facts, Your Honor.  The term

23  sheets state that a note from the document had to be executed

24  and they were binding.  Dr. Goldberg believed that he --

25  believed the words of the agreement --

1          THE COURT:  But when the term sheet -- when the term

2     sheet says -- when the term sheet says, as a condition, that

3     notes are required, and that there's a provision in the term

4     sheet that says no other documentation is required, you're

5     telling me that that latter provision means that the

6     requirement to execute notes, that that was just kidding, that

7     that overrides that and doesn't --

8          MR. KOOK:  It is not kidding.  It says --

9          THE COURT:  -- and means no notes to be issued?

10    That's ridiculous.

11         MR. KOOK:  I don't --

12         THE COURT:  That's not believable.

13         MR. KOOK:  I don't believe it is ridiculous, Your

14    Honor.  I believe the Court will --

15         THE COURT:  That's not the way corporate documents

16    work.  When a term sheet says that here's the deal and we're

17    going to do X, Y, and Z documents, and then at the end, it says

18    that no other documents need be required, that provision

19    doesn't negate the earlier provision.  It just says you don't

20    need to issue any other documents in addition to those.

21         MR. KOOK:  I believe the main --

22         THE COURT:  What would be the point of saying that --

23         MR. KOOK:  -- I believe it meaning may be you don't

24    have to produce issue any other documents, and if none are

25    issued, then you're bound by what's in the binding term sheet.

1          THE COURT:  Yeah, and in the binding term sheet, it
2    says that he had --
3          MR. KOOK:  All the --
4          THE COURT:  -- to issue notes and he had to --
5          MR. KOOK:  All the terms of the notes --
6          THE COURT:  -- (indiscernible).
7          MR. KOOK:  All the terms of the note are set forth in
8    the term sheet.  I don't think there's any dispute as to that.
9    All the terms are in there.
10          THE COURT:  Then the term sheet -- then the term sheet
11    would not have said that there requires the issuance of notes.
12          MR. KOOK:  Your Honor, but that's why the term
13    sheet --
14          THE COURT:  It's not a common-sense reading of the
15    document.
16          MR. KOOK:  That's why the term sheet says it's in full
17    force and effect, even if no further documents are exchanged.
18    And agreements say that all the time.  That's why the
19    agreements state that.  There are there are term sheets that
20    are preliminary and --
21          THE COURT:  No.  There are rules of construction that
22    you aren't supposed to read documents in a way that make no
23    sense.  It makes no sense that parties would draft a term sheet
24    that contemplates the signing of additional agreements, when,
25    in fact, what you're saying they really meant was this is the

1  only document we need because then, you would draft the term

2  sheet by saying, by signing this term sheet, there is now an

3  obligation.

4          MR. KOOK:  Yes, exactly.

5          THE COURT:  A term sheet would --

6          MR. KOOK:  Exactly.

7          THE COURT:  So then, exactly, give me the evidence of

8  him paying.  So then why are you telling me that I should pay

9  attention to the fact that someone saw the note?  One of two

10 things are true:  either it's your position that no notes were

11 needed, or it's your position that, I guess, notes were needed;

12 I don't remember signing them; I don't remember, but somebody

13 else saw them.

14         MR. KOOK:  I think both are correct, Your Honor.

15         Dr. Goldberg, if he wanted to lie, could have said

16 yes, I remember signing them.  But he said, I don't remember

17 signing them; I didn't think they were necessary.  And in fact,

18 as Your Honor stated in summing up what it said, that it was

19 enforceable and he was bound when he signed it.  In point of

20 fact --

21         THE COURT:  Okay.  Can you --

22         MR. KOOK:  -- in point of fact --

23         THE COURT:  -- go back for a minute?

24         MR. KOOK:  -- although Dr. Goldberg doesn't recall it,

25 but if he found that he did, and Mr. Filippo (sic), who has no

1   interest in stating otherwise, said -- he stated specifically

2   that he saw the notes.  Dr. Goldberg didn't remember signing

3   them.  He didn't hem and haw.  He said he didn't remember

4   signing them.  And he said, I didn't think they were necessary

5   because I was bound by the terms that were set forth in the

6   agreement and no further of the documents should

7   (indiscernible), and I was bound as a part of the agreement.

8   And that's how both parties took the agreement to be.  In fact,

9   the power -- and he did sign it over --

10          THE COURT:  Okay.  Can you --

11          MR. KOOK:  -- and he doesn't recall it.

12          THE COURT:  Can you stop for a -- Mr. Kook, could you

13  please stop?

14          MR. KOOK:  Yes.

15          THE COURT:  Okay.  Take a breather.  Take a breather.

16          Mr. Burns --

17          MR. BURNS:  Yes, Your Honor?

18          THE COURT:  Could you respond to some of this past --

19  some or all of this past colloquy that we've had here?

20          MR. BURNS:  Sure, Your Honor.  Let me just start with,

21  if we, PPVA, had in our file notes from Dr. Goldberg for eleven

22  million dollars, we would not be here before Your Honor,

23  fighting about four million dollars.  We would have long since

24  taken those notes, brought them to state supreme court, and

25  collected on them, pursuant to summary judgment in lieu of

1  complaint.  It would be easy.

2          The problem is we don't have the notes because there

3  were no notes.  And if we were to go into state supreme court

4  and say, hey, judge, we're moving for summary judgment, in lieu

5  of complaint on these notes; the problem is there are no notes,

6  but the agreement itself is the note, so could we please have

7  eleven million dollars, we would be laughed out of court.  The

8  term sheets are not notes; the notes were never issued.

9          THE COURT:  What about the argument that the fact that

10  there's a catchall provision in the term sheet that says, no

11  other documents need to be executed, somehow overrides the

12  requirement that Dr. Goldberg issue notes?

13          MR. BURNS:  We simply don't think that's a fair

14  reading.  The term sheets say "shall issue".  "Shall issue"

15  suggests a thing that will happen after the agreement is

16  executed.  The notion that the agreement itself, as the notes,

17  it's flatly contradicted by the fact that the agreement itself,

18  says, Dr. Goldberg shall issue these notes.  And he never did.

19  It's not a reasonable reading of what's required under the

20  under the term sheets.

21          And again, the fact of the matter -- just to bring it

22  back to the segregated accounts, whether or not -- these notes

23  are sort of a sideshow, albeit an important sideshow, because

24  the fact of the matter is, it is undisputed that the other

25  material condition precedent that we're talking about here is

1   the creation of the segregated account of control protection

2   satisfactory to Platinum did not -- absolutely, positively did

3   not happen until post-liquidations.

4           MR. KOOK:  Your Honor, there was no statement in the

5   term sheet as to when the segregated account had to be set up.

6   If did not have to be set up, as a practical matter, until the

7   physical transfer occurred on, and when the physical transfer

8   was to occur, this account was it was set up.  There's nothing

9   in the document -- this creation of terms of the agreement that

10  aren't there --

11          THE COURT:  Let's be a little reality based here.  The

12  overall structure of the transaction seems to not be disputed,

13  that there were to be -- that there were to be warrants and,

14  ultimately, stock that Dr. Goldberg was to pay for.  The

15  payment or the obligation to pay was to be reflected in notes,

16  putting aside what I would characterize as the incredible

17  argument that no notes were required and that the term sheet

18  itself was a note.

19          Okay.  So he was going to get the stock.  He was going

20  to pay for it.  And in order to secure the payment stream,

21  there was going to be a note in a control agreement, with a

22  segregated account, because that's how you document a

23  transaction like that.  So the idea that this transaction was

24  going to proceed on the basis of what I would call whatever is

25  simply not credible, that it didn't matter whether or not there

1  were notes, that it didn't matter whether or not there was a

2  segregated account.  That's just not the way a transaction like

3  this proceeds.

4          In order to effect, with an E, a security interest on

5  the securities, in order to secure the repayment of the notes,

6  they would have to be a segregated account.  There was none of

7  this.  None of these men followed any rules.  They just did

8  what they wanted.  And one of the things that they did was

9  realize, once the winding-up petition was filed, that they

10  hadn't done what they needed to do to actually get the Navidea

11  stock for Dr. Goldberg.  So they figure out this idea of a

12  backdated assignment that they execute with, "Put in whatever

13  date you want".  And so Dr. Goldberg does that; Nordlicht signs

14  it, backdates it.  Goldberg hands it to himself and issues

15  himself the shares.  And you're telling me that that's all

16  completely good, completely good?

17          MR. KOOK:  Yes, Your Honor, because he owned the stock

18  in March -- he owned the securities March 24, and they were not

19  part of the liquidated estate.  The ownership had already

20  passed, and it belonged to Dr. Goldberg.  He had to go through

21  (indiscernible) --

22          THE COURT:  And you based that statement --

23          MR. KOOK:  -- for years to get vested --

24          THE COURT:  -- base that statement on -- the only

25  support for that statement is that there's a one-sentence

1  statement in an SEC document?

2          MR. KOOK:  And on the statement in the Platinum

3  Management -- I think it's a memorandum dated July 9, 2015,

4  that Goldberg owns the notes, the statements in the 2014

5  audited financial statement that PPVA does not own the notes

6  anymore, they're not part of the estate, on the fact that

7  the --

8          THE COURT:  No, no, no.  Hold on, hold on, hold on.

9  There's no estate at that point.

10          MR. KOOK:  They're not part of -- they're not part

11  of -- they're not part of PPVA's corpus of assets.  They don't

12  belong to PPVA --

13          THE COURT:  Okay.  Hold on.  Please pause for a

14  moment.

15          Mr. Burns, could you respond to that particular point?

16          MR. BURNS:  Sure, Your Honor.  I'm not sure whether

17  we're talking about the July 2015 memo or the financial

18  statement, but I'll address them both if Your Honor would like.

19          THE COURT:  Thank you.  Yes, I would.

20          MR. BURNS:  So we have a July 9th, 2015 memo.  It's

21  Goldberg affidavit, Exhibit 4, which is by one of Platinum's

22  in-house accountants.  And it recommends certain accounting

23  treatment for these Goldberg transactions.  And Mr. Kook is

24  correct that it contains one very broad statement regarding

25  ownership.

1          And my response to that is, is as follows.  These and

2     the financial statements are accounting documents.  They say

3     nothing whatsoever about actual legal ownership.  So the

4     financial statements, the 2014 financial statements, are

5     exactly that.  These are accrual accounting documents where --

6     and this is exactly what Platinum's former CFO, Mr. SanFilippo,

7     testified to, that these statements, Platinum used accrual

8     accounting.  So an asset or an obligation gets booked when it's

9     incurred, not when the thing underlying it actually happens.

10    So Goldberg agrees in his term sheet to issue notes; okay, book

11    them then.  Platinum agrees in those term sheets to -- when it

12    gets the notes, to give the securities to Goldberg; okay, book

13    it then.  And that's exactly what they did in the 2014

14    financial statements.  And that's exactly what this July 2015

15    memo talks about.

16          Mr. SanFilippo testified that this is accrual

17    accounting and it doesn't bear any resemblance, necessarily --

18    although it may, but in this case does not -- to the underlying

19    factual or legal reality of who owned the stock at the time.

20    The fact that Platinum had booked a note receivable from

21    Goldberg in its financial statement does not, in fact, indicate

22    that Goldberg actually provided the note because, as we've been

23    discussing, there's no indication that he did.  The fact that

24    Platinum booked the note from Goldberg -- the note

25    receivable -- and, through various accounting treatments, said

1  we're going to keep the shares in our account, but then grant

2  Goldberg -- book a participation interest for him to recognize

3  the term sheet, doesn't indicate that as of that magical

4  moment, Goldberg was the legal owner of these warrants because,

5  as we've been discussing, because he had not done the things

6  that he needed to do in order to become the legal owner.

7          MR. KOOK:  Your Honor, the memo states that the fund

8  lead does not have control or ownership of the securities.  Mr.

9  Burns' own email, which refers to financial statements, which

10  we asked for, that the PPVA said it didn't have, and then

11  magically appeared when Mr. SanFilippo had the ordered

12  financial statement, states that all the statements -- notes

13  receivable from Goldberg were booked per Goldberg's term sheet,

14  and Navidea Series B preferred shares.  It was referenced in

15  Mr. Goldberg's term sheet and all the warrants for which they

16  were exchanged in 2005.  They were exchanged  it confirms the

17  Series B preferred stocks were exchanged for the warrants.  And

18  the Series B belonged to Goldberg, and then the warrants that

19  were going to Goldbergs were not included within the accounting

20  of PPVA's position.

21          In their brief --

22          THE COURT:  Can you --

23          MR. KOOK:  If I may have just one more minute, Your

24  Honor?

25          In their brief --

1          THE COURT:  Can I just -- hold on.  Please stop,

2    please stop.

3          MR. KOOK:  Sure.

4          THE COURT:  Can someone just point me to where I can

5    find this language?

6          MR. BURNS:  If you're looking for -- Your Honor, if

7    you're looking for what Mr. Kook's talking about, about my

8    email to him of January 2020, it's Exhibit A to his primary

9    affidavit.

10          MR. KOOK:  That's correct.

11          THE COURT:  Hold on.  Give me a moment.  Let me just

12    try to find it, please, in my binder.

13          MR. KOOK:  Sure, Your Honor.

14          THE COURT:  So Mr. Kook, it's your affirmation?

15          MR. KOOK:  It's Exhibit A to my affirmation.

16          THE COURT:  Hold on.

17          So this is an email from Mr. Burns to you, Mr. Kook,

18    saying, you stipulate that as of the NAV statement for the

19    period ending 6/30/14, notes receivable from Goldberg were

20    booked, per Goldberg's term sheet with Platinum Management.

