UNITED STATES BANKRUPTCY COURT                    *FOR PUBLICATION*

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>PLATINUM PARTNERS VALUE ARBITRAGE<br>FUND L.P. (IN OFFICIAL LIQUIDATION), et al.<br><br><div align=right>Debtors in Foreign Proceedings.</div> | Chapter 15<br><br>Case No. 16-12925 (JPM)<br><br>(Jointly Administered) |
| PLATINUM PARTNERS VALUE<br>ARBITRAGE<br>       FUND L.P.,<br><br><div align=center>Plaintiff,</div><br>v.<br><br>MICHAEL M. GOLDBERG,<br><br><div align=center>Defendant.</div> | Adv. Pro. No. 18-01650 (JPM) |

<u>**MEMORANDUM OPINION AND ORDER AWARDING DAMAGES**</u>

*APPEARANCES:*

**HOLLAND & KNIGHT LLP**
Counsel for *Plaintiff Platinum Partners Value Arbitrage Fund L.P.*
787 Seventh Avenue
New York, NY 10019
By:    Warren E. Gluck
       Robert J. Burns
       Qian (Sheila) Shen
       Noah W.S. Parson

**LAW OFFICE OF MARK R. KOOK**
Counsel for *Defendant Dr. Michael M. Goldberg*
Two Park Avenue, 20th Floor
New York, NY 10016
By:    Mark R. Kook

**JOHN P. MASTANDO III**
**UNITED STATES BANKRUPTCY JUDGE**

This is an adversary proceeding arising in the Chapter 15 bankruptcy case *In re: Platinum Partners Value Arbitrage Fund L.P.,* Case No. 16-12925 (October 18, 2016, the "**Chapter 15 Filing Date**"). On May 10, 2022, the Court granted Plaintiff's motion for summary judgment on Plaintiff's claim for turnover of certain property of the debtor pursuant to Bankruptcy Code §§ 1521(a)(5), 1521(a)(7), and 542(a). (*See Modified Bench Decision and Order on Cross-Motions for Summary Judgment*, [Doc. 44], the "**SJ Decision**").[1] The only issue still pending before the Court is the amount of damages that Plaintiff is entitled to on the turnover claim. On November 19 and November 20, 2024, the Court held a trial on the issue of damages (the "**Damages Trial**"). (*See Transcript regarding Hearing Held on 11/19/2024* [Doc. 136], the "**Nov. 19 Trial Tr.**"; *Transcript regarding Hearing Held on 11/20/2024*, [Doc. 135], the "**Nov. 20 Trial Tr.**").

Following the Damages Trial, on February 14, 2025, Platinum Partners Value Arbitrage Fund L.P. ("**Plaintiff**" or "**PPVA**") filed *Plaintiff Platinum Partners Value Arbitrage Fund LP's Post-Trial Brief* [Doc. 140] ("**Plaintiff PTB**"). The Plaintiff PTB asserts that Plaintiff is entitled to the fair market value as of October 17, 2016 of a certain warrant (the "**PPVA Warrant**") to purchase a certain number of common shares of stock in Navidea Biopharmaceutical Inc. ("**Navidea**"), which value Plaintiff alleges is $4,069,186.06. [Plaintiff PTB, Doc. 140, p. 1]. Plaintiff also seeks: (i) $3,052,224.00 in prejudgment interest; (ii) $1,253,615.86 in reasonable

---

[1] Unless otherwise specified, references to "[Doc. __]" are to filings entered in the adversary proceeding *Plaintiff Platinum Partners Value Arbitrage Fund L.P. v. Michael M. Goldberg.*, Case No. 18-1650 (October 5, 2018). References to "[Ch. 15 Dkt., Doc. ] are to filings entered in the bankruptcy case *In re: Platinum Partners Value Arbitrage Fund L.P,* Case No. 16-12925 (October 18, 2016).

References to "Bankruptcy Code § __ or Code § __" are to Title 11 of the United States Code. References to "Bankruptcy Rule __" are to the Federal Rules of Bankruptcy Procedure. References to "Local Rule __" are to the Local Bankruptcy Rules for the Southern District of New York.

attorneys' fees and costs; and (iii) punitive damages "in an amount to be determined by the Court." [Plaintiff PTB, Doc. 140, p. 1].

On February 14, 2025, Defendant Michael M. Goldberg ("**Defendant**") filed *Defendant's Post-Trial Memorandum* [Doc. 139] ("**Defendant PTB**"). The Defendant PTB argues, *inter alia*, that Plaintiff is not entitled to damages in any amount because of certain limits placed on Plaintiff's interest in the PPVA Warrant, namely that "Dr. Goldberg shall have sole voting and dispositive rights over the [PPVA Warrant]." [Defendant PTB, Doc. 139, p. 7] (quoting DX-2, p. 3, the "**Amended Separation Agreement**"). Defendant further argues that he is entitled to have his attorneys' fees paid for by Plaintiff. [Defendant PTB, Doc. 139, p. 24].

Filed by Defendant on February 28, 2025 in response to the Plaintiff PTB is *Defendant Dr. Michael M. Goldberg's Response to the Post-Trial Memorandum of Plaintiff Platinum Partners Value Arbitrage Fund, L.P.* [Doc. 141] ("**Defendant Response**"). The Defendant Response argues, *inter alia*, that the Plaintiff PTB mischaracterizes the findings in the SJ Decision and ignores the terms of the Amended Separation Agreement as they relate to Defendant's taking possession of the PPVA Warrant. [Defendant Response, Doc. 141, pp. 1–3].

Finally, also filed on February 28, 2025 is Plaintiff's *Response to Defendant Michael M. Golberg's Post-Trial Brief.* [Doc. 142] ("**Plaintiff Response**"). The Plaintiff Response asserts that the Defendant PTB improperly seeks to relitigate liability that was already determined in the SJ Decision [Doc. 142, p. 1], and that Defendant does not provide any legal basis for his "throwaway claim" for attorneys' fees [Doc. 142, p. 22].

Based on the Court's review of the record, and for the reasons set forth below, the Court finds as follows:

(1) Plaintiff is awarded damages on its turnover claim in the amount of $4,069,186.06.

(2) Plaintiff is also awarded prejudgment interest in the amount of $3,052,224.00.

(3) Plaintiff and Defendant's respective requests for attorneys' fees and costs are both DENIED.

(4) Plaintiff's request for punitive damages is also DENIED.

# I.    BACKGROUND

## A.    The Summary Judgement Decision and Order

"Before filing for liquidation, [Plaintiff] was a hedge fund formed in 2002 under the laws of the Cayman Islands." [SJ Decision, Doc. 44, p. 3]. On October 18, 2016, Plaintiff, as the debtor, filed its *Chapter 15 Petition for Recognition of a Foreign Proceeding* [Ch. 15 Dkt., Doc. 1] (the "**Chapter 15 Petition**") in the United States Bankruptcy Court for the Southern District of New York, and on November 23, 2016, this Court issued the *Order Granting Recognition and Relief in Aid of a Foreign Main Proceeding* [Ch. 15 Dkt., Doc. 27] (the "**Recognition Order**").

This adversary proceeding is based on two agreements: the Amended Separation Agreement between Defendant and Plaintiff's former general partner, Platinum Management LLC ("**Platinum**"); and a securities exchange agreement between Plaintiff and Navidea, by which Plaintiff agreed to transfer to Navidea all Navidea Class B Convertible Preferred Shares held by Plaintiff in exchange for warrants to purchase Navidea common shares (the "**Securities Exchange Agreement**"). [SJ Decision, Doc. 44, pp. 4–5].

Prior to the execution of either agreement, Defendant was a portfolio manager for Platinum, working with healthcare companies (including Navidea). [*Id.* at p. 3]. When Defendant left Platinum in 2013, he and Platinum entered a certain separation agreement (the "**Original Separation Agreement**"), which was replaced by the Amended Separation Agreement effective June 11, 2015 (together with the Original Separation Agreement, the "**Separation Agreements**").

[*Id.* at pp. 3–4]. Upon his departure from Platinum, Defendant became the interim chief executive officer ("CEO") of Navidea. [*Id.* at p. 3].