21    And then Navidea Series B preferred shares and were the

22    warrants for which they were exchanged in 2015.

23          MR. KOOK:  It's stating the Series B was exchanged for

24    the warrants in 2015, before the liquidation.

25          MR. BURNS:  Well, that's not --

1           THE COURT:  But the --

2           MR. BURNS:  There's no dispute about that.  That, of

3  course, happened; that's what we're talking about.

4           THE COURT:  Yeah.

5           MR. KOOK:  You're stipulating to it.

6           MR. BURNS:  I will stipulate to --

7           THE COURT:  No, we're talking about --

8           MR. BURNS:  -- it again.  That's exactly what

9  happened.

10          THE COURT:  We're talking about -- but the Series

11 preferred Bs were exchanged for the warrants.  But the warrants

12 then needed to be exchanged for the Navidea common, right?

13 That's a different exchange, right?

14          MR. BURNS:  Correct, Your Honor.  The --

15          MR. KOOK:  But it doesn't affect ownership of the

16 securities and who owned them as of the time of liquidation.

17 They were owned by Dr. Goldberg.  The fact that PPVA did not

18 transfer physical possession does not alter the fact that Dr.

19 Goldberg was the owner.  That's what's in 13(d), certified by

20 Platinum Management and --

21          THE COURT:  Hold on.

22          MR. KOOK:  -- PPVA.

23          THE COURT:  Hold on.  Please stop.

24          All this says is that the Navidea Series B preferred

25 shares and/or the warrants for which they were exchanged in

1    2015.  That's not the exchange of the warrants for the Navidea

2    stock in 2016.  That's the exchange --

3             MR. BURNS:  No, Your Honor.  That's the --

4             MR. KOOK:  But the warrants --

5             THE COURT:  -- right?

6             MR. KOOK:  By going --

7             MR. BURNS:  The 2015 transaction, Your Honor, in which

8    Navidea exchanged --

9             THE COURT:  Yeah.

10            MR. BURNS:  -- the Series B preferred for the

11   warrants --

12            THE COURT:  Right.

13            MR. BURNS:  -- that we're now talking about.  One

14   became the other --

15            THE COURT:  Right.

16            MR. BURNS:  -- and the warrants were reissued in

17   PPVA's name.  That's what that is.

18            THE COURT:  That's right.  Right.

19            So all that Mr. Burns is stipulating to is that they

20   are not included within the accounting of PPVA's positions and

21   that this accounting treatment continued so long as they were

22   prepared.  So this is not proof of ownership.  This is

23   reflective of accrual accounting.  There was an agreement out

24   there, in which, for the purposes of accurately reflecting it

25   on the financial statement, there was an obligation to reveal,

1  if you will, to disclose that there was this agreement out

2  there, in which the company was to receive notes receivable

3  from Goldberg.

4          MR. KOOK:  Your Honor --

5          MR. BURNS:  You're (indiscernible), Your Honor; that's

6  correct.  I mean, this email is confirming that the same

7  accounting treatment that I discussed with reference to the

8  2014 financials was also applied in connection with the monthly

9  net asset value statement.  That's all this email says.

10         MR. KOOK:  Well, Your Honor, the 13(d) certified by

11  PPVA and Platinum Management states that the 5,411,850 shares

12  of common stock owned by Dr. Michael M. Goldberg are excluded

13  from the beneficial ownership of PPVA and Platinum Management.

14  They're owned by Dr. Michael Goldberg.  It can't be more clear

15  than that.  It's not opaque.  It's not worthless rhetoric.

16  It's a statement in the 13(d) filed with the SEC and certified

17  by PPVA and Platinum Management.

18         MR. BURNS:  Only, Your Honor, there never were 5.4

19  million common shares of the Navidea until Mr. Goldberg had the

20  warrant transferred to him and exercised the warrant in 2017.

21         MR. KOOK:  He owned them.  The fact that they weren't

22  physically transferred and that PPVA failed to exercise a

23  warrant is not sort of a ha-ha gotcha.  The ownership had

24  already vested in Dr. Goldberg.  That's in the certified --

25         THE COURT:  If the ownership --

1           MR. KOOK:  -- (indiscernible).

2           THE COURT:  If the ownership had already vested in Dr.

3   Goldberg, why did the assignment take place when it did?  The

4   ownership had already vested.  Why was there an assignment?

5   Why?

6           MR. KOOK:  That's what Navidea wanted.  And they

7   were --

8           THE COURT:  That's what Navidea wanted?  In other

9   words, that's what Dr. Goldberg knew that he needed to paper

10  over this crooked line?

11          MR. KOOK:  It wasn't a crooked line.  It's a statement

12  of ownership and all the -- say that it wasn't a real

13  accounting --

14          THE COURT:  Why --

15          MR. KOOK:  -- it was a different accounting -- in the

16  one spreadsheet --

17          THE COURT:  Then why did Dr. Goldberg tell Mr.

18  Nordlicht, "Put in whatever date you want"?

19          MR. KOOK:  Because he --

20          THE COURT:  Why wouldn't Dr. Goldberg -- there is a

21  moment in time -- you're telling me that there is an exact

22  moment in time when ownership transferred.  So if the

23  assignments were merely a piece of paper needed to document

24  something that had already occurred, then Dr. Goldberg, being

25  the sophisticated and honest businessman that you're telling me

1  that he was, would have said, put this date on it because

2  that's when the transfer actually occurred.  None of this hangs

3  together.  None of this makes any sense.

4          MR. KOOK:  In the October --

5          THE COURT:  There were --

6          MR. KOOK:  In the October 14, 2016 email sent by

7  Nordlicht, talking about dating the assignment as of October

8  2015, Nordlicht says the date on it now -- can you resend me

9  the assignment form without date listed or put in correct date?

10 It has the date as of October 2016.  That was the date that was

11 sent.  No, he says, that's not accurate, as you were owned

12 then, as of October 1, 2015, when we did the exchange of

13 (indiscernible).  That's Exhibit 11 to Goldberg's affidavit.

14 That's the email by Nordlicht.  And Nordlicht is saying that

15 we're going to change -- that the date should be October 2015

16 because that's the date that you -- "you", meaning Dr.

17 Goldberg -- owned them when the exchange on the Tel Aviv Stock

18 Exchange was done.  That's when Dr. Goldberg owned them.

19         MR. BURNS:  If I may, Your Honor --

20         THE COURT:  Yeah.

21         MR. BURNS:  -- the October 1st, 2015 date has no

22 significance whatsoever to anything that actually happened in

23 this case.  August 20th, 2015 is the date on which the

24 securities exchange agreement was executed between PPVA and

25 Navidea, pursuant to which the Series B preferred shares at

1    PPVA held or turned into the warrants that we're talking about

2    here.  And those warrants were reissued on August 20th, 2015.

3    So October 1st, 2015 is a completely, completely made-up date.

4    It has no connection whatsoever to anything.

5          MR. KOOK:  It has connection to the fact that it's

6    after the date when the warrants were issued and when Dr.

7    Goldberg owned them.

8          THE COURT:  It's a made-up date.  You have put nothing

9    in your papers that establishes a date certain on which

10   anything occurred.  Everything that's in your papers is self-

11   contradictory.  You didn't need notes, but maybe there were

12   notes.  I don't remember signing them, but someone else saw

13   them.  There were notes, but I didn't have to pay them.  It

14   says something about a segregated account, but it didn't have

15   to be set up first, and oh, it was set up when I decided to

16   hand myself the shares after I engaged in this back and forth

17   with Nordlicht to execute an assignment that I didn't really

18   actually need because I already own the shares, and then I just

19   let Nordlicht put whatever date on it that he thought was

20   right.

21         MR. KOOK:  Your Honor, I understand that's how you

22   view them at this point, but I believe that the facts are

23   different and that ownership passed when the binding term

24   sheets were signed, and that Goldberg's ownership of the

25   underlying common shares was acknowledged and certified by all

1  the parties to the transaction, and even PPVA, which was not a

2  party to the transaction.

3           THE COURT:  Mr. Burns, if I were to find --

4           MR. BURNS:  Yes, Your Honor?

5           THE COURT:  -- if I were to find that there is no

6  disputed issue of material facts, that the notes provision was

7  a condition precedent and was not satisfied, without reaching

8  anything else, do you win?  Does PPVA win?

9           MR. BURNS:  Yes, I believe so, Your Honor.  I believe

10  that would be conclusive as to the question -- at least with

11  respect to our turnover claim, which is our primary claim here

12  as to who owned the property as of that magical moment in time,

13  on August 23rd, 2016, when the Cayman liquidation proceedings

14  commenced.  So if Goldberg hadn't done what he needed to do, if

15  he hadn't satisfied his conditions precedent, PPVA or Platinum

16  Management was under no obligation to transfer the securities

17  to him.  And therefore, he had no live right to those

18  securities as of that moment in time.  It's clear the title

19  hadn't passed.  It's clear that physical possession remained

20  with PPVA.

21           But if he hadn't done what he needed to do and he

22  hadn't satisfied those conditions, he had no live right, as of

23  that moment in time, to receive those securities.  And that

24  means that those securities remain property of PPVA, which they

25  did at all times.  They were in PPVA's name and in PPVA's

1   possession.  And he had no live right as of that moment to

2   receive them.

3        So whatever happened after that moment of eventually

4   setting up the segregated account a month or so after

5   liquidation and concocting this backdated transaction a month

6   after that doesn't matter for purposes of whether this property

7   was PPVA's as of the time the Cayman liquidation proceeding

8   commenced.

9        MR. KOOK:  Your Honor, if I may.  If Your Honor were

10  to --

11       THE COURT:  Yeah, go ahead.

12       MR. KOOK:  -- if Your Honor were to find that -- and

13  we respectfully submit that the facts, even if they're heavily

14  disputed or undisputed, show the opposite.  PPVA did not suffer

15  any damage because it could not sell the warrant.  It could not

16  convert it into common stock because of the blockers and the

17  9.99 percent rule.  So it could never have sold it, and it

18  could never have realized any monetary gain off of it or

19  monetary impact off of the warrants.

20       THE COURT:  Okay.  Hold on a minute.

21       Mr. Burns, what do you think about that?

22       MR. BURNS:  Well, I could say that the blockers are

23  not absolute.  I mean, we could have -- had these warrants sat

24  in our possession and had they not been -- when we first

25  learned about this, by virtue of the Navidea's SEC filing that

 1   Mr. Goldberg signed in -- I think it was early 2017, we

 2   certainly could have, as liquidators, tried to do something

 3   with respect to monetizing these warrants.

 4           But we were deprived of that opportunity, and the

 5   shares sat in Mr. Goldberg's account.  And I don't know if they

 6   still sit in Mr. Goldberg's account today, but the fact of the

 7   matter is there has been gross diminution in value of those

 8   underlying shares since the time they were improperly taken by

 9   Mr. Goldberg.  And that's not on us, nor should it be.

10           MR. KOOK:  But even if they were improperly taken --

11   and we submit that they were not; everything was proper, above

12   board, and certified -- there's still no possibility for PPVA

13   to monetize on those warrants or to convert them because of

14   the --

15           THE COURT:  But --

16           MR. KOOK:  -- 9.99 percent rule.

17           THE COURT:  -- Mr. Kook, you can't do something wrong

18   and then say, but it didn't matter to you anyway.

19           MR. KOOK:  It didn't cause damage.  Happens all the

20   time.

21           THE COURT:  Well, then --

22           MR. KOOK:  There are cases galore where people can

23   prove a wrong occurred, but they can't prove damages.  They

24   don't just pop out of the air --

25           THE COURT:  All right.  You --

1           MR. BURNS:  Your Honor, the Blocker provision -- it's

2    in Exhibit 5 to my opening declaration --

3           THE COURT:  Yeah.

4           MR. BURNS:  -- and it's section 7(b), which is on page

5    8 of the document -- and it's a dense provision, and I can't

6    claim mastery over it, but it says --

7           THE COURT:  Yeah.

8           MR. BURNS:  -- you can't exercise this warrant if it

9    would take you over ninety-nine percent, but there are

10   circumstances in which you might be able to, and here's the

11   procedure for doing so.  So it's not as if had these warrants

12   not been taken from PPVA that we were powerless.  We just had

13   to sit, and the liquidators just needed to sit idly by and

14   watch the value diminished to the vanishing point.  There

15   were --

16          THE COURT:  Mr. Kook --

17          MR. BURNS:  -- options available.

18          THE COURT:  -- are the shares still in Mr. Goldberg's

19   account?

20          MR. KOOK:  I believe so.  I'd have to confirm that.

21          THE COURT:  Where does Mr. Goldberg reside?

22          MR. KOOK:  I believe they are.  There was a

23   restrictive legend on the share that he couldn't sell them for

24   sixty days.  And then Navidea, which Mr. Gold is no longer

25   affiliated with, stated that they would not effectuate any sale

1  of the underlying securities until this action was resolved.  I

2  believe it's the current status.

3          MR. BURNS:  And obviously, Your Honor, a lot of water

4  has passed under the bridge since late 2016, when these

5  warrants were taken by Mr. Goldberg.  But some of the water

6  that's passed under the bridge is -- as of the time of our

7  papers, Navidea common stock was down ninety-three percent from

8  the moment of the taking.  And in preparation for this

9  argument, I just took a quick gander at that where it's at

10  today, and that's unchanged.  So it's down -- the shares that

11  now, to the extent Mr. Goldberg still possesses them --

12  worthless is too strong a term, but they are a mere sliver of

13  their value at the time that -- at the time of the commencement

14  of the Cayman proceeding and at the time of the October 2016

15  taking by Mr. Goldberg.