Under the Amended Separation Agreement, Platinum agreed to transfer to Defendant certain securities (the "**Transferred Securities**"), held by Platinum's private investment funds (the "**Platinum Funds**") as of December 31, 2013, which included 1,655 Navidea Series B Convertible Preferred Shares (the "**Preferred Shares**") held by PPVA that could be converted into 5,411,850 shares of Navidea common stock. [*See* Amended Separation Agreement, DX-2, pp. 1–2 & Schedule 1; SJ Decision, Doc. 44, pp. 3–4]. As consideration for the Transferred Securities, Defendant was required to (1) issue, to one or more of the Platinum Funds, seven-year notes for the fair market value of the Transferred Securities (the "**Notes Condition**"), and (2) establish one or more segregated brokerage accounts "subject to a [s]ecurities [a]ccount [c]ontrol [a]greement in favor of Platinum and/or its affiliates" (the "**Segregated Account Condition**"). [Amended Separation Agreement, DX-2, pp. 3–4; *see also* SJ Decision, Doc. 44, p. 4].

Before either Platinum or Defendant performed under the Amended Separation Agreement, Plaintiff and Navidea entered into the Securities Exchange Agreement, under which Plaintiff transferred to Navidea all of Plaintiff's Navidea Class B Convertible Preferred Shares in exchange for the warrants to purchase Navidea common shares. [*See* SJ Decision, Doc. 44, pp. 4–5]. "The Securities Exchange Agreement was purportedly executed due to Navidea's upcoming listing on the Tel Aviv Stock Exchange, which forbade listing companies from having multiple classes of shares." [*Id.* at p. 5]. Pursuant to the Securities Exchange Agreement, PPVA exchanged the 1,655 Preferred Shares that were subject to the Amended Separation Agreement for a specific warrant that was issued by Navidea in PPVA's name (the PPVA Warrant). [*Id.*]. As contemplated by the Securities Exchange Agreement, the PPVA Warrant was exercisable for 5,411,850 Navidea

common shares. [Plaintiff PTB, Doc. 140, p. 7]. Notably, "both the Securities Exchange Agreement and the PPVA Warrant identify PPVA as the owner of the Preferred Shares and, subsequently, the PPVA Warrant." [SJ Decision, Doc. 44, p. 5].

On August 23, 2016 (the "**Cayman Petition Date**"), Platinum filed a voluntary petition to wind up PPVA (the "**Cayman Liquidation**") with the Financial Services Division of the Grand Court (the "**Cayman Court**") of the Cayman Islands. [SJ Decision, Doc. 44, p. 5]. Two days later, the Cayman Court ordered the provisional liquidation of PPVA and appointed Martin Nicholas, John Trott, and Christopher Kennedy as the "joint provisional liquidators" (the "**Liquidators**") of Plaintiff. [*Id.*] On October 27, 2016, the Cayman Court converted the provisional liquidation to an official liquidation (the "**Cayman Liquidation Order**"), which led shortly thereafter to the Chapter 15 Petition and Recognition Order in this Court. [*Id.* at pp. 5–6].

Following the Cayman Petition Date, "at Goldberg's direction, Mark Nordlicht, CIO of Platinum, completed and executed a transfer/assignment form on a copy of the PPVA Warrant in an effort to assign the PPVA Warrant to Goldberg." [SJ Decision, Doc. 44, p. 6]. Instead of using the then-current date of October 16, 2016, Nordlicht backdated the document using the date of October 1, 2015. [*Id.*] The original PPVA Warrant was, however, never surrendered to Navidea, and has instead remained in PPVA's vault at BNY Mellon throughout the course of these proceedings. [*Id.*]. After receiving the new, back-dated copy of the PPVA Warrant executed by Nordlicht and Defendant, Navidea reissued the PPVA Warrant in Defendant's name on October 17, 2016. [*Id.*]. Goldberg then filed with the Securities and Exchange Commission a Form 4 Statement of Changes in Beneficial Ownership that asserted a beneficial ownership interest in the PPVA Warrant pursuant to the purported reissuing of the PPVA Warrant in Goldberg's name. [*Id.*].

On October 5, 2018, Plaintiff filed this adversary proceeding against Defendant.  [Doc. 1] (the "**Complaint**").  The Complaint alleges:

(1) that "Navidea and its then-President and CEO Goldberg were aware of the commencement of the Cayman Liquidation Proceeding and the chapter 15 case at or about the time" Navidea transferred the PPVA Warrant to Goldberg, [Complaint, Doc. 1, pp. 4–5];

(2) that Goldberg improperly exercised the PPVA Warrant, [*id.* at p. 6]; and

(3) that "[o]n November 1, 2017, the Liquidators formally demanded that Goldberg return any and all proceeds derived from his improper exercise of the PPVA warrants," and that "Goldberg rejected the Liquidators' demand." [*id.* at pp. 6–7].

The Complaint thus sought (1) turnover of "any and all proceeds derived from [Defendant's] improper exercise of the PPVA Warrant" ("Count I"); (2) damages on a theory of conversion ("Count II"); (3) damages for unjust enrichment ("Count III"), and (4) punitive damages pursuant to a finding that Defendant was in contempt of the stay imposed by the Cayman Liquidation ("Count IV").  [Complaint, Doc. 1, pp. 8–10].  On February 8, 2019, Defendant filed his answer, denying nearly every allegation made in the Complaint.  (*See Answer to Complaint*, [Doc. 14]).

On January 31, 2020, the Liquidators filed a motion for summary judgment, seeking summary judgment on Defendant's liability and requesting, in the alternative, that: (1) Defendant turn over the value of the PPVA Warrant; (2) Defendant pay monetary damages for conversion of the PPVA Warrant; or (3) Defendant pay damages for unjust enrichment. (*See Plaintiff Platinum Partners Value Arbitrage Fund LP's Memorandum Of Law In Support Of Motion For Summary Judgment,* [Doc. 23], "**Plaintiff MSJ**").  On March 20, 2020, Defendant filed a cross-motion for summary judgment, asking the Court to rule in favor of Defendant on each claim and dismiss Plaintiff's Complaint with prejudice. (*See Defendant's Memorandum Of Law In Support Of His Motion For Summary Judgment, And In Opposition To Plaintiff's Motion For Summary Judgment*, [Doc. 30], "**Defendant MSJ**").

On May 9, 2022, the Court granted the Plaintiff MSJ, denied the Defendant MSJ, and ordered the turnover of the value of the PPVA Warrant pursuant to §§1521(a)(5) and 1521(a)(7) of the Bankruptcy Code.  [*See* SJ Decision, p. 21].  The Court first noted that Section 99 of the Companies Act of the Cayman Islands (the "**Companies Act**"), the law applicable to the Cayman Liquidation, provided that "[w]hen a winding up order has been made, any disposition of the company's property and any transfer of shares or alteration in the status of the company's members made after the commencement of the winding up is, unless the Court otherwise orders, void." [*Id.* at p. 8].  The Court found that the Amended Separation Agreement was clear and unambiguous on its face, namely in that the Segregated Accounts Condition and Notes Condition were "conditions precedent to any obligation to transfer the Preferred Shares to Goldberg."  [*Id.* at p. 13].  Accordingly, the Court found that because "Goldberg failed to satisfy the Segregated Account Condition and the Notes Condition" prior to the commencement of the Cayman Liquidation, "Goldberg *had no live legal right to the PPVA Warrant* as of the commencement of the Cayman Liquidation." [*Id.* at p. 19] (emphasis added).  The Court thus concluded that "it is indisputable as a matter of law that the PPVA Warrant remained property of PPVA and that the purported assignment is void," thereby awarding judgment to Plaintiff on the turnover claim.  [*Id.* at p. 20].

Shortly after the SJ Decision was issued, on May 24, 2022, Defendant filed a motion to reconsider under Fed. R. Civ. P. 60 and Fed. R. Bankr. P. 3008.  (*See Defendant's Memorandum Of Law In Support Of His Motion Pursuant To Bankruptcy Rule 9023 For Reconsideration Of The Modified Bench Decision And Order On Cross-Motions For Summary Judgment*, [Doc. 46], the "**First Motion to Reconsider**").  In the First Motion to Reconsider, Defendant argued, *inter alia*, that based on Second Circuit precedent that allegedly had not been considered in the SJ Decision, the Court erred in finding that Defendant must satisfy the Segregated Accounts Condition and

Notes Condition for his interest in the PPVA Warrant to vest.  (*See Order Denying Motion for Reconsideration*, [Doc. 50, pp. 3–4 ], "**First Reconsideration Order**").   On July 11, 2022, the Court found that Defendant's First Motion to Reconsider was an attempt to "(i) relitigate issues previously considered, (ii) present the case under new theories, (iii) secure a rehearing on the merits, or (iv) otherwise take 'a second bite at the apple,'" and denied the First Motion to Reconsider in its entirety.  [First Reconsideration Order, Doc. 50, pp. 9–10].