16          THE COURT:  So the PPVA, the foreign representative,

17  is asking not for turnover of the actual shares, but you're

18  asking for, basically, a monetary recovery, a judgment as to

19  the amount that they would have -- that they were worth at the

20  time of the Chapter 15?

21          MR. BURNS:  That's correct, Your Honor.  And we cite

22  case law in our opening briefs, which states that in cases of

23  dissipation, including, as the case would say, a diminution in

24  value such as that we're talking about here, that mere recovery

25  of the thing that was taken -- the property taken -- wouldn't

1  be a sufficient turnover remedy, and that an actual judgment

2  based on the moment at which the property was transferred away

3  from the debtor is a proper remedy.

4          MR. KOOK:  Again, we disagree because PPVA could not

5  sell the stock or the warrants.

6          THE COURT:  But again, you don't get to -- you don't

7  get to say -- you don't get to -- someone doesn't get to take a

8  pair of shoes belonging -- and say, well, they didn't fit your

9  feet anyway.  I mean, you don't get to do something improper

10 and then defend it by saying, it wasn't worth that much to you.

11 I mean, that's not right.

12         MR. KOOK:  Your Honor, courts often award judgment,

13 but they either say there's no damage or they award one dollar

14 in nominal damages.  PPVA did not suffer any monetary damage.

15         MR. BURNS:  I don't want to restate what I've already

16 said, Your Honor --

17         THE COURT:  Yeah.

18         MR. BURNS:  -- but as I said, under the blockers, it

19 wasn't as if the liquidators had no options.  But by being

20 deprived of the property, we had no options.

21         MR. KOOK:  There's been no statement by the

22 liquidator, or PPVA, or its counsel as to what in the blockers

23 would have allowed them to sell the shares in this

24 circumstance.

25         THE COURT:  All right.  Well, that would have to be --

1  that would have to be something that would go to trial.  I

2  mean, there is -- I mean, just to kind of preview it, there is

3  no basis on which Dr. Goldberg can be awarded summary judgment

4  on anything.  None.  None.  The only question is to what extent

5  PPVA is entitled to summary judgment.  And it seems pretty

6  clear to me that PPVA has the far better argument here, that

7  what we have on the other side is a series of radically

8  inconsistent and incredible statements and recreations of the

9  history of what occurred with the culminating act being an

10 exchange between Goldberg and Nordlicht, in which it's quite

11 clear they made up an assignment, simply made it up.

12       So either I grant PPVA summary judgment or I set this

13 for trial.  If it goes to trial, Dr. Goldberg will need to come

14 and testify.

15       MR. KOOK:  We understand that, Your Honor.

16       THE COURT:  If Dr. Goldberg needs to come and testify,

17 there are more points than I can count on one hand that are

18 extremely problematic for him, statements that he's made that,

19 on their face, don't seem entirely truthful.  He would have to

20 testify to his dealings with Mr. Nordlicht.  And I dare say

21 that things would get complicated very quickly.

22       MR. KOOK:  We are fully prepared to go forward, Your

23 Honor.

24       THE COURT:  Indeed, even if I were to grant summary

25 judgment to the foreign representative, in my mind, there would

1    remain issues of fact as to what the damages amount would be.

2    And I also believe that there would be open questions as to

3    whether or not punitive damages would be assessed.  I find the

4    conduct here to be extremely troubling, extremely troubling.

5            And I think, Mr. Kook, that you should think hard

6    about what I've just said.

7            MR. KOOK:  I will, Your Honor.  I certainly will, Your

8    Honor.

9            And again, I understand where Your Honor is stating.

10   Respectfully, we disagree with how Your Honor feels about the

11   findings at this point, but --

12           THE COURT:  Does --

13           MR. KOOK:  -- and issues of credibility as to summary

14   judgment.  And we are ready to, if f Your Honor would order a

15   trial, to prepare for one.

16           THE COURT:  Where does Dr. Goldberg reside?

17           MR. KOOK:  In Englewood, New Jersey.

18           THE COURT:  All right.  We've gone way over my fifteen

19   minutes, and I need to now conclude the hearing because I have

20   to turn to another matter.  My chambers will contact you when

21   I'm prepared to give you a decision and outline next steps.

22           I am curious as to whether or not there have been any

23   discussions in the nature of settlement discussions between the

24   parties.

25           MR. BURNS:  There have not, Your Honor.

1           MR. KOOK:  I will talk with Mr. Burns.

2           THE COURT:  Is there any --

3           MR. BURNS:  I'll correct -- I'm sorry, I'll correct

4    that, Your Honor.

5           THE COURT:  Yeah.

6           MR. BURNS:  Before we filed the case, we did have --

7    it's ancient history at this point, but I believe we did have

8    some preliminary discussions with Mr. Kook before we commenced

9    the case.  And those discussions were not fruitful, given what

10   happened after that.

11          THE COURT:  Well, yeah.  I mean, I don't want to hear

12   what the substance of the discussions were.  The reason that

13   I'm asking is I am curious as to whether or not either of you

14   thinks that you would benefit from spending time with one of my

15   colleagues in the role as a mediator.

16          You clearly have given your client some advice.  And I

17   don't know if the things that I'm saying are going to resonate

18   with you or with him.  I think they should.  I think that they

19   warrant significant, careful consideration by your client --

20          MR. KOOK:  I understand, Your Honor.

21          THE COURT:  -- in my view.  In my view, there's a lot

22   of risk hanging around here.  And I wonder if it would be

23   beneficial.  And also from the perspective of the foreign

24   representative, given potential difficulties in collecting a

25   judgment, particularly in light of the fact that the -- given

1  that the securities have declined in value, it's not a matter

2  of there being simply a turnover, right?

3         But to the extent that there was -- I'll use the word

4  conversion -- an inability of the foreign liquidators to access

5  the securities during this period of time, et cetera, I just

6  wonder what collectability would look like, were you ultimately

7  to obtain a judgment against Dr. Goldberg.  So I'm just

8  wondering if you believe that you would benefit from sitting

9  with one of my colleagues in the role of a mediator to settle

10  this on a -- settle everything.

11         MR. KOOK:  Yes, Your Honor.

12         MR. BURNS:  Well, Your Honor, we don't -- yeah.  We

13  don't necessarily have concerns about collectability given Dr.

14  Goldberg's situation.  But we're, of course, always happy to

15  talk settlement.

16         THE COURT:  Would you be interested in spending time

17  with one of my colleagues in a mediation?

18         MR. KOOK:  I'd like to speak with my client and --

19         MR. BURNS:  That would be --

20         MR. KOOK:  -- and Mr. Burns, and get back to Your

21  Honor.

22         MR. BURNS:  That makes sense to me, Your Honor.

23         THE COURT:  I could --

24         MR. BURNS:  I think Mr. Kook and I could take a first

25  pass at things and see if we get anywhere.

1           THE COURT:  Okay.  All right.  Well, why don't you

2    have those conversations, if you would.  If you could get the

3    transcript of the hearing today and send it to me?

4           And then, Mr. Burns, if I could ask you within, say, a

5    week's time to contact Ms. Eisen in my chambers, and without

6    identifying which one of you has come to what conclusion, just

7    tell her that the parties are or are not interested in

8    mediation.  And that way, I won't know who has what view.  But

9    if you're interested in mediation, I'm quite sure I could get

10   one of my wonderful colleagues to spend some time with you.

11   And that might inform the path going forward.

12          MR. BURNS:  Understood, will do.

13          MR. KOOK:  Thank you, Your Honor.

14          THE COURT:  All right.  Stay safe, and we will talk to

15   you next time.

16          Thank you very much.

17          MR. KOOK:  Thank you.

18          MR. BURNS:  Thanks very much, Your Honor.

19       (Conclusion of proceedings)

20

21

22

23

24

25

1

2                          C E R T I F I C A T I O N

3

4    I, Ellen S. Kolman, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8

9    _____

10   Ellen S. Kolman (CET-568)

11   AAERT Certified Electronic Transcriber

12

13   eScribers

14   352 Seventh Ave., Suite #604

15   New York, NY 10001

16

17   Date:  December 13, 2021

18

19

20

21

22

23

24

25

Platinum Partners Value Arbitrage Fund, L.P.    16-12925-scc & 18-01650-scc
Michael Goldberg    December 8, 2021

## A

**able (2)**
17:14;55:10
**above (1)**
54:11
**absolute (1)**
53:23
**Absolutely (5)**
5:24;17:21;18:2;
19:21;40:2
**acceptable (3)**
8:16;12:19;16:20
**access (1)**
61:4
**accorded (1)**
8:10
**according (4)**
6:16;19:22,22;
21:25
**account (31)**
8:13,14;9:6;10:10,
11,11;11:15,17;
12:10,17,18;13:25;
14:6;15:16;16:13,
19;29:22;32:19,20;
40:1,5,8,22;41:2,6;
44:1;51:14;53:4;
54:5,6;55:19
**accountants (1)**
42:22
**accounting (13)**
42:22;43:2,5,8,17,
25;44:19;47:20,21,
23;48:7;49:13,15
**accounts (4)**
9:1;13:19;17:8;
39:22
**accrual (4)**
43:5,7,16;47:23
**accurate (2)**
21:10;50:11
**accurately (1)**
47:24
**accuse (1)**
13:2
**acknowledged (2)**
32:12;51:25
**act (1)**
58:9
**action (1)**
56:1
**activities (1)**
10:24
**actual (12)**
10:16;11:14;
15:15;18:21;19:10;
20:4;22:2;27:9;
34:11;43:3;56:17;
57:1
**actually (19)**
14:4,5,6;18:24;

**20:18,20,21;21:6;**
**27:17;28:17;30:5;**
**31:15;34:18;41:10;**
**43:9,22;50:2,22;**
**51:18**
**addition (1)**
35:20
**additional (1)**
36:24
**address (1)**
42:18
**adhered (1)**
29:10
**admits (1)**
22:8
**adversary (3)**
4:5,6;13:2
**advice (2)**
23:13;60:16
**affect (1)**
46:15
**affidavit (3)**
42:21;45:9;50:13
**affiliated (1)**
55:25
**affiliates (1)**
8:15
**affirmation (6)**
15:17,24;23:1;
31:8;45:14,15
**again (5)**
39:21;46:8;57:4,6;
59:9
**against (1)**
61:7
**agree (1)**
15:4
**agreement (26)**
8:14,16;9:4,11;
10:12,14;17:2,9;
22:10;26:1;27:5,15;
33:23;34:25;38:6,7,
8;39:6,15,16,17;
40:9,21;47:23;48:1;
50:24
**agreements (4)**
7:17;36:18,19,24
**agrees (2)**
43:10,11
**ahead (5)**
12:22;18:18;24:8,
25;53:11
**air (1)**
54:24
**albeit (1)**
39:23
**allegation (1)**
11:25
**allowed (2)**
6:7;57:23
**alter (1)**
46:18
**although (5)**

**19:9;31:25;34:2;**
**37:24;43:18**
**always (2)**
13:19;61:14
**amended (4)**
27:7;15;32:17;
33:22
**amendment (2)**
23:20;24:12
**among (1)**
7:10
**amount (2)**
56:19;59:1
**ancient (1)**
60:7
**and/or (1)**
46:25
**answered (1)**
12:12
**anymore (1)**
42:6
**apologies (1)**
5:10
**apologize (1)**
29:2
**apology (1)**
4:22
**apparently (1)**
22:7
**appeared (1)**
44:11
**appearing (1)**
4:14
**applied (1)**
48:8
**April (1)**
5:1
**Arbitrage (2)**
4:5;6:1
**argues (2)**
9:16;11:17
**arguing (1)**
28:16,16
**argument (4)**
39:9;40:17;56:9;
58:6
**around (1)**
60:22
**arrangement (1)**
28:18
**aside (1)**
40:16
**assessed (1)**
59:3
**asset (2)**
43:8;48:9
**assets (1)**
42:11
**assigned (1)**
26:20
**assignment (22)**
17:20;18:18;19:3;
20:14,16;21:5,6,

**23:6,17;26:14,19;**
**29:23;30:4,6;31:15;**
**41:12;49:3,4;50:7,9;**
**51:17;58:11**
**assignments (1)**
49:23
**assuming (1)**
27:21
**attention (3)**
5:5,9;37:9
**audited (1)**
42:5
**August (7)**
6:13;9:10,23;10:6;
50:23;51:2;52:13
**automatic (1)**
23:15
**available (2)**
29:14;55:17
**Aviv (3)**
20:25;31:22;50:17
**award (2)**
57:12,13
**awarded (1)**
58:3
**aware (1)**
5:8
**away (3)**
23:16;27:10;57:2

## B

**back (7)**
16:15;19:3;34:6;
37:23;39:22;51:16;
61:20
**backdated (5)**
20:16,17;29:23;
41:12;53:5
**backdates (2)**
30:8;41:14
**backdating (2)**
20:14;23:17
**bad (2)**
20:14;21:16
**bankers (1)**
10:13
**bankruptcy (1)**
23:17
**base (1)**
41:24
**based (4)**
25:22;40:11;
41:22;57:2
**basically (2)**
11:20;56:18
**basis (2)**
40:24;58:3
**bear (1)**
43:17
**became (2)**
6:18;47:14
**become (3)**