Defendant sought leave to appeal this Court's Summary Judgment Order pursuant to 28 U.S.C. § 1292(b) on July 25, 2022. (*See Defendant's Notice of Motion for Leave to Appeal*, [Doc. 52], the "**Appeal Motion**"); *see also In Re Platinum Partners Value Arbitrage Fund L.P.*, Case No. 1:22-cv-06376 (July 27, 2022) (Docket No. 3-1 at 6–7).  On September 19, 2022, the District Court denied that request, explaining that "[b]ecause [Defendant] has not met his burden to satisfy each of the criteria set forth in 28 U.S.C. § 1292(b), and because no exceptional circumstances justify the exercise of the Court's discretion to grant an interlocutory appeal, Mr. Goldberg's motion for leave to appeal is DENIED."  [Doc. 57, p. 8] (the "**Appeal Denial**").

On March 2, 2023, Defendant filed a second motion to reconsider. (*See Motion for Modification Pursuant to Rules 7054 and 9024*, [Doc. 65], the "**Second Motion to Reconsider**"). The Second Motion to Reconsider argued that the Court should revisit the SJ Decision in light of new evidence, namely a report purportedly prepared by a "liquidator" for Platinum Partners Value Arbitrage Fund (USA) L.P. that stated that Mark Nordlicht still retained control over Platinum Partners Value Arbitrage Fund (USA) L.P. as of October 26, 2018, and thus the transfer of the PPVA Warrant to Defendant by Nordlicht in 2016 was in fact authorized.  [*See* Second Motion to Reconsider, Doc. 65, pp. 12–13].  On January 31, 2024, the Court denied the Second Motion to Reconsider.  (*See Order on Defendant's Motion for Modification*, [Doc. 96], the "**Second

Reconsideration Order"). The Court found that Defendant had failed to demonstrate that the newly-discovered evidence was neither in his possession nor available upon the exercise of reasonable due diligence at the time the SJ Decision was issued (as is required for reconsideration under Federal Rule of Civil Procedure 54(b)). [Second Reconsideration Order, Doc. 96, pp. 11, 12–13]. In addition, the report was purportedly drafted for the liquidation of Platinum Partners Value Arbitrage Fund (USA) L.P., an "onshore" feeder fund distinct from PPVA, which is the "offshore" fund and holder of the PPVA Warrant. [*Id.* at p. 13]. Thus, the Court found that "[b]ecause Platinum Partners Value Arbitrage Fund (USA) L.P. was neither a party to the Term Sheets nor the owner of the PPVA Warrant, Nordlicht's authority as to that entity" had no effect on this adversary proceeding. [*Id.* at p. 14].

Shortly after the Second Reconsideration Order was issued, the Court set the outstanding issue of damages for trial beginning November 19, 2025. [*See Notice of Trial*, Doc. 114].

## B. **The Damages Trial**

The Damages Trial took place on November 19–20, 2024. On the first day, three witnesses testified. [*See* Nov. 19 Trial Tr., Doc. 136, 258:2–14]. First, the Court recognized Steven Napier, Plaintiff's valuation expert, as an expert in the field of evaluation. [Nov. 19 Trial Tr., Doc. 136, 15:12–18]. Napier's testimony was based on a report he prepared valuing the PPVA Warrant, and that report was also admitted into evidence (*Expert Witness Report of Steven Napier* [Doc. 104-1], designated as PX-029, the **"Napier Report"**). [Nov. 19 Trial Tr., Doc. 136, 18:02–19:06]. Napier valued the PPVA Warrant as of October 17th, 2016 (the "**Valuation Date**"), the date when Navidea reissued the Warrant to Goldberg. [*Id* at 19:21–20:09; *see also* SJ Decision, Doc. 44, p. 6]. Using that date, he calculated the value of the Warrant by applying a fair market value approach, which assumes a willing buyer and seller. [*Id*. at 22:9–21; *see also* Napier Report, Doc.

104-1, p. 4]. He stated that he used the fair market value approach as it is "the most commonly utilized standard for purposes of this nature." [Nov. 19 Trial Tr., Doc. 136, 23:05–13].

Napier calculated an initial value of $4,630,378.86, reflecting the value of the underlying 5,411,850 shares, i.e., 5,411,850 "multiplied by the trading price as of the Valuation Date." [Nov. 19 Trial Tr., Doc. 136, 26:3–27:11]. Napier relied on the closing price of Navidea common stock on the Valuation Date, as provided by Bloomberg, at $0.8656 per share.[2] [Nov. 19 Trial Tr., Doc. 136, 27:15–29:1; see also PX-035]. Napier also explained that the PPVA Warrant was a "penny warrant," meaning that whoever exercised the warrant would still have to pay $0.01 to purchase each share; this resulted in an additional subtraction of $54,118.50 from the initial value of the PPVA Warrant to reach the Warrant's "unadjusted fair market value" of $4,630,278.86. [Nov. 19 Trial Tr., Doc. 136, 25:22, 26:2, 34:18–35:1; see also Napier Report, Doc. 104–1, p. 8].

Finally, Napier applied a "discount for lack of marketability" or "DLOM," as the shares to be traded for the PPVA Warrant would be unregistered and thus could not be released into the market for approximately six months. [Nov. 19 Trial Tr., Doc. 136, 35:2–36:3]. Napier testified that the DLOM should be anywhere between 8.8% ($408,137.01) to 15.4% ($714,248.59), yielding values for the PPVA Warrant of $4,222,241.85 and $3,916,130.27 respectively. [Nov. 19 Trial Tr., Doc. 136, 37:19–24, 40:17–41:4]. Napier then used the midpoint of these two discounted amounts to value the PPVA Warrant at $4,069,186.06, which is the amount Plaintiff seeks in turnover damages. [Nov. 19 Trial Tr., Doc. 136, 41:5–14; Napier Report, Doc. 104-1, p. 5; Plaintiff PTB, Doc. 140, p. 11].

---

[2]     The Napier Report lists the closing price of Navidea Stock used in its calculations as "$0.87." [*See generally* Napier Report, Doc. 104–1]. However, the Court reviewed the calculations and verified that Napier applied the precise price of $0.8656 to reach the initial value of $4,630,378.86 (.8656 x 5,411,850).

According to Napier, the SJ Decision's conclusion that PPVA owned the Warrant is in effect the same conclusion that a prospective buyer would draw. [*See* Nov. 19 Trial Tr., Doc. 138:16–139:4]. Because the Napier Report assumed PPVA's ownership of the PPVA Warrant, the Napier Report did not incorporate other information from securities filings or the Separation Agreements that Defendant argues put PPVA's ability to sell the Warrant into question. [*Id.* at 127:12–19].

Joseph SanFilippo, Platinum's Chief Financial Officer, also testified on November 19. [Nov. 19 Trial Tr., Doc. 136, 174:1–175:5]. SanFilippo explained that, from what he understood, the Separation Agreements gave Goldberg a portion of the positions that he had managed for Platinum in exchange for a note secured by those positions. [*Id.* at 177:19–24]. SanFilippo testified that the Amended Separation Agreement remained in effect [*Id.* at 187:21–25], and thus neither Platinum nor PPVA could sell the Warrant without Goldberg's approval. [*Id.* at 182:9–12; 185:17–25, 187:4–187:25]. SanFilippo clarified that his understanding of the Separation Agreement was based on his experience as an accountant, not a lawyer. [*Id*. at 200:24–201:7].

The final witness on the first day was Christopher Smith, one of PPVA's current Liquidators. [Nov. 19 Trial Tr., Doc. 136, 223:5–224:5]. Smith's role as Liquidator is to maximize PPVA's recoveries for the benefit of the fund's creditors. [*Id.* at 224:21–25, 227:7–18]. That work entails speaking with lawyers to determine when to pursue legal claims on behalf of the fund. [*Id.* at 228:1–9]. Potential legal claims held by the estate are first submitted to a liquidation committee that then applies to the Cayman Court for final authorization to pursue the cause of action. [*Id.* at 233:6–234:12]. Before submitting the claim against Goldberg to PPVA's liquidation committee, the Liquidators reviewed the Separation Agreements. [*Id.* at 246:3–11]. Smith testified that he did not know whether the liquidation committee or the Cayman Court

reviewed the Amended Separation Agreement. [*Id.* at 246:12-19]. Ultimately, both the liquidation committee and the Cayman Court approved the pursuit of the claim against Goldberg. [*Id.* at 238:3–18].