**9:15;34:9;44:6**
**becomes (2)**
9:11;10:4
**began (1)**
10:2
**behalf (3)**
4:13,19;5:25
**believable (1)**
35:12
**Believing (1)**
15:1
**belong (1)**
42:12
**belonged (2)**
41:20;44:18
**belonging (1)**
57:8
**beneficial (5)**
9:14;25:12;27:12;
48:13;60:23
**benefit (2)**
60:14;61:8
**benefits (1)**
8:7
**beside (2)**
17:11;21:4
**best (1)**
15:20
**better (1)**
58:6
**big (1)**
9:18
**binder (1)**
45:12
**binders (1)**
5:14
**binding (5)**
27:6;34:24;35:25;
36:1;51:23
**bit (2)**
4:22;6:8
**Blocher (1)**
25:8
**Blocker (1)**
55:1
**blockers (5)**
25:19;53:16,22;
57:18,22
**board (2)**
9:13;54:12
**bob (1)**
20:5
**book (3)**
43:10,12;44:2
**booked (5)**
43:8,20,24;44:13;
45:20
**books (1)**
29:13
**both (5)**
22:17;29:10;
37:14;38:8;42:18
**bought (1)**

9:7

**bound (4)**
35:25;37:19;38:5,
7

**breach (2)**
29:7,8

**breather (2)**
38:15,15

**bridge (2)**
56:4,6

**brief (6)**
11:13;15:9,10;
31:19;44:21,25

**briefs (1)**
56:22

**bring (1)**
39:21

**broad (1)**
42:24

**brokerage (4)**
8:13;11:17;12:18;
14:6

**brought (3)**
5:4;14:21;38:24

**Bs (1)**
46:11

**Burns (85)**
4:15,17;5:23,24,
25;11:7,9;12:4,15,
22;13:2,5,12;16:8,
10,15,16;17:21;18:2;
19:17,21;23:4;24:5,
6,9,13,23;25:1;
27:11;29:18;30:21,
23,24;31:3,7,10;
38:16,17,20;39:13;
42:15,16,20;45:6,17,
25;46:2,6,8,14;47:3,
7,10,13,16,19;48:5,
18;50:19,21;52:3,4,
9;53:21,22;55:1,4,8,
17;56:3,21;57:15,18;
59:25;60:1,3,6;
61:12,19,20,22,24;
62:4,12,18

**Burns' (1)**
44:9

**businessman (1)**
49:25

**C**

**calculation (1)**
27:12

**calculations (2)**
25:14,20

**call (2)**
12:24;40:24

**called (1)**
16:3

**calls (1)**
19:9

**came (6)**

5:1;11:14;14:21;
15:15,25;17:10

**can (21)**
5:3,22;13:12,13;
14:17;17:19;22:12;
23:1;29:25;30:25;
37:21;38:10,12;
44:22;45:1,4,4;50:8;
54:22;58:3,17

**cards (1)**
10:2

**careful (1)**
60:19

**case (12)**
6:12;7:4;8:1,3;
21:16;24:19;43:18;
50:23;56:22,23;60:6,
9

**cases (3)**
23:14;54:22;56:22

**cash (1)**
29:1

**catchall (1)**
39:10

**cause (2)**
7:6;54:19

**Cayman (15)**
6:2,15,17,19,19,
21,21;10:19;11:3;
16:22;18:11;19:1;
52:13;53:7;56:14

**Caymans (1)**
10:7

**ceased (1)**
4:24

**CEO (2)**
19:8,12

**certain (5)**
7:6,8,10;42:22;
51:9

**certainly (1)**
12:15;54:2;59:7

**certificated (1)**
8:22

**certifications (1)**
31:25

**certified (9)**
23:22;29:11;32:4;
46:19;48:10,16,24;
51:25;54:12

**cetera (3)**
5:21;8:7;61:5

**CFO (4)**
13:14;16:25;
27:16;43:6

**chambers (3)**
5:3;59:20;62:5

**change (3)**
19:14;32:9;50:15

**changed (1)**
21:3

**Chapman (1)**
4:3

**Chapter (2)**
23:14;56:20

**characterize (1)**
40:16

**charade (1)**
26:14

**charitably (1)**
12:24

**chief (1)**
18:16

**circumstance (1)**
57:24

**circumstances (2)**
17:22;55:10

**cite (1)**
56:21

**cites (1)**
15:17

**claim (3)**
52:11,11;55:6

**clear (10)**
8:4;9:2,9,13;
18:25;48:14;52:18,
19;58:6,11

**clearly (1)**
60:16

**client (10)**
22:8,20,23,23;
23:5,14;30:14;60:16,
19;61:18

**collapse (1)**
10:3

**colleagues (4)**
60:15;61:9,17;
62:10

**collectability (2)**
61:6,13

**collected (1)**
38:25

**collecting (1)**
60:24

**colloquy (1)**
38:19

**coming (3)**
4:23;11:18;20:5

**comity (1)**
6:21

**commenced (7)**
10:19;21:9;23:17;
32:21;52:14;53:8;
60:8

**commencement (5)**
12:2;14:12;16:22;
19:1;56:13

**commences (1)**
30:3

**common (12)**
19:15;24:18;25:4,
5,10;27:13;46:12;
48:12,19;51:25;
53:16;56:7

**common-sense (1)**
36:14

**company (2)**
29:13;48:2

**compensation (1)**
27:24

**complaint (2)**
39:1,5

**completely (8)**
11:20;21:4;30:9,
12;41:16,16;51:3,3

**compliance (1)**
25:24

**complicated (1)**
58:21

**concerned (1)**
10:4

**concerns (1)**
61:13

**conclude (1)**
59:19

**conclusion (2)**
62:6,19

**conclusive (3)**
16:23,24;52:10

**concocting (1)**
53:5

**condition (7)**
8:9;13:24;17:7;
32:25;35:2;39:25;
52:7

**conditions (8)**
7:5,13;10:22;
11:22;17:12;25:25;
52:15,22

**conduct (1)**
59:4

**conducted (1)**
4:7

**confirm (1)**
55:20

**confirming (1)**
48:6

**confirms (1)**
44:16

**connection (3)**
48:8;51:4,5

**consideration (2)**
28:5;60:19

**construction (1)**
36:21

**contact (2)**
59:20;62:5

**contained (1)**
25:8

**contains (1)**
42:24

**contemplated (2)**
28:18;33:23

**contemplates (1)**
36:24

**contemporaneous (1)**
32:1

**continued (1)**
47:21

**continuing (1)**
10:13

**contract (4)**
29:8,9,9,9

**contradicted (1)**
39:17

**contradictory (1)**
51:11

**contrary (1)**
27:7

**control (9)**
8:14,16;10:12;
12:17;17:9,17;40:1,
21;44:8

**controlled (2)**
14:1,6

**conversation (3)**
11:2;18:8,15

**conversations (1)**
62:2

**conversion (2)**
12:6;61:4

**convert (2)**
53:16;54:13

**converted (2)**
7:12;27:3

**convertible (3)**
7:11;21:2;31:21

**convicted (1)**
18:16

**cooks (1)**
29:24

**copies (1)**
5:3

**copy (1)**
18:19

**corporate (1)**
35:15

**corpus (1)**
42:11

**counsel (1)**
57:22

**count (1)**
58:17

**counter- (1)**
13:10

**couple (1)**
13:16

**course (2)**
46:3;61:14

**COURT (177)**
4:2,18,21;6:15,19,
21,22;11:4,8,10;
12:12,21,23;13:4,6;
14:13,17,20;15:1,6,
9,14,21;16:6,9,11;
17:19,24;19:16,19;
20:10,14,20,23;21:4,
15,23;22:1,7,15,20,
22;23:1,4,13,21,23;
24:2,4,7,11,24;26:6,
13,16,19,22,25;
27:19,21;28:2,4,8,

10,12,22,25;29:19,
21;30:3,11,14,17,21,
25;31:9,13,17;32:11,
14,16;33:3,7,9,11,13,
16,18,20;34:6,14;
35:1,9,12,14,15,22;
36:1,4,6,10,14,21;
37:5,7,21,23;38:10,
12,15,18,24;39:3,7,
9;40:11;41:22,24;
42:8,13,19;44:22;
45:1,4,11,14,16;
46:1,4,7,10,21,23;
47:5,9,12,15,18;
48:25;49:2,8,14,17,
20;50:5,20;51:8;
52:3,5,53:11,20;
54:15,17,21,25;55:3,
7,16,18,21;56:16;
57:6,17,25;58:16,24;
59:12,16,18;60:2,5,
11,21;61:16,23;62:1,
14

**courtroom (1)**
4:25
**courts (1)**
57:12
**court's (1)**
6:19
**CourtSolutions (1)**
4:8
**COVID (1)**
5:7
**created (1)**
10:11
**creates (1)**
13:10
**creation (2)**
40:1,9
**credibility (1)**
59:13
**credible (3)**
34:15,16;40:25
**crime (1)**
21:17
**crooked (2)**
49:10,11
**cross- (1)**
4:3
**culminating (1)**
58:9
**curious (3)**
16:12;59:22;60:13
**current (2)**
27:14;56:2
**currently (1)**
26:1
**curtain (1)**
21:10
**custodial (6)**
9:25;10:10;12:10;
13:19;17:4,18
**custody (3)**

17:3,17;27:1
**cut (3)**
6:7;15:2;18:14

**D**

**daily (1)**
31:21
**damage (4)**
53:15;54:19;
57:13,14
**damages (4)**
54:23;57:14;59:1,
3
**dare (1)**
58:20
**dashboard (1)**
4:15
**date (45)**
6:14,16,20;18:22;
19:1,4,5;20:18;21:5,
10,12;22:24;23:8;
30:8,9,12,13,15,20;
31:12,13,14,14,20,
20,20,24;32:8;41:13;
49:18;50:1,8,9,9,10,
10,15,16,21,23;51:3,
6,8,9,19
**dated (2)**
18:24;42:3
**dating (1)**
50:7
**David (2)**
11:2;18:8
**day (3)**
10:1;18:10,14
**days (1)**
55:24
**deal (5)**
9:18;10:25,25;
27:22;35:16
**dealings (1)**
58:20
**debtor (2)**
23:16;57:3
**December (4)**
6:24;7:9,22;19:24
**decide (1)**
6:11
**decided (1)**
51:15
**decides (1)**
23:6
**decision (1)**
59:21
**declaration (3)**
23:4;31:9;55:2
**declined (1)**
61:1
**defend (1)**
57:10
**defendant (2)**
6:5;26:1

**delay (1)**
5:10
**deliver (6)**
11:15,19;12:14;
15:16;17:13,15
**delivered (1)**
12:1
**dense (1)**
55:5
**deposited (2)**
8:12;9:25
**deposition (1)**
20:4
**deprived (2)**
54:4;57:20
**described (1)**
7:6
**different (3)**
46:13;49:15;51:23
**difficulties (2)**
32:6;60:24
**diminished (1)**
55:14
**diminution (2)**
54:7;56:23
**directly (2)**
11:25;18:15
**director (2)**
9:20;27:14
**disagree (3)**
20:7;57:4;59:10
**disclose (1)**
48:1
**discovery (1)**
29:14
**discussed (1)**
48:7
**discussing (3)**
11:13;43:23;44:5
**discussion (1)**
16:17
**discussions (5)**
59:23,23;60:8,9,12
**dispute (4)**
7:9;21:19;36:8;
46:2
**disputed (6)**
13:8;15:21;26:4;
40:12;52:6;53:14
**disrupting (1)**
4:24
**dissipation (1)**
56:23
**dissolution (1)**
22:21
**dividends (1)**
8:6
**docket (1)**
5:4
**document (14)**
14:18;15:8;20:17;
25:14,16;34:3,23;
36:15;37:1;40:9,22;

42:1;49:23;55:5
**documentation (2)**
22:13;35:4
**documents (15)**
8:23;9:14;17:16;
22:3;35:15,17,18,20,
24;36:17,22;38:6;
39:11;43:2,5
**dollar (1)**
57:13
**dollars (8)**
7:24;19:24;20:1,2;
34:10;38:22,23;39:7
**done (13)**
10:25;13:23;14:4;
16:23;17:6;19:12;
26:3;28:9;41:10;
44:5;50:18;52:14,21
**down (2)**
56:7,10
**Dr (70)**
4:19;7:8;11:12;
12:1,13,23,25;13:9,
22,22,23;14:20;
15:15,25;16:3;
17:20;21:20;22:3,
18;24:1,18;27:4,8,9,
13,24;29:1,11,16;
32:8,9,25;33:2,11,
12,13,15,17,20,21;
34:24;37:15,24;38:2,
21;39:12,18;40:14;
41:11,13,20;46:17,
18;48:12,14,24;49:2,
9,17,20,24;50:16,18;
51:6;58:3,13,16;
59:16;61:7,13
**draft (3)**
23:6;36:23;37:1
**dropped (1)**
21:11
**dubious (1)**
27:22
**due (2)**
18:17;29:1
**during (2)**
29:14;61:5

**E**

**earlier (6)**
10:6;16:21;18:24;
21:12;27:6;35:19
**early (1)**
54:1
**easy (1)**
39:1
**effect (4)**
16:24;23:15;
36:17;41:4
**effective (2)**
27:15,15
**effectively (2)**