On November 20, 2024, Goldberg appeared as the only witness and offered factual and opinion testimony.[3] [Nov. 20 Trial Tr., Doc. 135, 33:15–19, 170:2–7]. In his factual testimony, Goldberg stated that the Amended Separation Agreement was a "win-win" for both himself and Platinum. [*Id.* at 11:4–8]. He argued that the Amended Separation Agreement settled Platinum's four million dollar debt to Goldberg while also allowing Goldberg to continue managing his investments and to maintain upside in a basket of securities. [*Id.* at 11:10–12:6].

According to Golberg, the parties structured the Separation Agreements such that Goldberg and Platinum would receive 15 percent and 85 percent of a basket of securities, respectively. [*Id.* at 12:17–22]. He testified that the Amended Separation Agreement specified that Goldberg would deliver a note to Platinum for the principal amount on his fifteen percent of the basket of securities. [*Id.* at 13:14–23]. Goldberg asserted that under the Amended Separation Agreement, he retained

---

[3]     At the Damages Trial, Goldberg testified as a non-retained expert witness; non-retained expert witnesses are "in essence hybrid fact and expert witnesses [because they are] expert[s] who happened to have personal involvement with the events giving rise to litigation[.]". *See Ayotte v. National Basketball A'ssn*, 2024 WL 3409027, at *1 (S.D.N.Y. Jul. 15, 2024) (quoting *Caruso v. Bon Secours Charity Health Systems, Inc.*, 703 F, App'x 31, 33 (2d Cir. 2017) (internal quotation marks omitted).

Plaintiff had initially opposed Defendant's offering of Goldberg's opinion testimony for the Damages Trial "because he has already been found liable for misappropriating PPVA Assets[,]" and because his expert disclosures were arguably insufficient. [*See Memorandum of Law in Support of Motion to Strike Michael M. Goldberg's Expert Disclosure*, Doc. 105, p. 1]. On April 3, 2024, the Court held a hearing on Plaintiff's motion to strike Goldberg's expert disclosure, and ruled on the record that Goldberg should not be prevented "from testifying as an expert[,]" but directed Defendant to furnish to Plaintiff an expert report that satisfies the more comprehensive requirements set forth under Fed. R. Civ. P. Rule 26(a)(2)(B). [*See Transcript regarding Hearing Held on 4/3/2024*, Doc. 113, 17:21–23, 19:9–15, 20:04–07].

On November 20, 2025—day two of the Damages Trial—after agreement between the parties, Defendant's expert report, designated as PX-002, was admitted into evidence without objection. [Nov. 20 Trial Tr., Doc. 135, 5:19–6:2].

sole voting and dispositive power over the Transferred Securities. [*Id*. at 14:5–6]. Goldberg further testified that the Transferred Securities governed by the Amended Separation Agreement included the Warrant, which Navidea exchanged for the initial series B convertible preferred equity. [*Id.* at p. 20:5–9].

In his opinion testimony, Goldberg first established his experience valuing securities: he has an "MBA in finance" from Columbia School of Business, and he had a total of approximately ten years of experience—five years at an investment bank, and later in his career, another five years at Platinum—performing valuations (including valuations for public investments in private equity). [Nov. 20 Trial Tr., Doc. 135, 33:23–34:5, 38:1–8]. Goldberg disagreed with the valuation of the PPVA Warrant in the Napier Report. [*Id.* at 49:20–22]. He stated that a willing buyer would not purchase the PPVA Warrant because the publicly-available securities filings indicated that Goldberg himself had the right to sell the PPVA Warrant. [*Id.* at 49:12–50:9]. He also testified that, along with the shares underlying the Warrant, other investors purportedly held 13.9 million shares of Navidea. [*Id.* at 57:2–17]. Moreover, he did not believe that the SJ Decision provided anything relevant to add to his report. [*Id.* at 155:2–12]. Accordingly, Goldberg asserted that the value of the PPVA Warrant to PPVA's estate has always been zero because PPVA did not have the right to sell it. [*Id.* at 156:13–17].

Additionally, Goldberg noted several regulatory and liquidity factors relevant to the PPVA Warrant, including that the PPVA Warrant gives the buyer the right to purchase unregistered shares. [*See id.* at 58:23–59:15]. Consequently, due to SEC regulations, the buyer must (1) wait at least six months before selling the shares into the open market, and (2) ask Navidea to register the shares. [*Id.* at 57:5–9, 58:12–22].

According to Goldberg, the regulatory and liquidity factors impact the PPVA Warrant's valuation. [*Id.*] Other investors holding Navidea's outstanding shares can sell them during the six-month waiting period, causing the stock price to decline. [*Id.*]. Then, even after waiting for six months, it is not guaranteed that Navidea would register the shares, and registration would incur costs. [*Id.* at 58:17–22]. Additionally, Goldberg questioned whether a buyer would undergo the "hassle" of purchasing a Warrant with questionable ownership in such a transaction when the buyer could purchase some of the existing outstanding shares on the market. [*Id.* at 62:20–25]. Alternatively, given Navidea's vulnerable financial condition, Goldberg believed that a buyer's best option would have been to purchase shares directly from the company at a "massive" discount. [*See id.* at 121:1–8]. Goldberg argued that the Napier Report thus did not account for these market dynamics. [*Id.* at 72:10–14].

The Damages Trial concluded on November 20, 2025.


## II.    <u>JURISDICTION</u>

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157 and the Amended Standing Order of Reference dated January 31, 2012 (Preska, C.J.).

## III.    <u>DISCUSSION</u>

### A.  <u>Turnover Damages</u>

#### 1.  <u>The Law on Damages Valuation in Property Turnover Claims Under the Bankruptcy Code</u>

As mentioned *supra*, Section (I)(A), the only remaining issue in this adversary proceeding is the amount of damages Defendant owes to Plaintiff for Goldberg's misappropriation of the PPVA Warrant. "Although the amount of recoverable damages also is a question of fact, the

measure of damages upon which the factual computation is based is a question of law." *United States use of N. Maltese & Sons, Inc. v. Juno Constr. Corp.*, 759 F.2d 253, 255 (2d Cir. 1985). Generally, on awarding damages in property turnover actions, "[t]he law is clear that where the property can be returned [i]ntact, it should be returned. Where the property has been dissipated, then its proceeds, where identifiable, are made part of the estate." *In re P & Z Island Farms, Inc.*, 478 F. Supp. 529, 534 (S.D.N.Y. 1979). Moreover, where the property has been dissipated by a "dramatic decline in market value," the debtor estate is entitled to recover the original value at the time the property was transferred away from the debtor. *See id.* at 534–35 ("If the property has declined in value, then its agreed-upon value at the time of transfer should be restored, with interest from the date of transfer.").

Additionally, property turnover claims brought in connection with bankruptcy proceedings are governed by Bankruptcy Code § 542(a). *See* 11 U.S.C. § 542(a). For § 542(a) turnover claims, "it is fundamental … that the subject property belongs to the estate [as of commencement of the case, and] the party seeking turnover bears the burden of proving, by a preponderance of the evidence that this is so." *In re Kaspar*, 667 B.R. 195, 220 (Bankr. S.D.N.Y. 2025). If a debtor only had a limited legal interest in the subject property before the case's commencement, only the extent of that limited interest would become property of the estate. *See* 11 U.S.C. § 541(d) ("Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest … becomes property of the estate … only to the extent of the debtor's legal title to such property[.]"); *see also Kasper*, 667 B.R. at 220–21. Therefore, in the context of damages valuation, the amount of recoverable damages in a § 542(a) property turnover action depends on the extent of a debtor's interests in the subject property at the time of the petition.

### 2.  **Analysis of Damage Valuation**

Before examining the parties' arguments regarding Plaintiff's proposed valuation of the PPVA Warrant, the Court will first address the threshold issue of the extent of Plaintiff's interest in the PPVA Warrant as of the Cayman Petition Date.