9:7;33:5
**effectuate (1)**
55:25
**Eisen (1)**
62:5
**either (5)**
15:2;37:10;57:13;
58:12;60:13
**eleven (6)**
7:24;19:24,25;
20:1;38:21;39:7
**eleven-million-dollar (1)**
8:2
**else (4)**
34:19;37:13;
51:12;52:8
**email (16)**
18:7;20:19;22:22;
23:9;30:18;31:1,5,
10,19;44:9;45:8,17;
48:6,9;50:6,14
**end (6)**
9:8;12:20;16:21;
17:6;19:23;35:17
**ending (1)**
45:19
**enforceable (1)**
37:19
**engaged (2)**
34:7;51:16
**Englewood (1)**
59:17
**enough (1)**
34:12
**enter (1)**
9:10
**entirely (2)**
4:7;58:19
**entities (4)**
8:10,19,24;10:17
**entitled (2)**
11:23;58:5
**error (1)**
27:5
**essentially (1)**
24:14
**established (1)**
11:22
**establishes (1)**
51:9
**establishing (1)**
12:9
**estate (3)**
41:19;42:6,9
**et (3)**
5:21;8:6;61:5
**even (6)**
34:17;36:17;52:1;
53:13;54:10;58:24
**event (3)**
20:18,20,20
**eventually (1)**
53:3

**everyone (1)**
4:2
**evidence (1)**
37:7
**exact (4)**
11:11;30:19;31:1;
49:21
**exactly (11)**
25:5,17;34:11;
37:4,6,7;43:5,6,13,
14;46:8
**example (1)**
23:15
**Exchange (14)**
9:11;17:2;20:25;
27:5;31:21,22;
46:13;47:1,2;50:12,
17,18,24;58:10
**exchanged (10)**
36:17;44:16,16,
17;45:22,23;46:11,
12,25;47:8
**excludable (2)**
25:12,15
**excluded (4)**
25:13,18;27:12;
48:12
**Excuse (2)**
24:23;28:12
**execute (7)**
18:18;33:1,23;
34:18;35:6;41:12;
51:17
**executed (5)**
19:14;34:23;
39:11,16;50:24
**exercisable (1)**
25:3
**exercise (4)**
25:9,19;48:22;
55:8
**exercised (3)**
25:4;27:2;48:20
**exercising (1)**
25:9
**Exhibit (9)**
23:2,4;31:7,9;
42:21;45:8,15;
50:13;55:2
**exist (2)**
22:4,7
**existing (1)**
6:17
**expect (1)**
6:5
**extend (2)**
6:21;17:25
**extensively (1)**
5:17
**extent (7)**
5:2;13:9;15:24;
25:9;56:11;58:4;
61:3

**extremely (4)**
6:10;58:18;59:4,4

## F

**face (6)**
7:16;9:4;16:12;
34:14,15;58:19
**facilitate (1)**
19:10
**fact (35)**
9:19;12:11;13:8;
14:8;15:22;20:3;
22:2;25:13,16;26:2;
27:8,8,18;34:2;
36:25;37:9,17,20,22;
38:8;39:9,17,21,24;
42:6;43:20,21,23;
46:17,18;48:21;
51:5;54:6;59:1;
60:25
**facts (5)**
6:9;34:22;51:22;
52:6;53:13
**factual (2)**
10:18;43:19
**failed (1)**
48:22
**fair (2)**
7:22;39:13
**far (1)**
58:6
**favor (1)**
8:14
**feels (1)**
59:10
**feet (1)**
57:9
**felon (1)**
18:17
**felt (1)**
34:1
**few (3)**
6:8;16:16,17
**fifteen (4)**
5:19;6:6;17:25;
59:18
**fighting (2)**
7:23;38:23
**figure (2)**
24:14;41:11
**file (1)**
38:21
**filed (5)**
6:15;10:7;41:9;
48:16;60:6
**filing (2)**
24:15;53:25
**filings (1)**
4:23
**Filippo (1)**
37:25
**finally (1)**

11:18
**financial (13)**
27:20;29:12,15;
42:5,17;43:2,4,4,14,
21;44:9,12;47:25
**financials (1)**
48:8
**find (11)**
5:5;11:11;14:25;
21:16;31:6;45:5,12;
52:3,5;53:12;59:3
**findings (1)**
59:11
**finish (2)**
24:24,24
**first (11)**
4:21;5:23;6:25;
7:15;8:20;28:14;
29:6,6;51:15;53:24;
61:24
**fit (1)**
57:8
**five (1)**
19:14
**flatly (1)**
39:17
**flipping (1)**
31:3
**flow (1)**
8:7
**flurry (1)**
10:24
**focus (2)**
6:8;7:3
**fog (1)**
5:7
**followed (3)**
10:23,24;41:7
**following (2)**
12:6;16:22
**follows (1)**
43:1
**force (1)**
36:17
**foreign (5)**
5:25;56:16;58:25;
60:23;61:4
**form (6)**
12:8;13:18;18:18,
21;19:3;50:9
**former (4)**
13:14;16:25;
18:16;43:6
**forms (1)**
29:20
**forth (4)**
33:5;36:7;38:5;
51:16
**forward (2)**
58:22;62:11
**found (2)**
20:17;37:25
**four (1)**

38:23
**frankly (4)**
5:2,21;6:11;25:21
**free (2)**
8:4;9:9
**front (1)**
30:18
**frozen (1)**
18:11
**fruitful (1)**
60:9
**full (5)**
9:5;15:14;28:5;
29:4;36:16
**fully (3)**
29:10,10;58:22
**Fund (6)**
4:5;6:1;8:1;29:16;
34:7;44:7
**funds (2)**
7:6,20
**further (3)**
22:13;36:17;38:6

## G

**gain (1)**
53:18
**galore (1)**
54:22
**gander (1)**
56:9
**Gave (3)**
18:22;28:3,5
**gee (1)**
21:9
**gets (2)**
43:8,12
**gift (1)**
27:23
**given (6)**
26:8;60:9,16,24,
25;61:13
**glad (1)**
5:6
**goes (2)**
24:22;58:13
**Gold (1)**
55:24
**Goldberg (141)**
4:5,19;6:23,25;
7:8,18,18,25;8:5,11;
9:5,5,12,16;10:3,10,
17,21,21,24;11:1,3,
12;12:1,13,24,25;
13:1,10,22,23,23;
14:4,12,21;15:15,17;
16:1,3;17:5,12,20;
18:7,10,12,14,17,19,
21;19:3,6,8,11;20:2,
3;21:3,20;22:4,18;
23:1,9;24:1,19;
25:14,23;27:5,14,24;

29:1,11,16,24;30:3;
31:10,23;32:2,3,5,8,
25;33:2,12,13,15,17,
18,20,21;34:24;
37:15,24;38:2,21;
39:12,18;40:14;
41:11,13,14,20;42:4,
21,23;43:10,12,21,
22,24;44:2,4,13,18;
45:19;46:17,19;48:3,
12,14,19,24;49:3,9,
17,20,24;50:17,18;
51:7;52:14;54:1,9;
55:21;56:5,11,15;
58:3,10,13,16;59:16;
61:7
**Goldbergs (1)**
44:19
**Goldberg's (14)**
10:16;20:3;27:8,
10;32:9;44:13,15;
45:20;50:13;51:24;
54:5,6,55:18;61:14
**Good (9)**
4:2,17,18,20,21;
30:6;34:12;41:16,16
**gotcha (1)**
48:23
**graciously (1)**
6:7
**grant (3)**
44:1;58:12,24
**gross (1)**
54:7
**ground (1)**
18:1
**guess (1)**
37:11
**guy (2)**
21:9;23:7
**guys (2)**
21:7;23:5

## H

**ha-ha (1)**
48:23
**hand (4)**
11:19;14:22;
51:16;58:17
**hands (2)**
27:8;41:14
**hang (1)**
18:23
**hanging (1)**
60:22
**hangs (1)**
50:2
**happen (3)**
12:20;39:15;40:3
**happened (12)**
8:4;14:3,4;17:22;
18:5;27:6;31:15;

Platinum Partners Value Arbitrage Fund, L.P.
Michael Goldberg

16-12925-scc & 18-01650-scc
December 8, 2021

46:3;9;50:22;53:3;
60:10
**happens (5)**
10:5;18:13;29:25;
43:9;54:19
**happy (2)**
5:19;61:14
**hard (2)**
24:16;59:5
**hat (1)**
29:24
**haw (1)**
38:3
**heads (1)**
25:6
**hear (3)**
5:16,17;60:11
**hearing (5)**
4:3,7,9;59:19;62:3
**heavily (1)**
53:13
**held (4)**
7:8;9:24;25:5;51:1
**help (1)**
30:25
**hem (1)**
38:3
**herein (1)**
7:6
**here's (2)**
35:16;55:10
**hey (1)**
39:4
**highlights (1)**
5:20
**himself (5)**
18:7;29:24,25;
41:14,15
**history (2)**
58:9;60:7
**hold (19)**
9:6;15:1;24:2,4,4;
26:7,7,7;30:22;42:8,
8,8,13;45:1,11,16;
46:21,23;53:20
**holding (1)**
27:9
**Holland (1)**
4:16
**honest (1)**
49:25
**Honor (93)**
4:17,20;5:24;6:4,
7;7:10;9:2;11:7;
12:4,15,22;13:12;
14:16,19,24;15:4,7,
7,19;16:5,8,16;
17:21;18:2;19:18;
20:13;21:18;22:6,
11;23:12,18;24:6,10;
25:7;26:5,24;28:1;
29:2;30:10,24;31:3;
33:8;34:22;35:14;

36:12;37:14,18;
38:17,20,22;40:4;
41:17;42:16,18;44:7,
24;45:6,13;46:14;
47:3,7;48:4,5,10,18;
50:19;51:21;52:4,9;
53:9,9,12;55:1;56:3,
21;57:12,16;58:15,
23;59:7,8,9,10,14,
25;60:4,20;61:11,12,
21,22;62:13,18
**Honor's (1)**
15:5
**hope (1)**
13:13
**hour (1)**
18:13
**house (1)**
10:2

# I

**idea (3)**
23:15;40:23;41:11
**identify (2)**
4:12,13
**identifying (1)**
62:6
**idly (1)**
55:13
**ie (1)**
17:13
**imagine (1)**
5:3
**immediately (2)**
11:18;19:12
**impact (1)**
53:19
**implemented (2)**
28:6;29:10
**important (5)**
7:2;8:18;13:6;
14:14;39:23
**importantly (1)**
22:14
**impossible (2)**
5:5;24:14
**improper (1)**
57:9
**improperly (2)**
54:8,10
**inability (1)**
61:4
**included (2)**
44:19;47:20
**includes (1)**
7:7
**including (3)**
8:21;28:5;56:23
**inconsistent (1)**
58:8
**incredible (3)**
34:15;40:16;58:8

**incurred (1)**
43:9
**Indeed (1)**
58:24
**indicate (2)**
43:21;44:3
**indication (1)**
43:23
**indiscernible (7)**
28:9;36:6;38:7;
41:21;48:5;49:1;
50:13
**inform (1)**
62:11
**in-house (1)**
42:22
**ink (1)**
8:23
**inscrutable (2)**
25:22;27:11
**insist (1)**
29:18
**insisted (1)**
27:3
**instance (1)**
29:6
**instances (1)**
29:7
**instructive (1)**
6:10
**intended (3)**
7:16;8:20;9:3
**interest (7)**
8:20,25;14:1;18:6;
38:1;41:4;44:2
**interested (3)**
61:16;62:7,9
**interests (1)**
28:18
**interrupt (2)**
11:5,8
**interrupting (1)**
17:24
**intimation (1)**
18:25
**into (11)**
7:12;8:13;9:10;
12:7,9;21:3;23:15;
27:4;39:3;51:1;
53:16
**investment (2)**
7:6;18:16
**Islands (1)**
6:2
**issuance (3)**
22:3;25:3;36:11
**issue (17)**
7:12,19;9:5,12;
15:21;20:9;23:18;
34:8;35:20,24;36:4;
39:12,14,14,18;
43:10;52:6
**issued (17)**

9:21,23,24;10:17;
12:6,7;14:5;17:1;
22:8;18;25:2;31:23;
32:19;35:9,25;39:8;
51:6
**issues (4)**
13:8;41:14;59:1,
13

# J

**January (1)**
45:8
**Jersey (1)**
59:17
**job (1)**
19:12
**Judge (2)**
4:2;39:4
**judgment (18)**
4:4;6:5,6;13:7;
15:11,12;38:25;
39:4;56:18;57:1,12;
58:3,5,12,25;59:14;
60:25;61:7
**July (4)**
42:3,17,20;43:14
**June (1)**
27:16
**jurisdiction (1)**
6:19

# K

**keep (2)**
5:5;44:1
**kept (1)**
29:13
**key (3)**
6:8;7:3;8:9
**kidding (2)**
35:6,8
**kind (1)**
58:2
**knew (1)**
49:9
**Knight (1)**
4:16
**knowing (1)**
21:7
**knowledge (1)**
15:20
**knows (1)**
14:3
**Kook (152)**
4:19,20;14:15,16,
18,24;15:4,7,13,19;
16:5;20:12,13,16,22,
24;21:14,18,25;
22:11,16,21,25;23:3,
11,12,18,22,24;24:3,
12,15,22,23;26:5,7,
12,15,18,21,23;27:1,