### a.  **The Parties' Interests in the PPVA Warrant**

In its post-trial briefing, Defendant argues that Plaintiff is not entitled to recover damages because Plaintiff allegedly lacked "dispositive rights in the [PPVA] Warrant" on the Cayman Petition Date—which precedes the Chapter 15 Filing Date.  [*See* Defendant PTB, Doc. 139, pp. 7–9; *see also* Defendant Response, Doc. 141, pp. 5–9].  Defendant apparently suggests that pursuant the Amended Separation Agreement, Goldberg had the sole voting and dispositive rights over the PPVA Warrant, and such rights are independent of Goldberg's right to receive the PPVA Warrant.  *See* [Defendant Response, Doc. 141, pp. 1–2] ("[T]he Court *never* ruled on Dr. Goldberg's 'right' to the Warrant or its proceeds…. In the Summary Judgment Decision, the Court ruled only that as of the commencement of PPVA's liquidation proceeding, Dr. Goldberg did not have any 'live right' to possession of the [PPVA] Warrant….") (emphasis in original); *see also id.* at 5–6].  Central to Defendant's argument here is a provision in the Separation Agreements, which states that "Dr. Goldberg shall have sole voting and dispositive power over the Transferred Securities."  [*See* Defendant PTB, Doc. 139, p. 7; Defendant Response, Doc. 141, p. 6; *see also* Amended Separation Agreement, PX-004, p. 3].  According to Defendant, because the Separation Agreements' condition[4] overriding Goldberg's dispositive rights over the PPVA Warrant had

---

[4]    The Separation Agreements required Goldberg to issue to Plaintiff certain "Securities Loan Notes" as the consideration for the Transferred Securities—including the PPVA Warrant.  [*See* Amended Separation Agreement, PX-004, p. 3].  According to the Separation Agreements, the holders of the Securities Loan Notes are entitled to declare the notes' entire balance due "if the aggregate fair market value of the Transferred Securities, as reasonably determined by Platinum [Management], on any day is less than 35% of" the Transferred Securities' fair market value as of December 31, 2013, and as reflected on Platinum Funds' books and records.  *Id.*  Moreover, upon such

never been triggered, Goldberg "had sole voting and dispositive rights over the [PPVA] Warrant" as of the Cayman Petition Date. [*See* Defendant PTB, Doc. 139, p. 7]. Additionally, to show that PPVA previously recognized Goldberg's "dispositive rights over the [PPVA] Warrant," Defendant also cites the testimony of Joseph SanFilippo at the Damages Trial, and numerous schedules that PPVA had filed with the SEC disclosing Goldberg's rights over the PPVA Warrant. [*See id.,* pp. 7–8; *see also* Defendant Response, Doc. 141, pp. 6–7].

In contrast, Plaintiff asserts that Defendant's argument regarding Goldberg's alleged sole dispositive rights over the PPVA Warrant is a disguised attempt to "relitigate [the] foregone conclusion" that Goldberg was found liable for misappropriating the PPVA Warrant. [*See* Plaintiff PTB, Doc. 140, p. 6]. Specifically, Plaintiff alleges that Defendant had already raised this same argument about Goldberg's purported sole dispositive rights over the PPVA Warrant on three separate motions in response to the Court's SJ Decision. [*See* Plaintiff Response, Doc. 142, p. 8 ("Goldberg has had more than a full and fair opportunity to litigate the initial determination of" the dispositive rights over the PPVA Warrant issue, and he "took three more bites at the apple with his Motion for Reconsideration, Motion for Leave to Appeal, and Motion for Modification.") (internal citations and quotation marks omitted); [*see also* First Motion to Reconsider, Doc. 46, Appeal Motion, Doc. 52; Second Motion to Reconsider, Doc. 65]. Plaintiff also notes that this Court and the District Court have collectively rejected each of Defendant's prior motions raising this same dispositive rights issue and attempting to relitigate the SJ Decision's ruling. [*See* Plaintiff Response, Doc. 142, p. 8; *see also* First Reconsideration Order, Doc. 50; Appeal Denial, Doc. 57; Second Reconsideration Order, Doc. 96].

---

declaration, the holders of the Securities Loan Notes may override Goldberg's "sole voting and dispositive rights" over the Transferred Securities by selling it and applying certain portions of the sale proceeds to "prepay the outstanding principal." [*Id.*].

Responding to the substance of Defendant's argument, Plaintiff notes that, on summary judgment, the Court has already "analyzed the explicit language of the Separation Agreements," and held that "Goldbert had *no live legal right* to the PPVA Warrant as of the commencement of the Cayman Liquidation." [Plaintiff Response, Doc. 142, p. 7 (emphasis in original)]. Specifically, Plaintiff first argues that the Court's SJ Decision has made a clear determination regarding dispositive rights over the PPVA Warrant:

> Goldberg ignores a key determination by the Court: … As of the commencement of the Cayman Liquidation, *no disposition or transfer of PPVA's assets could be made without the approval of the Cayman Court, and only the Liquidators had authority to act on behalf of PPVA.*

[*See id.* at p. 7] (quoting SJ Decision, Doc. 44, p. 16) (emphasis in original).  Citing to the law of the case doctrine, Plaintiff argues that "the Court need not address [the dispositive rights issue] because [it has] been litigated and decided in earlier proceedings in the same case."  [Plaintiff Response, Doc. 142, p. 8] (quoting *In re Highland Fin. Corp.*, 216 B.R. 109, 113 (Bankr. S.D.N.Y. 1997)) (internal quotation marks omitted).

Here, the Court agrees with Plaintiff that the SJ Decision fully determined the extent of Plaintiff's interest in the PPVA Warrant as of the Cayman Petition Date.  The Court previously noted in the SJ Decision that the commencement of the Cayman Liquidation invoked the protections of the Companies Act.  [*See* SJ Decision, Doc. 44, p. 8].  Following the winding up petition and pursuant to the Companies Act § 99, "any disposition of the company's property … made after the commencement of the winding up is, unless the Court otherwise orders, void." Companies Act § 99 (2016 Revision).  As Plaintiff noted, the Court reviewed the Companies Act § 99 and concluded that, following the commencement of the Cayman Liquidation, "all authority to dispose of or transfer PPVA's property vested in the Liquidators and became subject to the

approval of the Cayman Court." [SJ Decision, Doc. 44, p. 11; *see also* Plaintiff Response, Doc. 142, p. 7].

Thus, Defendant's argument that the Amended Separation Agreement—which predates the Cayman Petition Date—somehow grants Goldberg sole dispositive rights over the PPVA Warrant post-petition is inconsistent with the applicable law.    Furthermore, the Court also rejects Defendant's argument that Goldberg's dispositive rights over the PPVA Warrant are independent of his right to receive beneficial ownership of the same.  Because the Court has already held that Goldberg did not hold any live right to receive the PPVA Warrant as of the Cayman Petition Date, any argument that Goldberg nonetheless retains control over the disposition of that warrant following the Cayman Liquidation's commencement, including on the Chapter 15 Filing Date, is without merit. [*See* SJ Decision, Doc. 44, pp. 15–20].

Accordingly, notwithstanding the "sole voting and dispositive rights" provision in the Amended Separation Agreement, the Court finds that the PPVA Warrant was property of Plaintiff's estate as of the Chapter 15 Filing Date.  Plaintiff could sell the PPVA Warrant without Defendant's permission, and the Amended Separation Agreement does not negate, or reduce in any way, the value of the PPVA Warrant.  Therefore, Plaintiff is entitled to recover damages for Goldberg's misappropriation of the PPVA Warrant.

### b.  <u>Plaintiff's Expert Valuation of the PPVA Warrant</u>

To determine the appropriate damages for Plaintiff, the Court begins with Plaintiff's proposed valuation of the PPVA Warrant.  As mentioned *supra*, Section (I)(B), Plaintiff offered Steven Napier—a valuation expert—as its expert witness and submitted the Napier Report in connection with the Damages Trial. [*See* Napier Report, Doc. 104-1].  According to the Napier Report, which used a fair market value approach and applied certain discounts for exercising the warrant, a prospective buyer would value the PPVA Warrant at $4,069,186.06 as of the Valuation

Date (October 17, 2016). [*See* Napier Report, Doc. 104-1, p. 5]. Plaintiff therefore argues that it is entitled to at least $4,069,186.06 in damages for Goldberg's misappropriation of the PPVA Warrant. [*See* Plaintiff PTB, Doc. 140, pp. 1–2].