20;28:1,3,5,9,11,20,
24;29:1,20;30:2,10,
12,16,18;31:2,5,16,
18;32:12,15;33:2,4,
8,10,12,15,17,19,25;
34:13,22;35:8,11,13,
21,23;36:3,5,7,12,
16;37:4,6,14,22,24;
38:11,12,14;40:4;
41:17,23;42:2,10,23;
44:7,23;45:3,10,13,
14,15,17,23;46:5,15,
22;47:4,6;48:4,10,
21;49:1,6,11,15,19;
50:4,6;51:5,21;53:9,
12;54:10,16,17,19,
22;55:16,20,22;57:4,
12,21;58:15,22;59:5,
7,13,17;60:1,8,20;
61:11,18,20,24;
62:13,17
**Kook's (1)**
45:7
**KOOOK (1)**
22:6

# L

**lack (1)**
25:24
**language (5)**
7:3;24:15;30:19;
31:1;45:5
**large (1)**
5:4
**late (3)**
10:14,14;56:4
**later (3)**
18:14;19:13;32:8
**latter (2)**
4:23;35:5
**laughed (1)**
39:7
**law (5)**
6:17,21;15:10;
20:17;56:22
**lead (1)**
44:8
**learned (1)**
53:25
**least (3)**
4:22;10:21;52:10
**left (2)**
6:23;21:8
**legal (5)**
9:14;43:3,19;44:4,
6
**legend (1)**
55:23
**lie (1)**
37:15
**lieu (2)**
38:25;39:4

**life (3)**
  4:24;5:11;30:5
**light (3)**
  11:3;18:10;60:25
**line (4)**
  6:14;10:5;49:10,
  11
**liquidated (1)**
  41:19
**liquidation (14)**
  6:1;10:19,25;11:3;
  14:12;18:11;19:1;
  32:10,15;45:24;
  46:16;52:13;53:5,7
**liquidator (1)**
  57:22
**liquidators (5)**
  6:20;54:2;55:13;
  57:19;61:4
**list (4)**
  4:11;20:24;21:1,2
**listed (2)**
  7:17;50:9
**literally (1)**
  18:13
**litigation (1)**
  16:22
**little (4)**
  6:8;15:3;17:11;
  40:11
**live (3)**
  52:17,22;53:1
**loan (1)**
  7:20
**long (3)**
  23:11;38:23;47:21
**longer (2)**
  29:16;55:24
**look (3)**
  15:24;23:1;61:6
**looking (3)**
  14:18;45:6,7
**looks (2)**
  5:12;21:13
**lost (2)**
  5:7;6:17
**lot (4)**
  5:15;7:1;56:3;
  60:21
**lots (1)**
  6:4
**LP (1)**
  6:1

## M

**made-up (4)**
  30:9,12;51:3,8
**magical (2)**
  44:3;52:12
**magically (1)**
  44:11
**main (1)**

**makes (4)**
  12:1;36:23;50:3;
  61:22
**making (2)**
  13:1,10
**management (16)**
  6:17,25;7:5,7;
  8:15;23:24;27:17;
  29:12;32:4;42:3;
  45:20;46:20;48:11,
  13,17;52:16
**manager (3)**
  18:9;27:18;34:7
**Many (2)**
  8:21;23:14
**March (5)**
  4:25;21:21;27:15;
  41:18,18
**Mark (2)**
  18:15;31:10
**market (1)**
  7:22
**mastery (1)**
  55:6
**material (2)**
  39:25;52:6
**matter (14)**
  9:19;12:11;14:8;
  26:2;39:21,24;40:6,
  25;41:1;53:6;54:7,
  18;59:20;61:1
**May (7)**
  5:2;22:11;35:23;
  43:18;44:23;50:19;
  53:9
**maybe (7)**
  15:24;20:6,6,7,8;
  34:11;51:11
**mean (15)**
  19:19;22:9;24:20;
  28:22,22;32:23;
  34:10,14;48:6;
  53:23;57:9,11;58:2,
  2;60:11
**meaning (2)**
  35:23;50:16
**means (6)**
  19:24;25:15;
  34:11;35:5,9;52:24
**meant (1)**
  36:25
**mechanism (1)**
  29:4
**mechanisms (1)**
  28:20
**mediation (3)**
  61:17;62:8,9
**mediator (2)**
  60:15;61:9
**member (1)**
  9:12
**memo (4)**

**35:21**
**makes (4)**

**42:17,20;43:15;**
  44:7
**memorandum (2)**
  15:10;42:3
**men (1)**
  41:7
**mere (2)**
  56:12,24
**merely (1)**
  49:23
**Michael (7)**
  4:5;24:1,18;27:13;
  31:10;48:12,14
**might (2)**
  55:10;62:11
**million (10)**
  7:24;19:14,24,25;
  20:1,2;38:22,23;
  39:7;48:19
**million-and-change (1)**
  25:3
**millions (1)**
  34:9
**mind (1)**
  58:25
**minimum (1)**
  13:25
**minute (3)**
  37:23;44:23;53:20
**minutes (4)**
  5:19;6:7;17:25;
  59:19
**misfortune (1)**
  4:23
**missing (1)**
  32:16
**misstatement (1)**
  12:24
**mistake (1)**
  9:17
**moment (18)**
  10:9,19;11:11;
  17:23;27:21;34:7;
  42:14;44:4;45:11;
  49:21,22;52:12,18,
  23;53:1,3;56:8;57:2
**monetary (4)**
  53:18,19;56:18;
  57:14
**monetize (1)**
  54:13
**monetizing (1)**
  54:3
**month (4)**
  16:21;19:13;53:4,
  5
**monthly (1)**
  48:8
**months (5)**
  5:12;10:23,23;
  20:5;27:6
**more (7)**
  16:17,17;21:1;

**22:13;44:23;48:14;**
  58:17
**morning (7)**
  4:2,3,12,17,18,20,
  21
**motion (3)**
  6:6;15:11,12
**motions (1)**
  4:4
**moving (1)**
  39:4
**much (5)**
  18:2,3;57:10;
  62:16,18
**myself (1)**
  51:16

## N

**name (9)**
  9:24,24;10:10;
  12:8;16:4;19:13,13;
  47:17;52:25
**narrative (1)**
  13:11
**nature (1)**
  59:23
**NAV (1)**
  45:18
**Navidea (30)**
  7:11;9:10,20;
  11:19;12:6;14:22;
  17:1;19:6,8,10,11;
  20:24;25:10,18;27:2,
  14;29:24;41:10;
  44:14;45:21;46:12,
  24;47:1,8;48:19;
  49:6,8;50:25;55:24;
  56:7
**Navidea's (4)**
  9:12;12:6,14;
  53:25
**necessarily (2)**
  43:17;61:13
**necessary (3)**
  22:13;37:17;38:4
**need (16)**
  5:16,17;6:11;16:2;
  18:1;23:3;26:17;
  32:19;35:18,20;
  37:1;39:11;51:11,
  18;58:13;59:19
**needed (15)**
  8:12,16,25;20:9;
  26:17;37:11,11;
  41:10;44:6;46:12;
  49:9,23;52:14,21;
  55:13
**needs (2)**
  32:18;58:16
**negate (1)**
  35:19
**negotiate (1)**

**10:13**
**net (1)**
  48:9
**New (1)**
  59:17
**newly (1)**
  10:4
**next (2)**
  59:21;62:15
**ninety-nine (1)**
  55:9
**ninety-three (1)**
  56:7
**noise (2)**
  6:4,8
**nominal (1)**
  57:14
**none (7)**
  35:24;41:6,7;50:2,
  3;58:4,4
**nor (3)**
  7:16;9:3;54:9
**Nordlicht (26)**
  18:15,18,20,22,23;
  19:3,4,5;20:18;23:7,
  10;30:7,15;31:11,16,
  18;41:13;49:18;
  50:7,8,14,14;51:17,
  19;58:10,20
**normal (2)**
  5:11,12
**note (37)**
  6:13;7:25;8:2,3,5;
  9:5;10:17;19:17,19,
  25;20:1,4,6,7,7,9,9;
  22:9,10,12,17;25:7;
  28:14,25;34:3,10,11,
  23;36:7;37:9;39:6;
  40:18,21;43:20,22,
  24,24
**noteholders (1)**
  8:7
**notes (80)**
  7:15,19,20,21;8:8,
  11;14:5;17:23;
  19:16,17;20:8;22:3,
  4,4,7,8;25:25;27:17;
  28:13,15,16,17,18,
  19,23;29:4,5,22;
  32:19,21,22,23,24;
  33:1,4,6,23;34:2,3,4,
  9,17,18,19;35:3,6,9;
  36:4,5,11;37:10,11;
  38:2,21,24;39:2,3,5,
  5,8,8,12,16,18,22;
  40:15,17;41:1,5;
  42:4,5;43:10,12;
  44:12;45:19;48:2;
  51:11,12,13;52:6
**noting (1)**
  24:15
**notion (1)**
  39:16

18-01650-jpm    Doc 65-6    Filed 03/02/23    Entered 03/02/23 00:58:19    Exhibit 4 -
Platinum Partners Value Arbitrage... Pty.    Transcript    Pg 72 of 76

Michael Goldberg    16-12925-scc & 18-01650-scc
December 8, 2021

**notwithstanding (1)**
25:24
**November (1)**
6:23
**number (2)**
4:6;24:12

## O

**oath (1)**
33:21
**objection (2)**
9:16,21
**obligated (1)**
34:1
**obligation (6)**
17:13;37:3;40:15;
43:8;47:25;52:16
**obtain (1)**
61:7
**obviously (4)**
5:8;13:8;17:24;
56:3
**occur (1)**
40:8
**occurred (10)**
11:21;28:21;29:5;
31:22;40:7;49:24;
50:2;51:10;54:23;
58:9
**occurs (1)**
29:23
**October (24)**
11:1,15;12:2,13;
15:16;16:1,11;
17:20;18:5,10,22;
19:5,6;21:7;23:9;
50:4,6,7,10,12,15,21;
51:3;56:14
**odds (1)**
11:20
**off (5)**
8:3,5;9:7;53:18,19
**officer (1)**
18:16
**often (1)**
57:12
**once (5)**
5:8;8:3;9:7,7;41:9
**one (31)**
5:2;6:5;11:10,10,
12;13:18;21:1,9;
22:12;24:14;25:21,
22,23;29:6;31:6;
32:21;37:9;41:8;
42:21,24;44:23;
47:13;49:16;57:13;
58:17;59:15;60:14;
61:9,17;62:6,10
**one-sentence (1)**
41:25
**only (6)**
21:15,15;37:1;

**41:24;48:18;58:4**
**opaque (1)**
48:15
**open (1)**
59:2
**opened (1)**
11:17
**opening (2)**
55:2;56:22
**operative (1)**
6:14
**opportunity (1)**
54:4
**opposite (1)**
53:14
**opposition (1)**
15:11
**options (3)**
55:17;57:19,20
**order (9)**
26:21;27:1,19;
34:9;40:20;41:4,5;
44:6;59:14
**ordered (3)**
27:20;29:15;44:11
**otherwise (1)**
38:1
**out (12)**
5:6,9;16:6;18:14,
15;24:14;30:25;
39:7;41:11;47:23;
48:1;54:24
**outline (1)**
59:21
**outright (3)**
7:17;9:4;25:23
**outset (2)**
6:13;9:2
**over (8)**
6:18;14:8;25:10;
38:9;49:10;55:6,9;
59:18
**overall (2)**
28:17;40:12
**overrides (2)**
35:7;39:11
**own (5)**
9:9;26:3;42:5;
44:9;51:18
**owned (34)**
22:18;23:25;24:3,
18;25:14,23;26:2,8,
9,19;27:2,4,13;
29:11,16,17;31:20,
23,23;32:8,13;41:17,
18;43:19;46:16,17;
48:12,14,21;50:11,
17,18;51:7;52:12
**owner (9)**
9:15,19;32:2,3,5;
34:9;44:4,6;46:19
**ownership (26)**
21:20;23:19,25;

**24:16;25:10,12;27:7,**
8,10,12;32:9;41:19;
42:25;43:3;44:8;
46:15;47:22;48:13,
23,25;49:2,4,12,22;
51:23,24
**owns (2)**
26:22;42:4

## P

**page (7)**
11:14;15:8,9,10,
13,14;55:4
**paid (7)**
8:3,5;9:7;19:20;
27:24;28:19;29:4
**pair (1)**
57:8
**pandemic (1)**
4:24
**paper (9)**
8:23;12:8,9;16:23;
17:2;19:10;29:23;
49:9,23
**papers (9)**
4:22;5:1;6:5;
13:10,15;14:20;51:9,
10;56:7
**paragraph (2)**
15:14,18
**paragraphs (1)**
25:16
**part (7)**
31:25;38:7;41:19;
42:6,10,10,11
**participate (1)**
4:12
**participation (1)**
44:2
**particular (3)**
7:15;18:6;42:15
**particularly (1)**
60:25
**parties (11)**
21:19;29:9,10;
31:24;32:2,13;
36:23;38:8;52:1;
59:24;62:7
**Partners (3)**
4:4;6:1;22:17
**party (2)**
4:13;52:2
**pass (1)**
61:25
**passed (6)**
23:20;41:20;
51:23;52:19;56:4,6
**past (3)**
5:11;38:18,19
**path (1)**
62:11
**pause (3)**