Defendant counters the Napier Report's valuation with an alternative valuation report prepared by Goldberg (the "**Goldberg Report**") as a nonretained valuation expert, which was admitted into evidence at the Damages Trial. [*See* Goldberg Report, Doc. 117-1; *see also* November 20 Trial Tr., Doc. 135, 5:19–6:2]. The Goldberg Report disagrees with the Napier Report's conclusion, raises seven arguments as to why the Napier Report's valuation is inaccurate,[5] and alleges that "no reasonable investor would purchase the [PPVA] Warrant" considering the uncertainties of return on the investment. [*See id.*, pp. 15–16]. Echoing the Goldberg Report, Defendant argues that "fair market value valuation of the [PPVA] Warrant … was not a relevant measure of the value of PPVA's interest in the [PPVA] Warrant at [the Valuation Date.]" [*See* Defendant Response, Doc. 141, pp. 13–15]. Additionally, in the post-trial briefing, Defendant also raises certain "additional considerations" and argues that the Napier Report's valuation is inaccurate because: (i) as part of the Cayman Liquidation, the Liquidators are required to sell the estate's other Navidea shares, and such other sales would affect the price of the PPVA Warrant; (ii) Navidea recognized Goldberg as the PPVA Warrant's owner and would

---

[5]    Specifically, the Goldberg Report argues that the Napier Report: (1) did not consider the Amended Separation Agreement, which "gave [Goldberg] full dispositive power over the [PPVA Warrant]"; (2) assumes that a potential purchaser "would immediately exercise the [PPVA] Warrant and sell the [u]nderlying shares" after the six-month holding period, which was impossible due to Goldberg's "sole dispositive rights over the [PPVA] Warrant"; (3) assumes that PPVA would sell the PPVA Warrant, and not exercise the PPVA Warrant before the selling underlying shares;  (4) assumes that the PPVA Warrant would be sold to a purchaser not subject to the warrant's blocker provisions, which "prevented [the PPVA Warrant's] exercise if the exercise would result in the exercising party owning more than 4.99% of Navidea's common stock"; (5) assumes that Navidea would register the PPVA Warrant's underlying shares upon the warrant's exercise and expiration of the six-month restricted period, despite the assertion that Navidea recognizes Goldberg's alleged ownership over the PPVA Warrant and "would not permit anyone else to exercise the [PPVA] Warrant, [or] take possession of the [u]nderlying [s]hares"; (6) did not consider that the PPVA Warrant had another beneficial owner — Goldberg; and (7) assumes that PPVA was entitled to sell the PPVA Warrant on the Valuation Date. [Goldberg Report, Doc. 117-1, pp. 10–15].

not immediately register the PPVA Warrant's underlying shares upon exercise by another party; (iii) investors "savvy enough to consider purchasing a warrant for [more than] five million shares of Navidea stock" would likely negotiate a discount for the PPVA Warrant; and (iv) no reasonable investor would pay market price for the PPVA Warrant because of the availability of freely tradeable registered Navidea shares on the market. [*See* Defendant PTB, Doc. 139, pp. 21–22]. Defendant thus argues that Plaintiff "failed to meet its burden of proof … to establish by a preponderance of evidence the value of PPVA's estate's interest in the [PPVA Warrant]" as of the Valuation Date. [*See* Defendant Response, Doc. 141, p. 13].

Before addressing Defendant's arguments regarding the Napier Report's valuation of the PPVA Warrant, the Court finds that Plaintiffs' proposed Valuation Date is the appropriate date for damages valuation. Indeed, the parties do not dispute the Valuation Date's validity,[6] and the law is clear that in property turnover claims, the subject property's value is determined at the time that the property was transferred away from the debtor. *See P & Z Island Farms, Inc.*, 478 F. Supp. at 534–35. Furthermore, considering that the Court had already determined that Goldberg had no live legal right over the PPVA Warrant as of the Valuation Date, the Court also finds that the Liquidators were free to sell and deliver the PPVA Warrant to a willing buyer on the Valuation Date. [*See supra*, Section A(2)(a); *see also* SJ Decision, Doc. 44, p. 19]. Therefore, the Court finds that the fair market valuation approach employed by the Napier Report is the appropriate valuation method for the PPVA Warrant.

---

[6]     Although Defendant takes issue with Plaintiff allegedly directing Napier to perform valuation using the Valuation Date, Defendant does not challenge the Valuation Date's validity in his arguments. [*See* Defendant Response, Doc. 141, pp. 9–10] (arguing that "PPVA's expert witness … readily admitted that he had not done a damages analysis but, rather, merely assumed that the valuation he did conduct could, at most, serve as one input into the issue of damages, not an assessment of an amount PPVA was entitled to at trial…. In reality, it was PPVA, not Napier or his firm that dictated the Valuation Date he would use.").

Regarding Defendant's argument (i) that the Napier Report failed to consider the Liquidators' potential sale of other Navidea stock affecting the PPVA Warrant's price, the Court is not convinced that potential issue would undermine the Napier Report's proposed valuation. Indeed, notwithstanding this allegation, Defendant did not provide a precise alternative valuation for the PPVA Warrant with adjustments for this alleged concern.  [*See* Defendant PTB, Doc. 139, p. 21; *see also* Goldberg Report, Doc. 117-1, pp. 12–13].  In addition, as Plaintiff noted in its response, Defendant did not introduce any evidence nor testimony at the Damages Trial concerning this issue.  [*See* Plaintiff Response, Doc. 142, pp. 19–20] ("Goldberg did not testify, and no evidence was introduced at trial, concerning the number of Navidea shares the Liquidators held or how that would affect the price of Navidea common stock.").  Since this argument is not supported by evidence or an alternative valuation, the Court finds Defendant's concern here speculative at best.

Further, regarding Defendant's argument (ii) that the Napier Report incorrectly assumed that Navidea would register the PPVA Warrant's underlying shares, the Court notes that such argument relies on the assumption that Goldberg had sole dispositive rights over the PPVA Warrant.  [*See, e.g.,* Defendant PTB, Doc. 139, pp. 19–22; Defendant Response, Doc. 141, pp. 13–15; *see also* Goldberg Report, Doc. 117-1, pp. 10–15].  However, the Court has already found that Goldberg did not have sole dispositive rights over the PPVA Warrant as of the Cayman Petition Date.  [*See supra*, Section III(A)(2)(a)].  As a result, the Court also rejects argument (ii) as it has already rejected the dispositive rights argument.

Lastly, the Court also rejects Defendant's arguments (iii) and (iv), which allege that the Napier Report's proposed valuation failed to consider that sophisticated investors would negotiate a discount and not pay market price for the PPVA Warrant.  Contrary to Defendant's allegations,

Plaintiff's proposed valuation of the PPVA Warrant is not at "market price," as the Napier Report

had applied a "Discount for Lack of Marketability ('DLOM') based upon any restrictions

associated with the [PPVA Warrant]" in its valuation analysis. [Napier Report, Doc. 104-1, p. 9].

In calculating the applicable DLOM for the PPVA Warrant, the Napier Report considered factors

such as the PPVA Warrant's blocker provision, the holding period restrictions and the block size

of the underlying Navidea stock, and the volatility of Navidea common stock. [*See id.*, pp. 18–

25]. After calculating the range of applicable DLOM discounts using different techniques, Napier

took the midpoint value of those discount rates to compute the PPVA Warrant's fair market value

in his report. [*See id.*, p. 25; *see also id.* Ex. A.1 (Valuation Analysis Calculations)]. At the

Damages Trial, Napier testified, and Defendant did not object when it was explained that the

Napier Report's calculations of the DLOM discounts for the PPVA Warrant followed "the most

commonly utilized techniques in the profession." [*See* Nov. 19 Trial Tr., Doc. 136, 35:2–41:14].

Because Defendant's allegations are contradicted by evidence and by Napier's sworn testimony,

the Court does not find Defendant's unsupported arguments to be a credible challenge to the Napier

Report's valuation of the PPVA Warrant.

Having considered and rejected each of the Defendant's arguments challenging the Napier

Report's proposed valuation, the Court finds the Napier Report's analysis credible, and that its

valuation of the PPVA Warrant reasonable. Accordingly, the Court finds that Plaintiffs' proposed

valuation of the PPVA Warrant at $4,069,186.06 as of the Valuation Date is the appropriate

calculation of damages for the instant property turnover claim.

### B. Prejudgment Interest

The Court must also determine whether Plaintiff is entitled to prejudgment interest on its

claim, and if so, what that amount should be. Plaintiff argues that "in this Circuit . . . federal courts

have discretion to award prejudgment interest in a turnover action." [Plaintiff PTB, Doc. 140, p. 25]. In support of its argument, Plaintiff cites to three Southern District of New York cases where prejudgment interest was awarded. [*Id.*]

In the first case, *In re Tapmasters Chelsea, LLC*, the court awarded prejudgment interest to debtor-plaintiff on a default judgment against defendant who refused to return a $29,000 deposit to debtor-plaintiff for a project that defendant never actually completed. *In re Tapmasters Chelsea, LLC*, 621 B.R. 580, 582–83 (Bankr. S.D.N.Y., 2020). The court noted that "federal courts have discretion to award prejudgment interest in a turnover action," finding such award to be "necessary to compensate [debtor] fully for the lost use of funds from and after the date on which the funds should have been returned." *In re Tapmasters Chelsea, LLC*, 621 B.R. at 584.