**14:13;20:10;42:13**
**pay (6)**
28:4;37:8;40:14,
15,20;51:13
**paying (1)**
37:8
**payment (4)**
28:21;29:5;40:15,
20
**people (1)**
54:22
**per (3)**
34:4;44:13;45:20
**percent (5)**
25:10;53:17;
54:16;55:9;56:7
**perform (1)**
17:13
**period (2)**
45:19;61:5
**permitted (1)**
4:10
**person (3)**
16:1,2,4
**perspective (1)**
60:23
**petition (3)**
6:15;10:6;41:9
**ph (1)**
23:20
**physical (11)**
13:18;17:2,16,16;
19:9;27:1;32:7;40:7,
7;46:18;52:19
**physically (5)**
4:25;11:19;12:14;
14:21;48:22
**piece (3)**
18:4;29:23;49:23
**pieces (1)**
17:2
**place (11)**
11:11,16;15:17;
16:12,14,20;20:18,
21;21:5;31:23;49:3
**places (1)**
13:15
**plaintiff's (1)**
15:12
**platform (1)**
4:8
**Platinum (50)**
4:4;6:1,23,24;7:4,
4,20;8:1,1,10,14,17,
19,24;10:2,17;11:2,
14,18;12:13,19;14:7;
15:15,25;16:1,20;
17:14;18:9,12,17;
22:17;23:24;24:1,3;
25:4;27:16,18;32:4;
40:2;42:2;43:7,11,
20,24;45:20;46:20;
48:11,13,17;52:15

**Platinum's (8)**
10:12;13:14;
16:25;17:12,17;
18:16;42:21;43:6
**pleadings (1)**
5:18
**Please (8)**
4:12;38:13;39:6;
42:13;45:1,2,12;
46:23
**pm (1)**
31:11
**point (20)**
5:15;13:6;14:14,
20;16:13;17:11;
19:8;21:5;23:19;
30:19;35:22;37:19,
22;42:9,15;45:4;
51:22;55:14;59:11;
60:7
**points (5)**
5:19;13:16;16:17;
22:11;58:17
**pop (1)**
54:24
**portfolio (1)**
18:9
**position (6)**
12:23;26:10;
34:16;37:10,11;
44:20
**positions (3)**
7:8,10;47:20
**positively (1)**
40:2
**possesses (1)**
56:11
**possession (8)**
10:20;12:5;17:17;
32:7;46:18;52:19;
53:1,24
**possibility (1)**
54:12
**post- (1)**
10:24
**post-liquidations (1)**
40:3
**potential (1)**
60:24
**power (1)**
38:9
**powerless (1)**
55:12
**PP (1)**
22:17
**PPVA (59)**
6:2,15,18;7:7;8:2;
9:10,14,22;10:20;
11:3;12:1,5,8,9;
13:18;14:7;19:25;
22:17;23:19,24;25:4,
8,10,17;27:9;28:6,6;
29:7,11;31:24;32:4,

7;38:21;42:5,12;
44:10;46:17,22;
48:11,13,17,22;
50:24;51:1;52:1,8,
15,20,24;53:14;
54:12;55:12;56:16;
57:4,14,22;58:5,6,12

**PPVA's (24)**
6:17,18;9:24,24,
25;10:9,10,15;12:8,
23;13:19;14:1;17:3,
3;19:13;25:12,13;
42:11;44:20;47:17,
20;52:25,25;53:7

**practical (1)**
40:6

**pre- (1)**
32:9

**precedent (7)**
13:24;17:8,12;
32:25;39:25;52:7,15

**preceding (1)**
25:25

**preferred (12)**
7:11;9:11,15,19;
12:7;44:14,17;
45:21;46:11,24;
47:10;50:25

**preliminary (2)**
36:20;60:8

**pre-liquidation (1)**
14:9

**prepaid (1)**
8:11

**preparation (1)**
56:8

**prepare (1)**
59:15

**prepared (5)**
5:17;18:21;47:22;
58:22;59:21

**prepay (1)**
8:7

**presentation (2)**
5:22;6:3

**presents (1)**
32:21

**preserve (1)**
8:24

**presume (1)**
14:3

**pretty (1)**
58:5

**prevent (1)**
25:19

**prevented (1)**
25:8

**preview (1)**
58:2

**price (1)**
9:8

**primary (2)**
45:8;52:11

**prior (2)**
12:16;14:12

**priority (1)**
8:20

**private (2)**
4:9;29:12

**problem (7)**
23:5,7,8;30:4,7;
39:2,5

**problematic (1)**
58:18

**procedure (1)**
55:11

**proceed (1)**
40:24

**proceeded (2)**
11:22;20:5

**proceeding (4)**
4:5,6;53:7;56:14

**proceedings (5)**
10:19;18:11;19:2;
52:13;62:19

**proceeds (1)**
41:3

**produce (1)**
35:24

**produced (1)**
20:3

**promised (1)**
13:23

**proof (1)**
47:22

**proper (2)**
54:11;57:3

**properly (2)**
25:12,15

**property (10)**
6:18,18;23:16,19;
52:12,24;53:6;
56:25;57:2,20

**protect (2)**
8:24;14:1

**protected (1)**
8:20

**protection (2)**
17:9;40:1

**protections (7)**
8:10,11;9:1,1;
12:18;14:1;16:20

**prove (2)**
54:23,23

**provided (3)**
18:19;22:3;43:22

**provision (9)**
34:20;35:3,5,18,
19;39:10;52:6;55:1,
5

**provisions (2)**
25:8;32:18

**pull (1)**
17:23

**punitive (1)**
59:3

**purported (1)**
17:19

**purposes (3)**
7:14;47:24;53:6

**pursuant (5)**
17:1;27:14;33:22;
38:25;50:25

**put (20)**
5:13;11:22;12:9;
18:21;19:4;21:10,
12;22:23;23:8;30:8,
15;31:11;33:18,20;
41:12;49:18;50:1,9;
51:8,19

**Puts (1)**
19:5

**putting (1)**
40:16

## Q

**quick (1)**
56:9

**quickly (1)**
58:21

**quite (2)**
58:10;62:9

**quote (1)**
7:19

**quoted (2)**
31:19,19

**quoting (2)**
15:5,8

## R

**radically (1)**
58:7

**raised (2)**
9:16,20

**raises (1)**
8:9

**rather (7)**
4:24;13:6;16:7;
18:3,3;19:5,13

**reached (1)**
5:6

**reaches (1)**
18:15

**reaching (1)**
52:7

**read (2)**
31:1;36:22

**reading (3)**
36:14;39:14,19

**ready (2)**
17:14;59:14

**real (2)**
31:13;49:12

**reality (2)**
40:11;43:19

**realize (2)**
23:5;41:9

**realized (2)**
21:9;53:18

**realizes (2)**
23:7;30:4

**really (5)**
5:17;15:1;21:10;
36:25;51:17

**reason (2)**
13:21,22;14:9,11;
17:4;60:12

**reasonable (1)**
39:19

**reasonably (2)**
8:16;16:20

**rebutted (1)**
14:10

**recall (4)**
34:3,18;37:24;
38:11

**receivable (5)**
43:20,25;44:13;
45:19;48:2

**receive (3)**
29:2;48:2;52:23;
53:2

**receiving (1)**
13:24

**recognize (1)**
44:2

**recommends (1)**
42:22

**record (2)**
4:13;10:18

**recording (1)**
4:8

**recordings (1)**
4:9

**recovery (2)**
56:18,24

**recreations (1)**
58:8

**refer (1)**
6:2

**reference (2)**
25:18;48:7

**referenced (1)**
44:14

**referred (3)**
7:19;10:5;31:21

**referring (1)**
25:6

**refers (1)**
44:9

**reflect (1)**
34:6

**reflected (1)**
40:15

**reflecting (2)**
18:7;47:24

**reflective (1)**
47:23

**regarding (1)**
42:24

**regardless (1)**
25:13

**registered (1)**
4:11

**reins (1)**
6:17

**reissue (1)**
19:11

**reissued (3)**
19:12;47:16;51:2

**reiterations (1)**
5:18

**relevant (1)**
17:3

**relies (1)**
34:16

**remain (2)**
52:24;59:1

**remainder (1)**
5:1

**remained (2)**
10:9;52:19

**remedy (1)**
57:1,3

**remember (8)**
20:6;37:12,12,16,
16;38:2,3;51:12

**repaid (1)**
8:11

**repayment (1)**
41:5

**representative (3)**
56:16;58:25;60:24

**representatives (1)**
5:25

**required (6)**
17:7;35:3,4,18;
39:19;40:17

**requirement (1)**
35:6;39:12

**requires (2)**
34:8;36:11

**resemblance (1)**
43:17

**resend (1)**
50:8

**reside (2)**
55:21;59:16

**resolve (1)**
13:8

**resolved (1)**
56:1

**resonate (1)**
60:17

**respect (4)**
8:5;24:19;52:11;
54:3

**respectfully (2)**
53:13;59:10

**respond (4)**
11:25;24:7;38:18;
42:15

**response (1)**

18-01650-jpm    Doc 65-6    Filed 03/02/23    Entered 03/02/23 00:58:19    Exhibit 4 -
Transcript    Pg 74 of 76
Platinum Partners Value Arbitrage Fund L.P.
Michael Goldberg
16-12925-scc & 18-01650-scc
December 8, 2021

43:1
**restate (1)**
57:15
**restrictive (1)**
55:23
**reveal (1)**
47:25
**rhetoric (1)**
48:15
**ridiculous (2)**
35:10,13
**right (32)**
4:23;19:20;23:6;
24:2,20;26:6,10,25;
28:2,17;30:6,18;
32:19;34:7;46:12,
13;47:5,12,15,18,18;
51:20;52:17,22;
53:1;54:25;57:11,
25;59:18;61:2;62:1,
14
**rightful (1)**
9:18
**rights (1)**
28:6
**risk (1)**
60:22
**Robert (1)**
5:25
**role (2)**
60:15;61:9
**rule (3)**
20:25;53:17;54:16
**rules (2)**
36:21;41:7
**run (1)**
18:1

**S**

**safe (1)**
62:14
**sale (1)**
55:25
**salient (1)**
13:16
**same (3)**
18:14;25:16;48:6
**sand (2)**
6:14;10:5
**SanFilippo (10)**
13:14;14:10;
22:14,16;27:16;
29:14;34:4;43:6,16;
44:11
**sat (5)**
12:10;13:19;17:3;
53:23;54:5
**satisfaction (1)**
10:12
**satisfactory (1)**
40:2
**satisfied (7)**

10:21;11:22;
17:12;34:19;52:7,15,
22
**saw (12)**
22:16;27:17;
28:15,15;32:22;34:4,
17,19;37:9,13;38:2;
51:12
**saying (12)**
13:11;25:22;29:7;
30:7;32:22;35:22;
36:25;37:2;45:18;
50:14;57:10;60:17
**scoured (1)**
19:18
**screw-ups (1)**
32:6
**se (1)**
34:4
**SEC (4)**
24:14;42:1;48:16;
53:25
**second (5)**
6:25;8:9;15:14;
18:23;20:11
**section (1)**
55:4
**secure (2)**
40:20;41:5
**securities (48)**
7:18,20,21,22,23;
8:2,4,6,14,16,19,21,
21,23,25;9:6,10;
10:11;11:19,24;
12:14;14:2,11,22;
17:5;20:25;21:20;
22:18;23:25;24:20;
26:1;29:11,16;32:8;
34:10;41:5,18;
43:12;44:8;46:16;
50:24;52:16,18,23,
24;56:1;61:1,5
**security (10)**
8:20,25;12:18;
14:1;21:1,2;22:10;
27:4;28:18;41:4
**seeing (1)**
10:3
**seem (3)**
15:21;28:16;58:19
**seems (4)**
16:12;28:16;
40:12;58:5
**segregated (19)**
8:13;9:6;10:11;
12:18;13:25;16:13,
19;17:8;29:22;
32:18,20;39:22;40:1,
5,22;41:2,6;51:14;
53:4
**self- (1)**
51:10
**sell (4)**

53:15;55:23;57:5,
23
**send (1)**
62:3
**sends (2)**
19:3,6
**sense (5)**
30:14;36:23,23;
50:3;61:22
**sent (5)**
5:3;12:8;20:18;
50:6,11
**September (5)**
10:14;12:16,20;
16:21;17:6
**Series (12)**
7:10;12:7;44:14,
17,18;45:21,23;
46:10,24;47:10;
50:25;58:7
**serious (2)**
15:23;16:7
**set (16)**
13:25;14:6;17:8;
26:9,10,10;32:19,20;
36:7;38:5;40:5,6,8;
51:15,15;58:12
**setting (2)**
33:5;53:4
**settle (2)**
61:9,10
**settlement (2)**
59:23;61:15
**seven (1)**
20:1
**seven-year (2)**
7:19;20:1
**shall (4)**
7:19;39:14,14,18
**share (1)**
55:23
**shares (32)**
7:11;9:15,19;
18:12;19:14,20;
24:18;25:3,5;26:9;
27:2,13,23,23;29:25;
41:15;44:1,14;
45:21;46:25;48:11,
19;50:25;51:16,18,
25;54:5,8;55:18;
56:10,17;57:23
**sheet (37)**
9:3;10:22;19:23;
22:9;27:6;28:14;
32:17,17;33:5,22,23;
34:12,13;35:1,2,2,4,
16,25;36:1,8,10,10,
13,16,23;37:2,2,5;
39:10;40:5,17;
43:10;44:3,13,15;
45:20
**sheets (20)**
6:24;7:2,3,18;