In the second case cited by Plaintiff, *In re FKF 3, LLC*, the District Court found that the debtor, as plaintiff, was "entitled to a discretionary award of prejudgment interest on its turnover/conversion claim because [p]laintiff was deprived of the use of the wrongfully converted funds as a result of [defendant]'s conduct." *In re FKF 3, LLC*, 2018 WL 5292131, at *16 (S.D.N.Y., 2018). The *FKF 3* court stated that "the purpose of prejudgment interest is not to punish [d]efendants or to provide [p]laintiff with a windfall, rather prejudgment interest is an element of [the plaintiff's] complete compensation that aims to make the plaintiff whole." *Id.* at *12 (internal quotations omitted). The court further found that "an award of prejudgment interest in this case will more adequately compensate Plaintiff for the lost value of the funds it would have been entitled to." *Id.* at *13.

Finally, Plaintiff cites *In re Pali Holdings, Inc.*, where the Chapter 7 trustee, as plaintiff, was awarded prejudgment interest on a turnover claim "at the contract rate of 8%" that was

24

originally owed per annum along with repayment of the note's principal. *In re Pali Holdings, Inc.*, 491 B.R. 389, 395 (Bankr. S.D.N.Y. 2013).

Here, Plaintiff argues that its claims accrued on October 17, 2016—the date that Defendant misappropriated the warrant [SJ Decision, Doc. 44, pp. 6, 20]—and that Plaintiff is entitled to prejudgment interest on the claim since that date, as "[t]he deprivation of PPVA's own property has been compounded by the subsequent near-complete dissipation of value of that underlying property in the ensuing years." [Plaintiff PTB, Doc. 140, pp. 26–27].

Defendant argues that "PPVA has not established its right to damages in any amount . . . [and that PPVA] is not entitled to prejudgment interest because there should be no damages award based on which to award or calculate such interest." [Defendant Response, Doc. 141, pp. 19–20]. Defendant further argues alternatively that "if PPVA is awarded any amount as compensatory damages for the estate's interest in the Warrant as of the date of the assignment of the Warrant to Dr. Goldberg, that award would already represent a windfall in that if PPVA had held that right until trial it would be essentially worthless." [Defendant Response, Doc. 141, pp. 20–21]. Finally, Defendant argues that this adversary proceeding "is clearly a turnover proceeding within the meaning of the Bankruptcy Act" and not a proceeding for unjust enrichment or conversion, and thus "PPVA should not be permitted to argue for prejudgment interest based on those claims under the circumstances here." [*Id.* at p. 21].

As to whether to grant prejudgment interest at all, the Court agrees with Plaintiff that, based on the facts and arguments presented here, and the caselaw cited, Plaintiff is entitled to prejudgment interest. In addition to being deprived of the value of the warrant at the time it was improperly transferred to Goldberg, PPVA has gone almost nine years without being able to realize the value of the warrant for its estate and creditors in the Cayman Liquidation. Awarding

prejudgment interest would account for this near decade of time without this asset, thus "mak[ing] the plaintiff whole." *In re FKF 3, LLC,* 2018 WL 5292131, at *12.

The Court must also determine the interest rate to be applied. Addressing Defendant's argument regarding characterization of Plaintiff's claim as a turnover claim, rather than a claim for conversion or unjust enrichment, the Plaintiff MSJ sought the following relief:

> PPVA respectfully request[s] that the Court grant it summary judgment and enter an order that (i) directs Goldberg to turn over the value of the PPVA Warrant as of October 17, 2016, plus prejudgment interest; or alternatively (ii) holds Goldberg liable for conversion damages totaling the value of the PPVA Warrant as of February 8, 2017, plus prejudgment interest and punitive damages; or (iii) finds that Goldberg was unjustly enriched by the transfer of the PPVA Warrant to him in the amount of the value of the PPVA Warrant improperly transferred to him on October 17, 2016, plus prejudgment interest.

[Plaintiff MSJ, Doc. 23, p. 24]. In the SJ Decision, the Court granted "summary judgment in favor of the Liquidators in connection with the turnover of the value of the PPVA Warrant pursuant to sections 1521(a)(5) and 1521(a)(7) of the Bankruptcy Code and (ii) den[ied] the cross-motion for summary judgment filed by Goldberg." [SJ Decision, Doc. 44, p. 20]. Thus, of the three forms of alternative relief sought by Plaintiff, this Court granted summary judgment only as to the turnover claim.

Nevertheless, Plaintiff asserts that as both its conversion and unjust enrichment claims are New York state law claims, New York law should be applied to determine prejudgment interest on its turnover claim. [Plaintiff PTB, Doc. 140, p. 26]. The Court agrees, applying the same reasoning used by the court in the *Tapmasters* case. In that case, the plaintiff alleged alternative turnover and unjust enrichment claims, and the court granted a default judgment only as to the turnover claim but calculated prejudgment interest at the New Jersey state law interest rate:

> The Court has discretion in selecting an appropriate interest rate at which prejudgment interest may be awarded on a turnover claim. One option is to use the applicable federal judgment rate. Another option is to use the relevant prejudgment

interest rate under state law. A turnover claim is asserted as a matter of federal bankruptcy law, but the underlying property rights that are enforced through a turnover claim are governed by state law, and so there may be some sense (at least in this case) to the use of a state's interest rate in calculating prejudgment interest.

*In re Tapmasters Chelsea, LLC*, 621 B.R. at 584.  Plaintiff argues that it is "entitled to the prejudgment interest rate of 9%, due to this case's connection to New York." [Plaintiff PTB, p. 27].  The Court agrees, as this comports with NY Civil Practice Law & Rules § 5004, which states that "[i]nterest shall be at the rate of nine per centum per annum, except where otherwise provided by statute."  NY CPLR § 5004.  *See also In re FKF 3, LLC*, 2018 WL 5292131 at *13 ("Under New York law, '[i]nterest shall be at the rate of nine per centum per annum, except where otherwise provided by statute.'") (quoting N.Y. C.P.L.R. § 5004).

Since the Court is granting prejudgment interest at the nine percent New York statutory rate, the final question to determine is what dates should be used to calculate the amount of prejudgment interest.  Plaintiff asserts the amount of prejudgment interest awarded should be $3,052,224.00. [Plaintiff PTB, Doc. 140, p. 27].  Plaintiff reached this number using the date the PPVA Warrant was misappropriated—October 17, 2016—and the day Plaintiff submitted the Plaintiff PTB—February 14, 2025—as the end date.  [*Id.*]

The Court agrees with Plaintiff's calculation using this time period.  As to the start date, the court in *FKF 3* found the appropriate date to commence calculation of prejudgment interest for a turnover claim would be the petition date.  *See In re FKF 3, LLC*, 2018 WL 5292131 at *14; *see also Buchwald v. The Renco Grp., et al.*, No. 12-cv-7948 (AJN) (S.D.N.Y. Mar. 16, 2015) (Docket No. 342, p. 10) ("As the fraudulent conveyance claims here were only asserted in the bankruptcy context . . . the [c]ourt finds in its discretion that the date that the petition was filed is the appropriate date from which to commence prejudgment interest"); NY CPLR §5001(b) ("Interest shall be computed from the earliest ascertainable date the cause of action existed.").  The Cayman

27

Petition Date is August 23, 2016. [SJ Decision, Doc. 44, p. 5]. Given that the Cayman Petition Date had already passed at the time the improper transfer took place on October 17, 2016, Plaintiff's cause of action existed immediately upon this transfer of the PPVA Warrant to Goldberg. Thus, the October 17, 2016 date is the proper start date for calculating prejudgment interest.

As to the end date, prejudgment interest typically runs until a final judgment awarding prejudgment interest is issued. *See In re Tapmasters Chelsea, LLC*, 621 B.R. at 584, 587 (indicating the amount of damages to be awarded on the record of September 17, 2020 hearing but including prejudgment interest through to October 28, 2020, the date the opinion on prejudgment interest was issued); *In re Pali Holdings, Inc.*, 491 B.R. at 395 (awarding additional prejudgment interest for the duration between when summary judgment on liability was found and the subsequent decision solely on the issue of prejudgment interest). Here, Plaintiff seeks interest through the date of its post-trial submission. [Plaintiff PTB, Doc. 140, p. 27]. Given that the proposed February 14, 2025 date is prior to this final judgment awarding prejudgment interest, the Court finds February 14, 2025 appropriate as the end date for calculating prejudgment interest under the applicable law.

Accordingly, Plaintiff is awarded prejudgment interest on $4,069,186.06 in turnover damages at a rate of 9% per annum, not compounded, for the period of October 17, 2016 through and including February 14, 2025 (eight (8) years and 121 days), which amounts to $3,052,224.00.