8:12;10:4;14:5;17:7;
20:8;22:12,12;26:4;
34:1,23;36:19;39:8,
14,20;43:11;51:24
**sheet's (1)**
22:9
**shoes (1)**
57:8
**show (2)**
26:2;53:14
**sic (1)**
37:25
**side (4)**
10:15,16,16;58:7
**sideshow (2)**
39:23,23
**sign (2)**
20:6;38:9
**signature (1)**
18:23
**signatures (1)**
8:23
**signed (9)**
20:4,7,7;21:6;
22:17;33:5;37:19;
51:24;54:1
**significance (1)**
50:22
**significant (1)**
60:19
**signing (10)**
34:1,3;36:24;37:2,
12,16,17;38:2,4;
51:12
**signs (2)**
19:5;41:13
**simply (6)**
5:7;23:17;39:13;
40:25;58:11;61:2
**single (1)**
10:16
**sit (5)**
9:25;12:10;54:6;
55:13,13
**sitting (1)**
19:25;61:8
**situation (1)**
61:14
**sixty (1)**
55:24
**skipping (4)**
21:24;22:1,1,2
**sliver (1)**
56:12
**sold (2)**
8:6;53:17
**solve (1)**
23:8
**somebody (1)**
37:12
**somehow (1)**
39:11
**someone (9)**

28:15,15;32:22;
34:17,19;37:9;45:4;
51:12;57:7
**Sophisticated (2)**
34:7;49:25
**sorry (5)**
5:8;15:6;16:10;
32:16;60:3
**sort (3)**
20:5;39:23;48:23
**speak (2)**
4:13;61:18
**specific (1)**
25:17
**specifically (2)**
5:4;38:1
**spend (2)**
6:6;62:10
**spending (2)**
60:14;61:16
**spent (1)**
5:15
**spreadsheet (1)**
49:16
**stand (1)**
33:21
**standing (1)**
29:8
**start (2)**
4:22;38:20
**started (1)**
26:11
**starts (1)**
10:3
**state (4)**
34:23;36:19;
38:24;39:3
**stated (5)**
8:12;27:7;31:18;
37:18;38:1;55:25
**statement (30)**
11:20;12:1,25;
13:9;14:23;15:19,
20;24:17,17;25:21,
22;27:11,20;40:4;
41:22,24,25;42:1,2,
5,18,24;43:21;44:12;
45:18;47:25;48:9,
16;49:11;57:21
**statements (17)**
9:13;22:18;29:12,
15;32:1,2,4;42:4;
43:2,4,4,7,14;44:9,
12;58:8,18
**states (5)**
23:25;44:7,12;
48:11;56:22
**stating (4)**
27:17;38:1;45:23;
59:9
**station (1)**
21:8
**status (1)**

56:2

**stay (2)**
23:15;62:14

**Steinberg (5)**
11:2,2;18:8,9,14

**step (1)**
34:6

**steps (1)**
59:21

**still (6)**
5:9;27:7;54:6,12;
55:18;56:11

**stipulate (2)**
45:18;46:6

**stipulating (2)**
46:5;47:19

**stock (27)**
9:11;11:14;12:1,7;
15:16;17:13,15;
19:15;20:25;21:2;
24:18;25:4,11;27:4,
13;31:22;40:14,19;
41:11,17;43:19;
47:2;48:12;50:17;
53:16;56:7;57:5

**stocks (2)**
17:4;44:17

**stood (1)**
10:8

**stop (8)**
28:8,8,8;38:12,13;
45:1,2;46:23

**straight (1)**
29:21

**stream (1)**
40:20

**strong (1)**
56:12

**structure (1)**
40:12

**subject (4)**
6:18;7:5,14;8:13

**submission (1)**
6:16

**submissions (1)**
5:16

**submit (3)**
17:11;53:13;54:11

**subsequently (1)**
7:11

**substance (1)**
60:12

**suffer (2)**
53:14;57:14

**sufficient (2)**
17:9;57:1

**suggests (1)**
39:15

**suitable (1)**
9:1

**summaries (1)**
5:18

**summary (13)**

4:4;6:4,6;13:7;
15:11,12;38:25;
39:4;58:3,5,12,24;
59:13

**summing (1)**
37:18

**support (2)**
15:11;41:25

**supposed (4)**
25:25;26:3;27:24;
36:22

**supreme (2)**
38:24;39:3

**sure (9)**
5:16;23:13;24:9;
38:20;42:16,16;45:3,
13;62:9

**surrender (1)**
19:10

---

**T**

**tails (1)**
25:6

**talk (4)**
17:19;60:1;61:15;
62:14

**talking (20)**
8:22;21:24;24:9,
20,21;25:1,2,11,17;
31:6;39:25;42:17;
45:7;46:3,7,10;
47:13;50:7;51:1;
56:24

**talks (1)**
43:15

**technical (1)**
11:23

**Tel (3)**
20:25;31:22;50:17

**telephonically (1)**
4:8

**telling (5)**
35:5;37:8;41:15;
49:21,25

**Tells (2)**
19:4;23:7

**term (58)**
6:24;7:3,18;8:12;
9:3;10:4,22;14:5;
17:7;19:22;20:8;
22:9,9,12,12;26:4;
27:6;28:14;32:17,
17;33:5,22,22;34:1,
11,13,22;35:1,1,2,3,
16,25;36:1,8,10,10,
12,16,19,23;37:1,2,
5;39:8,10,14,20;
40:5,17;43:10,11;
44:3,13,15;45:20;
51:23;56:12

**terms (15)**
7:2,5,13;8:15;

10:14,22;11:23;
28:25;33:5,22;36:5,
7,9;38:5;40:9

**testified (12)**
13:16,16;14:9;
20:3;22:14,16;33:15,
17,25;34:2;43:7,16

**testify (4)**
16:3;58:14,16,20

**testimony (4)**
13:14,15;16:25,25

**thanks (2)**
20:10;62:18

**therefore (1)**
52:17

**though (1)**
34:17

**thought (3)**
9:17,18;51:19

**threads (1)**
18:1

**throughout (2)**
6:2;13:15

**timeline (1)**
6:10

**times (5)**
12:5;17:3,14,16;
52:25

**tip (1)**
29:3

**title (1)**
52:18

**today (5)**
5:10,17;54:6;
56:10;62:3

**together (4)**
5:13;21:7;23:5;
50:3

**told (5)**
11:2;18:9,17,17;
29:14

**tongue (1)**
29:3

**took (6)**
20:18,20,21;21:5;
38:8;56:9

**track (1)**
5:5

**trade (1)**
28:11

**trading (1)**
9:8

**trail (2)**
12:9;16:24

**train (1)**
21:8

**transaction (13)**
21:19;31:24,25;
32:1;34:8;40:12,23,
23;41:2;47:7;52:1,2;
53:5

**transactions (3)**
32:3;33:24;42:23

**transcript (1)**
62:3

**transfer (14)**
7:8,17;13:22;
14:11;18:12;19:11;
29:7;9:31:15;
40:7,7;46:18;50:2;
52:16

**transferred (10)**
10:20;13:21;17:5;
21:20;27:3;32:7;
48:20,22;49:22;57:2

**transferring (4)**
7:21,25;8:1,19

**transfers (3)**
7:14;9:3,4

**treated (1)**
29:9

**treatment (3)**
42:23;47:21;48:7

**treatments (1)**
43:25

**trial (5)**
16:2;58:1,13,13;
59:15

**tricky (1)**
13:7

**tried (1)**
54:2

**trigger (1)**
28:20

**troubling (2)**
59:4,4

**true (7)**
13:9;15:3,19,20;
16:6;27:22;37:10

**truthful (3)**
12:25;14:22;58:19

**try (3)**
10:25;18:25;45:12

**trying (6)**
6:7;11:11;14:25;
15:4;26:23;29:18

**turn (1)**
59:20

**turned (4)**
5:9;14:7;16:6;51:1

**turnover (4)**
52:11;56:17;57:1;
61:2

**twenty (1)**
5:11

**two (12)**
6:24;7:14;10:23;
13:21;18:5,13;21:7,
11;22:11;25:16;
27:6;37:9

**type (1)**
21:1

---

**U**

**ultimately (4)**

5:6;34:9;40:14;
61:6

**unchanged (1)**
56:10

**undated (1)**
19:4

**under (11)**
7:7;9:3;17:7;26:4;
33:21;39:19,20;
52:16;56:4,6;57:18

**underlying (8)**
9:14;23:25;27:4;
43:9,18;51:25;54:8;
56:1

**underscore (1)**
5:21

**understood (3)**
33:4,14;62:12

**undisputed (6)**
6:9;10:18;16:19;
25:24;39:24;53:14

**uninterrupted (1)**
5:22

**unless (1)**
5:4

**unrebutted (3)**
6:16;13:14;16:25

**untrue (1)**
13:3

**up (30)**
6:15;10:6;12:3;
13:25;14:6;16:11;
17:8;21:8,11;23:6;
25:16;26:11;27:9;
29:24;30:1,3,4,6;
32:19,20,21;37:18;
40:5,6,8;51:15,15;
53:4;58:11,11

**upon (3)**
11:18;16:3;34:1

**upside (1)**
9:9

**use (1)**
61:3

**used (1)**
43:7

---

**V**

**valuable (1)**
34:8

**Value (11)**
4:4;6:1;7:22;9:5;
19:23;48:9;54:7;
55:14;56:13,24;61:1

**vanishing (1)**
55:14

**various (2)**
13:15;43:25

**variously (1)**
9:17

**vault (3)**
9:25;17:4,18

Platinum Partners Value Arbitrage Fund L.P. v.
Michael Goldberg

16-12925-scc & 18-01650-scc
December 8, 2021

**vested (4)**
41:23;48:24;49:2,
4
**via (1)**
4:8
**view (4)**
51:22;60:21,21;
62:8
**virtue (1)**
53:25

**W**

**wait (5)**
21:23,23;28:8,8,8
**wall (1)**
10:3
**warrant (11)**
17:20;18:19;27:2,
3;30:5;48:20,20,23;
53:15;55:8;60:19
**warrants (58)**
7:12;8:3,22;9:11,
15,21,23;10:9,20;
12:5,7,9;13:18,24;
14:7;17:1,16;18:12;
19:9,10,11,12,23;
21:3;25:1,2,5,7,9,11,
18,23;27:23;31:22;
40:13;44:4,15,17,18;
45:22,24;46:11,11,
25;47:1,4,11,16;
51:1,2,6;53:19,23;
54:3,13;55:11;56:5;
57:5
**watch (1)**
55:14
**water (2)**
56:3,5
**way (5)**
35:15;36:22;41:2;
59:18;62:8
**wearing (1)**
29:24
**weave (1)**
20:5
**week's (1)**
62:5
**weren't (2)**
29:14;48:21
**wet (1)**
8:23
**what's (8)**
5:18;7:1,2;14:17;
26:20;35:25;39:19;
46:19
**whatsoever (3)**
43:3;50:22;51:4
**whoa (1)**
18:23
**whose (1)**
4:13
**willing (1)**

17:14
**win (2)**
52:8,8
**winding (10)**
6:15;10:6;12:3;
16:11;21:8,11;
26:11;30:1,3;32:21
**winding-up (1)**
41:9
**wishes (1)**
7:5
**within (4)**
17:17;44:19;
47:20;62:4
**without (3)**
50:9;52:7;62:5
**witness (1)**
33:20
**wonder (2)**
60:22;61:6
**wonderful (1)**
62:10
**wondering (1)**
61:8
**word (2)**
34:10;61:3
**words (2)**
34:25;49:9
**work (3)**
18:17;21:10;35:16
**worked (1)**
5:14
**worth (2)**
56:19;57:10
**worthless (2)**
48:15;56:12
**writing (1)**
10:3
**wrong (2)**
54:17,23

**Y**

**year (2)**
18:24;30:8
**years (2)**
22:19;41:23
**yes-or-no (1)**
32:24

**1**

**1 (1)**
50:12
**10/14/2016 (1)**
31:11
**11 (4)**
23:2,14;27:16;
50:13
**11th (4)**
11:1;18:5,10,22
**13 (3)**
23:4;31:7,9

**13d (8)**
23:20;24:9,13;
25:6,23;46:19;48:10,
16
**14 (7)**
11:14;15:8,9,13,
14;23:9;50:6
**15 (1)**
56:20
**18-01650 (1)**
4:6
**1st (2)**
50:21;51:3

**2**

**2005 (1)**
44:16
**2013 (6)**
6:23,24;7:9,23;
9:8;19:24
**2014 (7)**
6:25;21:21;27:15;
42:4;43:4,13;48:8
**2015 (26)**
7:1;9:10,23;12:6;
17:1,17;19:5;20:24;
25:2;27:5,16;42:3,
17,20;43:14;45:22,
24;47:1,7;50:8,12,
15,21,23;51:2,3
**2016 (23)**
6:13;10:2,6,14;
11:1,15;12:17;
15:16;16:1,11,21;
17:20;18:5,10,22;
19:6;21:7;47:2;50:6,
10;52:13;56:4,14
**2017 (2)**
48:20;54:1
**2020 (2)**
4:25;45:8
**20th (2)**
50:23;51:2
**23rd (3)**
6:13;10:6;52:13
**24 (1)**
41:18
**28 (1)**
15:10
**28th (1)**
27:15

**3**

**3 (1)**
24:12
**31st (1)**
7:9

**4**

**4 (1)**

42:21
**4:34 (1)**
31:11
**43 (1)**
15:18

**5**

**5 (1)**
55:2
**5,411,850 (3)**
24:18;27:13;48:11
**5.4 (2)**
25:3;48:18

**6**

**6/30/14 (1)**
45:19

**7**

**7b (1)**
55:4

**8**

**8 (1)**
55:5

**9**

**9 (1)**
42:3
**9.99 (3)**
25:10;53:17;54:16
**9th (2)**
4:25;42:20