## C. **Attorneys' Fees and Costs**

Both Plaintiff and Defendant argue that they are respectively entitled to have their attorneys' fees paid by the other party. [*See* Plaintiff PTB, Doc. 140, p. 27]; [Defendant PTB, Doc. 139, p. 24]. Defendant argues only that "PPVA's willful failure to prove that it suffered any

actual damages here should require PPVA to pay Dr. Goldberg his attorney fees and costs of this Trial." [Defendant PTB, Doc. 139, p. 24]. The Court's finding that Plaintiff indeed suffered significant damages, *see supra* Section III(A), defeats this argument, and thus the Court finds Defendant is not entitled to attorneys' fees.

Plaintiff asserts that it is entitled to an exception to the American rule that parties pay their own litigation costs [Plaintiff PTB, Doc. 140, p. 27], arguing that Defendant has acted in bad faith and sought to "delay judgment for the six-year period of this litigation" [*id.* at p. 30]. Plaintiff bases this argument primarily on Defendant's "three formal attempts to re-litigate the Court's determinations in its Summary Judgment Decision and Order." [*Id.* at p. 29]. Plaintiff asserts that (1) Defendant asked the Court to reconsider the SJ Decision immediately after it was issued [First Motion to Reconsider, Doc. 46], (2) Defendant sought leave to appeal the SJ Decision [Appeal Motion, Doc. 52], and (3) Defendant asked the Court to reconsider the SJ Decision again purportedly in light of new evidence [Second Motion to Reconsider, Doc. 65]. [Plaintiff PTB, Doc. 140, pp. 29–30]. All three forms of relief were denied. [*See* First Reconsideration Order, Doc. 50; Appeal Order, Doc. 57; Second Reconsideration Order, Doc. 96]. Defendant argues that "[t]his Court considered each of Dr. Goldberg's motions and denied them, but did not suggest that any of the motions were made in bad faith or were frivolous in any way." [Defendant Response, Doc. 141, p. 22].

Plaintiff further argues that "Goldberg's actions in October 2016 in blatant—and knowing—disregard of the exclusive authority of PPVA's court-appointed liquidators over PPVA's property" and refusal to return the Warrant to Plaintiff prior to the commencement of this lawsuit also constitute bad faith. [Plaintiff PTB, Doc. 140, p. 29]. Plaintiff relies on *Oliveri v. Thompson*, in which the Second Circuit held that "[b]ad faith may be found, not only in the actions

29

that led to the lawsuit, but also in the conduct of the litigation." *Oliveri v. Thompson*, 803 F.2d

1265, 1272 (2d Cir. 1986) (citing *Hall v. Cole*, 412 U.S. 1, 15 (1973); [*see also* Plaintiff PTB, Doc.

140, pp. 27–28].

However, in *Oliveri*, the court awarded payment of defendants' attorney's fees by

plaintiff's counsel because plaintiff's counsel had continued to prosecute a § 1983 action through

to trial even after it became clear that plaintiff had lied to counsel about the facts surrounding the

plaintiff's arrest. *See Oliveri*, 803 F.2d at 1270–71. On the issue of when to award attorneys' fees,

the Second Circuit found that "[a] different standard applies when a defendant prevails, for there

attorneys' fees may be awarded only if the court finds that the plaintiff's claim was frivolous,

unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so."

*Id.* at 1272 (internal citations omitted). In contrast, here, Goldberg has sought to defend legal

action prosecuted against him and subsequently sought to reverse a ruling against him.

Furthermore, in the *Hall* case, to which the *Oliveri* court cites, the United States Supreme

Court stated that "the underlying rationale of 'fee shifting' is, of course, punitive, and the essential

element in triggering the award of fees is therefore the existence of 'bad faith' on the part of the

unsuccessful litigant." *Hall*, 412 U.S. at 5. While the Court has disagreed with many of the

arguments made by Defendant throughout the course of this lawsuit, it does not find that his

litigation tactics have been carried out "in bad faith, vexatiously, wantonly, or for oppressive

reasons." *Oliveri*, 803 F.2d at 1272.

Finally, the Court finds that the damages it has awarded Plaintiff on the turnover claim and

accompanying prejudgment interest are sufficient remedies for Defendant's improper transfer of

the warrant and refusal to return. *See Supra*, Section IV(A) and IV(B). The Court believes that

these awards will sufficiently compensate PPVA's estate for its losses from Dr. Goldberg's misconduct.

Accordingly, Plaintiff's request that Defendant pay its attorneys' fees and expenses is denied.

### D. <u>Punitive Damages</u>

The final form of relief Plaintiff seeks against Defendant is punitive damages "in an amount to be determined by the Court." [Planitiff PTB, Doc. 140, p. 30]. Plaintiff's argument here significantly overlaps with the assertions it made in support of its request for attorneys' fees, including citing to Defendant's "formal attempts to re-litigate the Court's determinations in its Summary Judgment Decision and Order." [Plaintiff PTB, Doc. 140, p. 24]. Plaintiff also asserts that "Goldberg's conduct in knowingly converting PPVA's property justifies imposing punitive damages here, in an amount deemed appropriate by the Court." [*Id.*].

Plaintiff further references two emails sent to Platinum employees that led to the reassignment of the PPVA Warrant, where Defendant stated: "given the situation with the liquidation of Platinum and the Cayman Islands liquidator, no one at Platinum can transfer the shares committed to me in December 2013" and "[h]ere it is[,] put in whatever date you want." [Plaintiff PTB, Doc. 140, p. 23]. Plaintiff cites *Morales v. Kavulich & Assocs., P.C.* for its argument that "Goldberg's purported backdated assignment of the PPVA Warrant, and the subsequent exercise thereof, were malicious acts undertaken with knowing disregard of the powers of PPVA's liquidators over PPVA's property." [Plaintiff PTB, Doc. 140, p. 24] (citing *Morales v. Kavulich & Assocs., P.C.*, 294 F. Supp. 3d 193, 198 (S.D.N.Y. 2018). However, the court in *Morales* had granted summary judgment against the defendant attorney who had enforced a non-existing judgment against plaintiff, setting the issue of punitive damages for trial. *Morales¸* 294

F. Supp. 3d at 197–99.  Thus, the Court does not find that *Morales* supports Plaintiff's request for punitive damages.

Plaintiff further asserts that "punitive damages may be recovered *for conversion* where the conversion was 'accomplished by malice or reckless or willful disregard of the plaintiff's right.'" [Plaintiff PTB, Doc. 140, p. 22] (citing *Kubin v. Miller*, 801 F. Supp. 1101, 1122 (S.D.N.Y. 1992) (emphasis added here).  Plaintiff further asserts that an act is malicious if "it is done deliberately with knowledge of the plaintiff's rights and with the intent to interfere therewith."  [Plaintiff PTB, Doc. 140, p. 22] (quoting *Caballero v. Anselmo*, 759 F. Supp. 144, 153 (S.D.N.Y. 1991)).

Defendant responds that "PPVA argues that Dr. Goldberg acted with some form of malice and should be required to pay PPVA punitive damages based on two e-mails by Dr. Goldberg." [Defendant Response, Doc. 141, p. 3].  Defendant asserts that he "left the terms of the assignment up to Navidea and Platinum Management, and that he did not intend to engage in any form of misconduct and did not believe he did so in connection with the assignment of the Warrant." [Defendant Response, Doc. 141, pp. 3–4].

Here, the Court disagrees with Plaintiff for two reasons: first, as stated in Section (III)(B), *supra*, the Court granted summary judgment on Plaintiff's turnover claim, not its claim for conversion. Thus, there is no conversion claim for which judgment has been entered, upon which punitive damages for malice could be granted.  Second, the Court does not find, based on the record, that Defendant transferred the PPVA Warrant out of malice or with an "intent to interfere" with Plaintiff's rights.  Rather, the Court finds, based on the complete record before it, that Defendant transferred the PPVA Warrant solely for his own benefit, not to maliciously deprive Plaintiff of its value.

Accordingly, Plaintiff's request for punitive damages is denied.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff is awarded $4,069,186.06 in damages on its turnover claim, reflecting the value of the PPVA Warrant as of October 17, 2016.   Plaintiff is further awarded $3,052,224.00 in prejudgment interest from October 17, 2016 through February 14, 2025. All other relief sought by either party is denied.

**IT IS SO ORDERED.**

Dated: September 30, 2025
New York, New York

/S/ John P. Mastando III_____
THE HONORABLE JOHN P. MASTANDO III
UNITED STATES BANKRUPTCY JUDGE